**FILED**

Sep 1 0 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DOCKET

SEP 1 3 2004

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MARILYNN D. ALSDORF,                    )

               Plaintiff,          )

v.                                      )

THOMAS C. BENNIGSON,                    )

               Defendant.          )

# 04C 5953

Case No.

**JUDGE COAR**

MAGISTRATE JUDGE ASHMAN

## COMPLAINT FOR DECLARATORY JUDGMENT
## AND TO QUIET TITLE TO PERSONAL PROPERTY

### NATURE OF THE ACTION AND THE RELIEF REQUESTED

1.  Plaintiff, Marilynn D. Alsdorf ("Mrs. Alsdorf") has filed this action in accordance with 28 U.S.C. §§1655 and 2201 for Declaratory Judgment to Quiet Title in relation to the ownership of a painting by Pablo Picasso known as "Femme en Blanc" (the "Painting"). Mrs. Alsdorf and her husband purchased the Painting in good faith from the Stephen Hahn Gallery in New York, New York (the "Hahn Gallery") in 1976. The Hahn Gallery had purchased the Painting in good faith from a dealer in Paris, France in 1975. Mrs. Alsdorf currently maintains the Painting in Chicago.

2.  Defendant Thomas C. Bennigson ("Mr. Bennigson") claims that his right to possess the Painting is superior to Mrs. Alsdorf's and has demanded that Mrs. Alsdorf return it to him. Mr. Bennigson contends that in 1938 or 1939, his grandmother, Carlotta Landsberg–a German citizen residing in Berlin–owned the Painting and sent it to an art dealer in Paris, France for safekeeping. Claiming that Painting was looted from the art dealer by the Nazis during their occupation of Paris in World War II, Mr. Bennigson contends that neither the Hahn Gallery nor the Alsdorfs could have obtained good title in light of the theft of the Painting some 60 years ago and that as his grandmother's sole heir, the Painting belongs to him.

3.     Regardless of what Mr. Bennigson has claimed, whether he has a right to bring such a claim and whether such facts could be proven in court, Mr. Bennigson cannot divest Mrs. Alsdorf from the valid title that she has in the Painting.  Under the laws of the Nation of France, when the Hahn Gallery purchased the Painting in Paris in 1975, the Hahn Gallery acquired valid title to the Painting and a superior right of ownership against all others.  When the Hahn Gallery subsequently sold the Painting to Mr. and Mrs. Alsdorf, the Hahn Gallery passed valid title to the Painting to them.

4.     In this action, Mrs. Alsdorf seeks a declaration from this Court that she has valid title to the Painting removing the cloud Mr. Bennigson's claims have upon the Painting's title and that she has superior right, title and interest in the Painting as against all others, including Mr. Bennigson.

## PARTIES AND JURISDICTION

5.     Plaintiff, Marilynn D. Alsdorf, is an Illinois resident residing within this district.[1]

6.     Defendant, Thomas Bennigson, is a California resident.

7.     This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §1332 in that the value of the Painting exceeds $75,000.00 and the dispute is between a citizen of the State of California and a citizen of the State of Illinois.

8.     This Court has jurisdiction to grant the relief requested by Mrs. Alsdorf in accordance with 28 U.S.C. §1655 in as much as this is an action to clear a cloud on title to the Painting which is located within this district within the meaning of 28 U.S.C. §1655.

9.     This Court has _in_ _rem_ jurisdiction, as well as personal jurisdiction over Bennigson in accordance with 28 U.S.C. §1332 and 735 ILCS 5/2-301 in that he has been present in this judicial district in connection with his claims to the Painting.

---

[1] Mrs. Alsdorf's husband, James, with whom she purchased the Painting, died in 1990.

10. Venue is proper in this district pursuant to 28 U.S.C. §1391(a)(2) because Mrs. Alsdorf resides in this district and the Painting is located in this judicial district.

11. An actual controversy exists pursuant to 28 U.S.C. §2201 in that both Mrs. Alsdorf and Mr. Bennigson each contend that their claims of their right, title and interest in the Painting are superior to all others and that each is entitled to possess it.

## FACTS

### The Hahn Gallery's Acquisition of the Painting in France and Subsequent Sale of the Painting to the Alsdorf's

12. In 1975, New York art dealer Stephen Hahn purchased the Painting from the Renou & Poyet art gallery in Paris, France.

13. When he purchased the Painting in France, Mr. Hahn had no knowledge that the Painting had ever been stolen or that there was any irregularity about the history of the Painting. A true and correct copy of the Affidavit of Stephen Hahn is attached hereto as Exhibit A.

14. After Mr. Hahn purchased the painting in Paris, he shipped it from Paris to the Hahn Gallery in New York.

15. In 1976, Mr. and Mrs. Alsdorf purchased the Painting from the Hahn Gallery in New York.

### Bennigson's Adverse Claims to the Painting

16. On December 19, 2002, Mr. Bennigson filed a lawsuit against Mrs. Alsdorf, in the Superior Court of Los Angeles County, California in which he asserted that the Painting had been owned by his grandmother, Carlotta Landsberg, in Germany in the 1930's and requested, among other things, the Superior Court to order Mrs. Alsdorf to turn the Painting over to him (the "California State Action").

17. A true and correct copy of the Complaint Mr. Bennigson filed in the Superior Court of Los Angeles County, California is attached hereto as Exhibit B.

18.    In the Complaint he filed in the Superior Court of Los Angeles County, California, Mr. Bennigson asserts that in the 1930's, Mrs. Landsberg sent the Painting to an art dealer in Paris, France, named Justin Thannhauser. Mr. Bennigson further asserts that during World War II, the Painting was stolen from Mr. Thannhauser's home in Paris. Mr. Bennigson claims that he is the sole heir of Carlotta Landsberg, and that he is entitled to recover the Painting.

19.    On June 16, 2003, the Superior Court in the California State Action found that it lacked personal jurisdiction over Mrs. Alsdorf and granted Mrs. Alsdorf's Motion to Quash the Summons served on her (the "Quash Order").

20.    Mr. Bennigson appealed that Quash Order to the California Court of Appeal. On April 15, 2004, the California Court of Appeal affirmed the Superior Court's Quash Order.

21.    On July 28, 2004, the California Supreme Court accepted review of the California State Action. The parties are currently submitting briefs to the California Supreme Court.

22.    Notwithstanding the Superior Court's finding that it lacked personal jurisdiction over Mrs. Alsdorf, Mr. Bennigson's claim remains a cloud on the title to the Painting which has dissuaded potential buyers of the Painting from tendering offers to purchase it from Mrs. Alsdorf pending the resolution of Mr. Bennigson's adverse claims.

### The Laws of the Nation of France
### Regarding Title to Personal Property

23.    Over the course of its long history, the Nation of France has developed laws governing title to personal property, which are premised upon the policy of fostering social peace.

24.    Attached hereto as Exhibit C, and incorporated by reference herein is the affidavit of French law professors Saveur Vaisse and Annelies Sam-Simenot setting forth the provisions of French law which determine how title to personal property is acquired in France.

-4-

25.    By operation of French law as set forth in Exhibit C, when Mr. Hahn purchased the Painting in Paris, France in 1975, he acquired valid title to the Painting and a superior right of ownership against all others, including Mr. Bennigson.

26.    When Mr. and Mrs. Alsdorf purchased the Painting from the Hahn Gallery in 1976, Mr. Hahn passed valid title to the Painting to Mr. and Mrs. Alsdorf.

WHEREFORE, Plaintiff Marilynn D. Alsdorf prays that this Court:

a.    order Defendant, Thomas C. Bennigson, to appear or plead by a date certain in accordance with 28 U.S.C. §1655;

b.    order, declare and enter judgment in accordance with 28 U.S.C. §2201 that Mrs. Alsdorf has valid title to the Painting and a superior right of ownership as against all others, including Defendant Thomas Bennigson; and

c.    order such further and other relief as this Court deems just and equitable.

MARILYNN D. ALSDORF, Plaintiff

By:_____
        One of Her Attorneys

Richard H. Chapman, Esq.
David M. Rownd, Esq.
Beth L. Hansher, Esq.
James L. Oakley, Esq.
FagelHaber LLC
55 East Monroe Street
40th Floor
Chicago, IL 60603
(312) 346-7500
Firm ID No. 90041

Stephen Hahn, being duly sworn, deposes and says:

1.  I am a retired art dealer. I now reside at 888 Cold Spring Road, Santa Barbara, California. I submit this affidavit to explain the background of my purchase and subsequent sale of a painting entitled "Femme En Blanc" by Pablo Picasso (hereafter "the Painting").

2.  I worked as an art dealer in New York City from 1953 until approximately 1991. From 1953 until 1976, I maintained galleries at various locations in New York City. From 1963 until 1976, I maintained a gallery at 960 Madison Avenue in New York City. After 1976, I worked as a private dealer, buying and selling works of art from my apartment, until 1986. From 1986 until 1991, I once again maintained a public gallery in New York City. I retired in 1991, and thereafter limited my commercial activity to selling works of art from my private collection. I am now fully retired and have been since 1996.

3.  As an art dealer, I specialized in French paintings of the 19th and 20th centuries. I had particular expertise in Impressionist and Post-Impressionist French paintings. I also accumulated one of the world's most important collections of the works of Jean Dubuffet, which I donated to the National Gallery in Washington in 1995.

4.  From 1980 through 1982, I served as President of the Art Dealers Association of America. During the 1970's, and again in the 1980's, I served on the Art Advisory Panel of the Internal Revenue Service, in Washington, D.C.

5.  In the course of my work as an art dealer, it was my frequent practice to acquire works of art in France. I visited galleries in Paris three or four times yearly to look for paintings. One of the galleries I visited was Renou & Poyet, at 164 Faubourg Saint-Honore in

Paris. Renou & Poyet was an old and highly respected gallery that was established in Paris prior to World War I. At the gallery, I dealt with Maurice Covo, the owner and manager. In my years as an art dealer, I purchased three paintings from this gallery.

6. At some point in early 1975, Mr. Covo contacted me and told me that he might be able to acquire the Painting. He asked if I was interested, and when I said yes, he said that he would try to acquire it for me. I told him to let me know when he had obtained it on consignment.

7. Mr. Covo later informed me that he had acquired the Painting, and I inspected it during a visit to Paris in June, 1975. Mr. Covo did not tell me from whom he had acquired it, but said merely that it had been acquired from a distinguished French private collection. In my experience as an art dealer, there is nothing unusual about one dealer declining to disclose to another dealer his source of paintings. Dealers try to protect their sources, and Mr. Covo's conduct toward me was consistent with what I believe to be standard practice both in Europe and the United States.

8. Mr. Covo never said anything to me about any irregularity in the history of the Painting, and he certainly never mentioned that it had been the product of looting or forced sale by the Nazis or anyone else. Had any of these issues been raised, I would never have purchased the Painting.

9. After inspecting the Painting, I agreed to buy it. The Painting appeared to be in excellent condition, and there was no question about its authenticity; it was reproduced in Volume 4 of the Zervos catalogue raisonne, at No. 389. Moreover, Renou & Poyet had an impeccable reputation. I purchased the painting in Paris for 630,000 French francs. The invoice

and an accompanying letter from Mr. Covo, both dated June 27, 1975, are attached as Exhibits 1 and 2 to this affidavit.

10.     After I purchased the painting, it was shipped in 1975 from Paris to my gallery in New York.

11.     Later in 1975, Mr. and Mrs. James Alsdorf visited my gallery in New York. Mr. and Mrs. Alsdorf were prominent collectors, and Mr. Alsdorf had served as President of the Art Institute of Chicago. I had previously sold the Alsdorfs two paintings by Henri Matisse.

12.     The Alsdorfs inspected the Painting at the gallery and agreed to buy it. After arranging for the Painting to be framed, I packed it and sent it to them in Chicago. My invoice to Mr. and Mrs. Alsdorf dated January 7, 1976, appears as Exhibit 3 to this affidavit.

13.     During the course of 2002, I became aware that the descendant of a German family has now claimed that the Painting was once his family's property and was improperly taken from them by the Nazis. I had never heard of this claim before 2002, and I certainly had not heard of it when I purchased the Painting from Mr. Covo or when I sold it to Mr. and Mrs. Alsdorf.

Dated: 5-J--03

By: _____

Stephen Hahn

Subscribed and sworn to before me this 5ᵗʰ day of _____, 2003

_____
Notary Public



JOHN QUITMAN HYDE V
Commission # 1367941
Notary Public - California
Santa Barbara County
My Comm. Expires Aug 4, 2006

# RENOU & POYET

## 164, FAUBOURG SAINT-HONORÉ
### 359 35-95

PARIS, *le* 27 Juin 1975

FACTURE N°256

DOIT : STEPHEN HAHN GALLERIES

960 MADISON AVENUE
NEW-YORK
U.S.A

P. PICASSO

" Femme en blanc "

Huile sur toile
Dimensions : 65 X 54
Signée et datée 1922
Bibl. P. Picasso par C. Zervos Vol. IV n°389,
Ed. Cahiers d'Art. Paris.

Valeur.................................. 630.000 F.F

SIX CENT TRENTE MILLE FRANCS

en votre aimable règlement          Marchandise exportée
                                     en franchise de T.V.A

Banque domiciliataire : B.N.P, 27 rue la Boetie

75008 Paris

Compte N°210.419

SOCIÉTÉ ANONYME AU CAPITAL DE 200.000 F

# RENOU & POYET

### 164, FAUBOURG SAINT-HONORÉ

### 359 35-95

PARIS, le 27 Juin 1975

Monsieur HAHN
Stephen Hahn Galleries
960 Madison Avenue
NEW-YORK

Cher Monsieur,

Nous avons l'avantage de vous remettre ci-joint, facture en double exemplaire du tableau de Picasso dont vous venez de faire l'acquisition.

A toutes fins utiles, nous joignons à la présente photos en blanc et noir de cette toile.

Comme convenu, nous prions ce jour, votre transitaire, la Maison Wingate & Johnstone, de procéder à l'exportation du tableau à votre adresse de New-York où il devrait parvenir dans les plus brefs délais.

Nous n'avons pas de raison de penser que cette exportation puisse être retardée ou faire l'objet d'une quelconque difficulté, mais si contre toute attente, cela devait se produire, nous ne manquerions pas de vous en aviser et de prendre en accord avec vous et notre commettant les mesures conservatoires propres à assurer la sauvegarde des intérêts de chacun.

Veuillez agréer, Monsieur, avec nos remercie-ments, l'expression de nos sentiments les meilleurs.



M. COVO

RENOU & POYET S.A.
Le Président Directeur Général

N°3613 MC/CC

SOCIÉTÉ ANONYME AU CAPITAL DE 100.000 F

09/06/2002  10:17    3126409902              ALSDORF INTL                          PAGE  02

# STEPHEN HAHN GALLERY

### 960 MADISON AVENUE

### NEW YORK, N.Y. 10021

January 7, 1976

Mr. and Mrs. James W. Alsdorf
301 Woodley Road
Winnetka, Illinois 60093

· · · · · · · · · · · · · · · · · · · · · · · · · · · ·

Pablo PICASSO            "Femme en Blanc"

                         Oil on canvas

                         25 ½ X 21 inches   (65 X 54 cm.)

                         Signed and dated 1922

Provenance:              Private Collection, Paris

Recorded and
reproduced:              Zervos, Volume IV, No. 389, page 160.

                                              $ 357,000.00

Full payment received by check, with thanks.

E. Randol Schoenberg (SBN 155281)
BURRIS & SCHOENBERG, LLP
12121 Wilshire Blvd., Suite 800
Los Angeles, CA 90025-1168
Tel: (310) 442-5559
Fax: (310) 442-0353
E-mail: randols@bslaw.net

Attorney for Plaintiff
THOMAS C. BENNIGSON

**ORIGINAL FILED**

DEC 1 9 2002

LOS ANGELES
SUPERIOR COURT

SUPERIOR COURT FOR THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

| | |
|---|---|
| THOMAS C. BENNIGSON, an individual,<br><br>             Plaintiff,<br><br>vs.<br><br>MARILYN ALSDORF, an individual; DAVID TUNKL dba DAVID TUNKL FINE ART, an individual; and DOES 1 THROUGH 10, inclusive,<br><br>    Defendants. | Case No. **BC287294**<br><br>VERIFIED COMPLAINT FOR REPLEVIN AND INJUNCTIVE RELIEF |

## INTRODUCTION

This action concerns a painting by Pablo Picasso known as "Femme en blanc" or "Femme assise" (the "Painting"), currently valued at over $10 million,

COMPLAINT FOR REPLEVIN AND INJUNCTIVE RELIEF

which was looted from Plaintiff Thomas Bennigson's family by the Nazis during World War II. Defendants have offered the Painting for sale in Los Angeles, California over the past year. During that time, Plaintiff first learned of the whereabouts of the Painting. Because Defendants have said they are immediately removing the Painting to Chicago, Plaintiff seeks injunctive relief keeping the Painting in this jurisdiction so that Plaintiff's claims can be fairly decided and the Painting can be returned to him as required by law.

1. Plaintiff THOMAS C. BENNIGSON ("BENNIGSON") is an individual residing in Oakland, California. BENNIGSON is the grandson and sole heir of Robert and Carlota Landsberg (the "Landsbergs"), who are now deceased. The Landsbergs were owners of a Painting by Pablo Picasso known as "Femme en blanc" or "Femme assise" (the "Painting") when they resided in Berlin, Germany. Robert Landsberg died in 1932.

2. After the Nazi takeover of Germany in 1933 Carlota Landsberg, who was Jewish and faced persecution

2

COMPLAINT FOR REPLEVIN AND INJUNCTIVE RELIEF

by the Nazis, made plans to escape Germany. She sent the Painting in 1938 or 1939 to the well-known art dealer, J. K. Thannhauser, in Paris for safekeeping. The Painting was subsequently looted by the Nazis from Mr. Thannhauser after the Nazi invasion of France in 1940. All efforts by Mrs. Landsberg and Mr. Thannhauser to locate and recover the Painting after World War II were unsuccessful, and the Painting remained "lost" until this year, although it had been included (with a picture) in an important catalogue of art looted by the nazis in France during the war.

3. Plaintiff is informed and believes, and based thereon alleges, that Defendant MARILYN ALSDORF ("ALSDORF") is a resident of Illinois. ALSDORF and/or her husband purchased the Painting in or about 1973 or 1975.

4. Plaintiff is informed and believes, and based thereon alleges, that Defendant DAVID TUNKL ("TUNKL") is an individual residing in Los Angeles, California. TUNKL does business as DAVID TUNKL FINE ART, located at 8428 Melrose Place, Los Angeles, California 90069.

BURRIS & SCHOENBERG, LLP
12121 Wilshire Blvd. Sta. 800
Los Angeles, CA 90025-1168
Tel: (310) 442-5559 Fax: (310) 442-0353
E-mail: randos@bslaw.net

3

COMPLAINT FOR REPLEVIN AND INJUNCTIVE RELIEF

5. Plaintiff is informed and believes, and based thereon alleges, that DOES 1 through 10, inclusive, whose identities are presently unknown to Plaintiff, have participated and contributed to the actions by Defendants described herein. Plaintiff sues these Defendants by their fictitious names and will amend this Complaint to allege their true names and capacities when they have been ascertained.

## FIRST CAUSE OF ACTION FOR REPLEVIN

### (AGAINST ALL DEFENDANTS)

6. Plaintiff incorporates here by reference the allegations in paragraphs 1 through 5, inclusive.

7. Plaintiff, as the sole heir of the Carlota Landsberg, is entitled to recover the Painting. Mrs. Landsberg never conveyed good title to the Painting to any third party. Therefore, Defendants do no have good title to the Painting.

8. Plaintiff and his grandmother Carlota Landsberg, who died in 1994, made reasonable efforts to locate the Painting after it was taken by the Nazis from Mr. Thannhauser but did not discover the

BURRIS & SCHOENBERG, LLP
12121 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025-1168
Tel: (310) 442-5559  Fax: (310) 442-0353
E-mail: randols@bslaw.net

4

COMPLAINT FOR REPLEVIN AND INJUNCTIVE RELIEF

1  whereabouts of the Painting until 2002.  In 1958, Mr.

2  Thannhauser wrote (in German) to Carlota Landsberg:

3      Dear Mrs. Landsberg,

4
5          As I remember very clearly, and
6  as I therefore can confirm to you in
   writing, in 1938 or 1939 you sent your
7  Painting by Picasso, of a woman, from
   the so-called classical period of the
8  artist, to me in my house in Paris, 35
9  Mirosmenil.  At this time, as we were
   forced to leave our home in Paris in
10  1939, your Picasso hung in the middle
   of a small wall.  Upon the occupation
11  of Paris in 1940, when we were no
12  longer in Paris and the house was
   closed, the entire contents of the
13  four-story building - and with it your
14  Painting - were stolen.  This was
   confirmed to us by the property
15  manager after the end of the war.
16  Further we heard from porter of the
   house on the occasion of a later visit
17  certain facts, revealing that during
18  the four day long violent German
   national socialist plundering
19  everything was taken out of the four-
20  story house during the night and
   placed in trucks.
21      Your Painting is pictured in
22  Christian Zervos' large Picasso work,
   Volume 4, No. 389, Page 160 with the
23  title "Femme en blanc" 1922, oil
24  Painting, 65:54 cm.  As you know, I
   have often tried to find a trace of
25  this oil Painting, as well as all of
26  the other property that disappeared at
   the same time, but until now without
27  success.
28      In conclusion may I especially

BURRIS & SCHOENBERG, LLP
12121 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025-1168
Tel: (310) 442-5559  Fax: (310) 442-0353
E-mail randols@bslaw.net

5

COMPLAINT FOR REPLEVIN AND INJUNCTIVE RELIEF

state that I have set forth the
foregoing to the best of my knowledge
and conscience.

9. For about the past year, the Painting has been in the possession of Defendant TUNKL in Los Angeles, California. TUNKL has offered the Painting for sale to the public from his gallery known as David Tunkl Fine Art, located at 8428 Melrose Place, Los Angeles, California, 90069.

10. Plaintiff is informed and believes, and based thereon alleges, that in 2002 Defendants transported the Painting to Paris for viewing by a potential purchaser.

11. As a result of the Paris viewing, the Art Loss Register in London, England was notified that the Painting was being offered for sale.

12. The Art Loss Register recognized that the Painting was on a list of Nazi-looted Paintings that had been lost since World War II. The Art Loss Register located and contacted Plaintiff and informed him that the Painting had been located and was being offered for sale. This was the first time that

BURRIS & SCHOENBERG, LLP
12121 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025-1168
Tel: (310) 442-5559 Fax: (310) 442-0353
E-mail: randob@bslaw.net

6

COMPLAINT FOR REPLEVIN AND INJUNCTIVE RELIEF

Plaintiff, or any member of his family, had learned of

the location of the Painting since 1939.

13. Plaintiff has made demands through the Art

Loss Register for compensation or a return of the

Painting, which demands have been refused by

Defendants.

14. As a result, Plaintiff has been damaged by

Defendants in the amount of approximately $10 million,

the current value of the Painting.  Plaintiff seeks

return of the Painting, or compensation for its loss,

from Defendants.

SECOND CAUSE OF ACTION FOR INJUNCTIVE RELIEF

(AGAINST ALL DEFENDANTS)

15. Plaintiff incorporates here by reference the

allegations in paragraphs 1 through 14, inclusive.

16. Plaintiff is informed and believes, and based

thereon alleges, that for most of the past year, the

Painting has been in the possession of TUNKL in Los

Angeles, California.

17. On December 18, 2002, TUNKL's attorney,

Stephen Bernard of Los Angeles, California, informed

BURRIS & SCHOENBERG, LLP
12121 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025-1188
Tel: (310) 442-5559 Fax: (310) 442-0353
E-mail: randols@bslaw.net

7

Plaintiff's attorney that the Painting was "on its way to Chicago."

18. Plaintiff believes that without preliminary injunctive relief, Defendants will move the Painting out of this jurisdiction, making recovery of the Painting more difficult for Plaintiff, who is a California resident.

19. Plaintiff also believes that Defendants wish to remove the Painting from California to avoid application of California Code of Civil Procedure 354.3 (effective January 1, 2003) which retroactively extends until December 31, 2010 the statute of limitations on all claims against museums and galleries concerning Nazi-looted artworks.

WHEREFORE, PLAINTIFF THOMAS C. BENNIGSON, PRAYS FOR RECOVERY FROM DEFENDANTS AS FOLLOWS:

1. For an order directing Defendants to return the Painting to Plaintiff, or to compensate him for the current value of the Painting;

2. For injunctive relief ordering Defendants not to remove the Painting from this jurisdiction and to

8

COMPLAINT FOR REPLEVIN AND INJUNCTIVE RELIEF

maintain the painting in this jurisdiction pending a

final determination of this action;

3.    For pre- and post-judgment interest on any

award;

4.    For costs of suit; and

5.    For any and all such further relief as the

Court may deem just and proper.

DATED:   December 19, 2002

                              BURRIS & SCHOENBERG

                              By: _____
                                 E. Randol Schoenberg
                                 Attorney for Plaintiff
                                 THOMAS C. BENNIGSON

BURRIS & SCHOENBERG, LLP
12121 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025-1168
Tel: (310) 442-5559  Fax: (310) 442-0353
E-mail: randole@bslaw.net

9

COMPLAINT FOR REPLEVIN AND INJUNCTIVE RELIEF

VERIFICATION

I, Thomas C. Bennigson, am the Plaintiff in the above-captioned action.  I declare under penalty of perjury that the foregoing facts are true and correct to the best of my knowledge and belief.  Executed this 18th day of December, 2002 in Oakland, California.


_____
Thomas C. Bennigson

10

COMPLAINT FOR REPLEVIN AND INJUNCTIVE RELIEF

# AFFIDAVIT OF SAUVEUR VAISSE
# AND ANNELIES SAM-SIMENOT

Sauveur VAISSE and Annelies SAM-SIMENOT depose and say :

1.    Sauveur VAISSE is a member of the Bar of Paris and a Professor of Law Emeritus at the School of Law of the University of Paris René Descartes. Annelies SAM-SIMENOT is a member of the Bar of Paris and "Maître de Conférences" of Law at the School of Law of the University of Paris René Descartes. We submit this affidavit in order to assist the Court in the determination of the content of French Law.

2.    We are fluent in French and English and for the purposes of our opinion we have reviewed the following documents :

- the complaint filed by Mr. Thomas C. BENNIGSON in case n° BC 287294 before the Superior Court of the State of California, County of Los Angeles

- the documents B1 to B250, B 393, B 394, B 416, B 417, B 429, B 430, B 437 to B 440, B 449 and B 450, produced by Mr. BENNIGSON

- the affidavit of Mr. Stephan HAHN and its attached exhibits, dated June 5, 2003

- photographs of the front and the back of the Painting

- the "Catalogue Général Illustré de l'oeuvre de Picasso", Volume IV, Paris, Editions Cahiers d'Art, published in 1971

For the purposes of this opinion, we are assuming that the facts contained in Mr. HAHN's affidavit and in the complaint of Mr. BENNIGSON are correct.

3.    Based on these elements and on our knowledge of French Law, it is our opinion that under French Law, Mr. HAHN, when he bought the Painting became the legal owner of it. The claims which have been made by Mr. BENNIGSON in his complaint do not change the fact that by operation of French Law, Mr. HAHN acquired under said Law, a valid title to the Painting he bought in Paris on June 27, 1975.

4.    Indeed, as set forth in more detail below, the French Law governing the property title Mr. HAHN acquired is found in two sources : (i) Articles 2279 and 2262 of the French Civil Code which apply generally to property titles and all claims for return of property, (ii) the special Ordinance of April 21, 1945, which was designed to address claims to property looted in France during World War II .

## FACTUAL BACKGROUND

5.    We have relied on the following facts set forth in the Plaintiff's claim and in the statement made by Mr. HAHN, as well as in the documents we have reviewed and which are mentioned in paragraph 2.

6.    Plaintiff is the heir of Mr. and Mrs. LANDSBERG, - who are now deceased -, and who were, according to the Plaintiff, the owners of a Painting by Picasso known as "Femme en blanc" ("Woman in white") 1922, (see Art Catalogues n° B85, B 230 and B 233 filed by the Plaintiff) when they resided in Berlin, Germany.

7.    In or around 1938 or 1939, Mrs. LANDSBERG, who was a German Jewish citizen, faced persecution by the Nazis and sent the Painting for safekeeping to a Parisian art-dealer, Mr. TANNHAUSER. After the invasion of France in 1940, the Painting, according to the Plaintiff, was subsequently looted by the Nazis in or around 1940 (or 1941) from Mr. TANNHAUSER's residence in Paris.

8.    After the War, Mr. TANNHAUSER filed a declaration with the French Authorities (the OBIP) to claim the restitution of property stolen by the Nazis, in case it had been recovered by the French State (Documents n° B 102 to B 167 produced by the Plaintiff).

On the inventory list of property seized by the Nazis at his residence in Paris, which Mr. TANNHAUSER filed along with his claim for recovery to the OBIP, is mentioned a Painting by PICASSO, but with the title "Femme assise" ("Woman sitting") and dated "ca. 1921".

9.    Mr. Stephen HAHN had acquired the Painting for the price of 630.000 French Francs on June 27, 1975, from the Gallery RENOU & POYET in Paris, where it was put on display to the public for sale. According to the letter sent by the Gallery RENOU & POYET to Mr. HAHN on June 27, 1975, (exhibit 2 of Mr. HAHN's statement), the Painting was exported from France to the United States by a freight forwarding company (Winston & Johnston) and that it was duly declared to the French customs. (Document B 90 submitted by the Plaintiff).

10.    According to Mr. HAHN's affidavit, the owner and manager of the Gallery RENOU & POYET, Mr. COVO, told Mr. HAHN that he acquired it from "a distinguished French private collection" without revealing the name of this collector, in accordance with a common practice in the art business.

11.    According to Mr. HAHN's affidavit the present owners, Mr. and Mrs. ALSDORF, have purchased the Painting from Mr. HAHN on January 7, 1976, for the price of 357.000 US$, at Mr. HAHN's Gallery in New York, where it was put on display for sale.

12.    According to documents n° B 393 and B 394 produced by the plaintiff, at the request of the Galerie THOMAS, München, the Art Loss Register carried out a search of its database in April 2001, and advised Gallery THOMAS that the Painting was *"not listed on the ALR database as having been stolen, nor has the work been reported to us as a theft in forced sales during World War II".*

However, in 2002, on request of Mr. Didier IMBERT, acting on behalf of a client, the Art Loss has conducted an extensive search in international archives and concluded that the Painting was looted during the War by Nazis (Documents B417, and B 437 to B 439 produced by Mr. BENNIGSON).

## APPLICABLE FRENCH LAW

13.    Because Mr. HAHN bought the Painting in Paris on June 27, 1975, the sales agreement and the property title acquired by Mr. HAHN are ruled by French Law.

Indeed according to Article 1583 of the French Civil Code (Exhibit n°1)
« *It (the sale) is perfect (complete) between the parties, and the property is acquired by the buyer in respect of the seller, at the moment that they have agreed on the item and the price, notwithstanding the item not having been delivered or the price paid.* »

Thus Mr. HAHN immediately acquired under French Law the property title on the Painting when he bought it in Paris from the Gallery RENOU & POYET, even if it was not yet delivered to him or the price was not yet paid.

Furthermore, according to French Rules of Conflict on the Law applicable to international sales of moveable and tangible goods, - which result from the Convention of The Hague of 1955 – if the contracting parties did not expressly declare which Law governs the sales,

« *the sale is ruled by the internal Law of the Country where the seller has his usual residence at the time he received the order.* » (Exhibit n°2 : Convention of The Hague of 1955 on the Law applicable on international sales of moveable and tangible goods).

The Convention of The Hague became French internal Law and applies to sales which took place in France regardless the nationality and residence of the contracting parties (Exhibit n°3 : Y. LOUSSOUARN and J.D. BREDIN : « Droit du Commerce International », Sirey, paragraph 570, pp 663-664).

The above mentioned rule determining the Law applicable on international sales thus applies even if the buyer or the seller has the nationality or resides in a country which is not a party to the Convention of The Hague.

In the present case, the Painting was bought by Mr. HAHN in the country of residence of the seller, the Gallery RENOU et POYET in Paris and it is thus French Law which applies to the sale and the property title acquired by Mr. HAHN.

14.    The French Law governing property titles and claims for recovery of lost and stolen personal property is found in :

3

i.    Article 2279 of the Civil Code, which applies when the possessor acquired a moveable property in "good faith", (A)

ii.    Article 2262 of the Civil Code, which applies when the possessor acquired property in "bad faith" (B)

iii.    finally, the Ordinance of April 21, 1945, which rules claims to property looted in France during World War (C), but which does not apply in the present case as explained below.

Under French Law Mr. HAHN acquired a valid property title on the Painting which cannot be challenged, whether under Articles 2279 or 2262 of the Civil Code. And even if the Ordinance of April 21, 1945, would apply - which it does not - the same conclusion must be made.

### A - Article 2279 of the French Civil Code

**15.**    According to Article 2279 of the French Civil Code :

*"In respect of movable properties, possession constitutes title".*

*"Nevertheless, a person who has lost an object, or from whom an object has been stolen, may claim it from the person in possession of it, during three years starting from the date of the loss or the theft; but the possessor has recourse against the person from whom he [she] received it".* (exhibit n°4).

Thus, according to this provision which applies to all movable property acquired in France, the person which holds such a property becomes the legal owner of it at the date he (she) takes possession of it.

Although, according to the second paragraph of Article 2279, the property title of the possessor may be challenged by a person who claims that he (she) lost the property or that it was stolen from him (her), during a period of three years starting from the date of loss or theft, these provisions of the Civil Code are a matter of substantive Law and not of procedural Law.

Indeed, the provisions address the way in which property title is acquired on moveable goods : three years after the date the present holder took possession of the object, his (her) property title becomes undisputable and the original owner who lost it or from whom it was stolen , has no longer any property rights to it.

The French Courts have confirmed that indeed the original owner from whom an object is stolen can no longer recover it from the present holder three years after the date of theft, even if it was impossible for him to locate the object before the expiration of the three year period (Court of Appeal of Paris, 1st Ch. A, March 24, 1999 – Exhibit n°5).

4

16.    It should also be noted that under numerous decisions rendered by the French Supreme Court *"good faith is required by the mode of acquiring* [property title] *provided for by Article 2279 of the Civil Code (…)"* (Cour de Cassation, 1ère Civ., 27 November 2001, Exhibit n°6),

but according to Article 2268 of the Civil Code : *"good faith is always presumed, and it is up to the one who alleges bad faith to prove it".* (Exhibit n°7)

The Supreme Court has constantly reaffirmed this principle by stating that the holder is presumed to be in good faith and that he does not have to prove the origin of the goods in his possession, since possession is equivalent to title (Cour Cass. civ. 1, June 11, 1991, Bull. civ. n°199, Exhibit n°8).

Furthermore, according to the Case-law,

-*"good faith is understood as the full and entire belief of the possessor at the time of the acquisition in the ownership of the person transferring the property to him"* (Court of Appeal of Paris, Exhibit n°5).


17.    In the present claim, the plaintiff claims that the Painting was stolen by the Nazis at Mr. TANNHAUSER's residence in Paris, in or around 1940-1941.

According to Mr. HAHN's affidavit and the attached exhibits, he bought the Painting on June 27, 1975, from the well-known gallery RENOU & POYET in Paris, of which the Manager, Mr. COVO, stated that he acquired the Painting from *"a distinguished French Private Collection".*

According to the first paragraph of Article 2279 of the Civil Code , Mr. HAHN thus acquired the property title on the Painting on the date he bought it.


18.    Furthermore, Mr. HAHN acquired a valid property title which cannot be challenged by the original owner Mrs LANSBERG, nor her heirs, under the provisions of the second paragraph of Article 2279 the Civil Code.

Indeed, it must be reminded that according to these provisions, the owner  from whom the Painting was stolen in or around 1940-1941 can only claim the restitution of it against a possessor in *"good faith"* within a period of three years, starting at the date it was stolen.

Indeed, *"good faith is presumed"* and it is for the Plaintiff, Mr. BENNIGSON, - in accordance with the above mentioned Article 2268 of the Civil Code - to bring evidence that Mr. HAHN, when he bought the Painting from the Gallery RENOU & POYET in 1975, was not in good faith.

Nothing in the Plaintiff's claim or in the documents he submitted suggests that Mr. HAHN acquired the Painting in *"bad faith".*

On the contrary, the only evidence, including Mr. HAHN's affidavit and exhibits, indicates that Mr. HAHN bought the Painting in "good faith", i.e. not knowing that it had been looted by the Nazis during World War II.

5

**19.** Indeed, first of all, Mr. HAHN apparently bought the Painting by PICASSO under "normal conditions" :

- the seller, the Gallery RENOU & POYET, is a very well-know and prestigious Parisian art-dealer ;

- Mr. COVO of the Gallery RENOU & POYET declared to Mr. HAHN that the Painting *"had been acquired from a distinguished private collection"* ;

- the Painting was put on public display ;

- the sales-price seemed to be in accordance with the market-value at that time ;

- the Painting was regularly exported from France to the United States, by a freight forwarding company, WINGATE & JOHNSTONE, with the authorisation of the French customs (exhibit n°2 of HAHN's statement and Document B90 filed by the plaintiff).

**20.** According to French case-law, professional art-dealers do not have an obligation to establish a list of all previous owners of an artwork. They only have to check the provenance if the origin seems to be suspect (Court of Appeal of Paris, 5 March 2002, Valton v/Couturier a.o. - Exhibit n°9).

In the present case, at the time Mr. HAHN acquired the Painting in 1975, there were no indications that the Painting was (or could have been) stolen by the Nazis.

The Painting is reproduced under n°389 in Volume IV of the Catalogue raisonné by ZERVOS published in 1971, which does not mention either that the Painting was looted during the War.

According to Document B 449 produced by the Plaintiff, Sarah JACKSON of the ART LOSS REGISTER examined the Painting in 2002 at Mr. David TUNKL's Gallery in Los Angeles Based on that examination, Ms. JACKSON dit not identify anything on the Painting which indicated to her that it had been seized by the Nazis.

The ART LOSS REGISTER was not created until 1991. Accordingly, at the time Mr. HAHN purchased the Painting, he could not consult the Art Loss Register to determine if it had an irregular history.

In April 2001, after having carried out a search, it stated that *"the above mentioned item* ["Femme en Blanc" by Picasso, 1922] *is not listed on the ALR database as having been stolen, nor has the work been reported to us as a theft in forced sales during World War II"* (Document B 394 produced by the Plaintiff).

It was only after the ART LOSS REGISTER conducted in 2002 an extensive research in archives internationally, that it concluded that the Painting was stolen by the Nazis (Documents B 417, B 429, B 30, B 437, B 438 and B 439 produced by the Plaintiff).

Thus, it seems very unlikely that Mr. HAHN, when he bought the Painting in 1975, could know or even suspect that the Painting was stolen by the Nazis.

21.    In accordance with Article 2268 of the Civil Code, Mr. HAHN must therefore be presumed as having acquired the Painting in good faith.

Since the Painting was stolen in or around 1940-1941, the original owner could thus not make a claim under the second paragraph of Article 2279 of the Civil Code against the possessor in good faith who acquired it in 1975.

**As a result, Mr. HAHN acquired on June 27, 1975, a valid and undisputable property title under Article 2279 of the French Civil Code.**

### B - Article 2262 of the Civil Code

22.    According to Article 2262 of the Civil Code :

*"All actions, both actions to enforce a right in personam and actions to enforce a right in rem, are barred after thirty years.*

*"A party who invokes this prescription is not obliged to produce a title and an objection deriving from bad faith cannot be enforced against him".* (Exhibit n°10)

The second paragraph of Article 2262 is a substantive Law according to which a possessor, either of movable goods or of real estate, who does not have a valid property title and/or who possesses in bad faith, becomes the legal owner, thirty years after the original owner was depossessed of the property.

Thus Article 2262 of the Civil Code allows possessors in bad faith to acquire title by prescription, which is called in French legal terms "usucapion".

Under Article 2268 of the Civil Code, "good faith" is always presumed and the person claiming title must bring evidence of the "bad faith".

23.    It should be added that according to Article 2229 of the Civil Code :

*"In order to prescribe, the possession must be continuous and not interrupted, peaceful, open, unequivocal and as an owner".* (Exhibit n° 11)

These provisions mean that the claimant must prove that the possessor does not meet the conditions of the acquisitive prescription provided for in Article 2262 and namely that the possessor did not act as if he/she were the rightful owner. The acquisitive prescription is retroactive to the date at which the possession started : the previous owner is considered to have lost the property title at the date he lost the possession of the property (C. Cass. 3ème civ. 10 July 1996, Bull. Civ. III n°186 – Exhibit n° 12).

7

24. Concerning the conditions laid down by Article 2229 of the Civil Code, first it should be noted that *"continuous and non-interrupted"* possession does not mean that the property should be held for thirty years by the same person.

Indeed, according to Article 2235 of the Civil Code : *"to complete the period of prescription, one may join to his period of possession, the one of its principal, in whichever manner one has succeeded, whether as a universal or particular heir, or whether for lucrative purposes or for a consideration."* (Exhibit n° 13)

This provision means that the last sub-purchaser, no matter for how long he possessed the object, becomes the legal owner, thirty years after the date at which the original owner was depossessed of it (C. Cass. civ. 3, April 17, 1996, Bull. Civ. III,n°107- Exhibit n° 14 and C. Cass. civ. 3, October 3, 2000, Legifrance- Exhibit n° 15) on the condition however that the successive holders of the item did not actively conceal it from the latter.

25. Secondly, *"peaceful, open and unequivocal possession"* does not require that publicity is given to the possession of the item.

It is for the plaintiff who claims title to bring evidence that the possessor of the sought-after object actively concealed it from him (Court of Appeal of Paris, 2nd Chamber, February 5, 1996, Wuillaume v/Mclerty - Exhibit n° 16 and Supreme Court, Civ. 1ère, June 11, 1991, VEYRAT a.o. v/Pascal - Exhibit n° 8).

The principle was also applied by the Court of Appeals of Paris in a case concerning a claim for return of looted property during the War (Court of Appeal of Paris, 1st Chamber B, March 30, 1990, de Chassaigne de Beaufort de Miramon Fitz James, Exhibit n° 17). Indeed, in this case, the Court held that the claimant could not recover on precious books looted during the War, on the grounds that the claimant failed to provide evidence, though the onus was on him, that the possession by the person holding the books was precarious and equivocal and that the alleged defect in possession may be inferred neither from the lack of proof of the initial acquisition of the books, nor from the holdings of the books after the War in a private library.

26. In the present case, even if Mr. BENNIGSON should bring evidence that Mr. HAHN acquired the Painting in bad faith (and did not therefore acquire a valid property title under the provisions of Article 2279 of the Civil Code), Mr. HAHN nevertheless acquired valid and indisputable title under aforesaid provisions of Article 2262 for the Civil Code.

The documents produced by Mr. BENNIGSON do not provide any evidence that the successive possessors of the Painting actively concealed it from the initial owner Mrs. LANDSBERG or her heirs.

Under Article 2262 of the Civil Code, it is for Mr. BENNIGSON to prove that these successive possessors actively concealed the Painting from him or Mrs LANDSBERG.

According to the above mentioned case-law, the successive owners of the Painting could keep it at a safe place without giving any particular publicity to it. Furthermore the Painting was published in the Catalogue raisonné of ZERVOS in 1971, it was put on public display by the Gallery RENOU & POYET in 1975, invoices were made for the sale to Mr. HAHN and it was openly and regularly exported from France with the authorization of the French Customs Authorities, and consistent with this openess, when Mr. HAHN brought the Painting to his Gallery in New York, he put it on display and sold it to Mr. and Mrs. ALSDORF with an invoice.

Thus there is no evidence that the Painting has been actively concealed from Mrs. LANDSBERG and/or Mr. BENNIGSON.

Mrs. LANDSBERG having been depossessed of the Painting in or around 1940-1941, under Article 2262, the person who possessed it in 1971- even if he was in bad faith - acquired valid property title  which could no longer be disputed.

Thus, the thirty year acquisitive prescription period was already completed when Mr. HAHN bought the Painting in June 1975.

Therefore, under Article 2262 of the Civil Code, Mr. HAHN acquired a valid and indisputable property title, even if it is proved that he and/or the previous owners were  in "bad faith".

### C - The ordinance of April 21, 1945

27.     In order to be complete, it should be mentioned that a special Ordinance was taken to rule on claims for recovery of property looted by the Nazis in France during the War, even though it does not apply in the present case.

Indeed, in principle, the Ordinance applies to all claims for recovery of property which was looted by the Nazis or the Authorities of the Vichy regime on the French territory, even though the depossessed owner did not have the French nationality and regardless the nationality and residence of the actual possessor, but the French Supreme Court made one exception to this rule.

It quashed a decision from an Appeal Court which decided that a person of Italian nationality and Jewish, whose property was looted by the Nazis in France, could benefit from the provisions of April 21, 1945.

The Supreme Court motivated its decision rendered in 1950 as follows :

"Whereas indeed the Ordinance of April 21, 1945, which was adopted while the hostilities were still going on, originates from the Ordinance of April 12, 1943, concerning the implementation of the declaration of the Allied Nations of January 5 of the same year, which aims at foiling the methods of expropriation employed by Governments, against which those Nations were at war, in countries which they assaulted and looted : _nationals of enemy countries were not among the persons protected by the aforesaid Declaration and as a consequence, are excluded from the benefit of the Ordinance of April 21, 1945._" (C. Cass. ch. civ. May 16, 1950 ; D. 1950, p. 493 - Exhibit n° 18).

q

It should be noted that the Declaration of the Allies of January 5, 1943, has the value of an international Treaty (to which the US are also a contracting party) which supersedes national French Laws.

Thus, in principle, French Law does not allow the claimant to obtain the annulment of the act of despoiliation of the Painting by Picasso committed by the Nazis during the war on the French territory, since, at that time, the rightful owner, Mrs. LANDSBERG, apparently had the German nationality.

This principle might seem unfair, since Mrs. LANDSBERG was apparently a victim of the persecution of Jews (as well as Mr. TANNHAUSER to whom she sent the Painting for safekeeping) but it was considered at that time that it was for the German State to compensate such victims.

According to documents produced by Mr. BENNIGSON, Mrs. LANDSBERG did indeed obtain damages from the German State for the loss of the Painting by PICASSO (Document B45 to B43).

However, even if the Ordinance of April 21, 1945 would have applied in the present case, Mr. HAHN's property title should still be considered as valid and indisputable.

28. The Ordinance n° 45/770 of April 21, 1945, provides that :

Art. 1 : *"Individuals or legal entities or their heirs and assigns whose properties, rights and interests have been disposed of, even if with their substantive assistance, as a consequence of seizures, provisional administration, management, liquidation, confiscation, or any other exorbitant ordinary-law measures in effect on June 10, 1940, and performed either by virtue of alleged laws, decrees and decisions, rules and regulations, or decisions of the de facto authority claiming to be the Government of the French State, or by or at the order of or upon inspiration of the enemy, may, on the basis of the order of November 12, 1943, relative to the nullity of acts of despoiliation perpetrated by or under the supervision of the enemy, or on the basis of the order or August 9, 1944, relative to the reestablishment of Republican Law on the mainland, cause to said measures to be declared null and void."* (Exhibit n° 19)

Article 10 of the Ordinance of April 21, 1945, rules on claims for return of tangible and moveable goods (such as a Painting) made by the legal owner against the person who acquired such a good which had been looted during the War :

*"In the case of tangible moveable property, application will be made, - with exception of the provisions of Article 2280 of the Civil Code -, of the second paragraph of Article 2279 of the same Code concerning lost or stolen moveable property. However, the deadline for claiming recovery will be one year starting at the legal date of cessation of hostilities".* (Exhibit n° 19)

The second paragraph of Article 2279 to which Article 10 of said Ordinance refers to, provides that :

*"(...) a person who has lost a thing or from whom a thing has been stolen may claim it for three years from the date of the loss or of the theft from the person in whose possession it is found ; but this individual has recourse against the person from whom he received it."* (Exhibit n°4)

10

The reason why the prescriptive period provided for by Article 10 of the Ordinance of April 21, 1945 (one year) is different than the one of Article 2279 of the Civil Code three years) and why Article 10 does not allow a claimant to be relieved from it, is because the Legislature wanted to liquidate as fast as possible the operation of return to dispossessed owners, so as to restore social peace.

Indeed, as Mr. Paul CHAUVEAU noted in his comments on the Ordinance of April 21, 1945, published in "La Semaine Juridique" of 1946 (n° I - 550 - Exhibit n°20) :

*"They (the Legislature) did not want that possessors (of looted property) remained too long uncertain about their rights with a threat of annulment hanging over their heads : it would have created an annoying public disorder. To this effect, a deadline has been imposed to file a claim for recovery."*

Persons who were unable to recover property which was looted during the War are entitled to obtain damages from the French State.

**29.**     It should be noted however that the Decree n°47-2105 of October 29, 1947, (Exhibit n° 21) has extended the deadline to file a declaration of despoiliation with the OBIP ("Office des Biens et Intérêts Privés" - Office of Private Property and Interests) until December 31, 1947.

Consequently the deadlines provided for by Article 10 of the Ordinance of April 21, 1945, to file a claim for annulment of an act of despoiliation or a claim for recovery against a purchaser or a sub-purchaser of looted tangible personal property has been extended and expired also on December 31, 1947, except if the present possessor is the French State or a public national Museum.

**30.**     Furthermore, the claimant cannot avoid this prescriptive period, even if it was impossible to locate the looted property before the expiration of the deadline set forth in Article 10 of the Ordinance of April 21, 1945.

Indeed, it is a principle of Law resulting from Article 2279 of the Civil Code (to which Article 10 of the Ordinance of April 21, 1945 refers) that after the expiration of the prescriptive period (which normally starts at the date the item was lost or stolen), the legal owner cannot make a claim for recovery against the current holder who purchased "in good faith" a stolen or lost good, even if it was impossible for the original owner to file his claim earlier (for example, because he could not locate the property earlier).

11

## CONCLUSION

**31.** It is our opinion that Mr HAHN when he bought the Painting in Paris in June 1975 acquired a valid and undisputable property title :

i. Indeed, according to Article 2279 of the French Civil Code "possession is equivalent to title" and the property title of a person who acquired moveable goods in "good faith" (being reminded that "good faith" according to Article 2268 of the Civil Code is always presumed and that it is for the claimant to bring evidence of "bad faith"), cannot be challenged by a previous owner three years after the date she/he lost it or at which it was stolen from him/her.

In the present case the Plaintiff has not brought evidence (or even alleged) that Mr HAHN when he acquired the Painting in 1975, knew that it had been stolen by the Nazis in or around 1940-1941. Therefore, Mr HAHN acquired a valid title which can not be challenged.

ii. Subsidiarily, even if the Plaintiff should bring evidence that Mr HAHN did not buy the Painting in "good faith', the latter's property title is valid and cannot be challenged, since Article 2262 of the Civil Code provides for an acquisitive prescription period of thirty years starting at the date of the loss or of the theft, in favor of possessors of "bad faith", which thus expired in or around 1970-1971.

iii. Finally, the Special Ordinance of April 21, 1945, concerning looted property during the War does not apply to claims for recovery of moveable and tangible property against private persons, which were brought after December 31, 1947.

Dated, 30 July 2004

Paris, France

Annelies SAM-SIMENOT          Sauveur VAISSE

12

## LIST OF EXHIBITS

1.     Article 1583 of the Civil Code

2.     Convention of The Hague of 1955 on the Law applicable on international sales of moveable tangible goods

3.     Y. LOUSSOUARN et J.D. BREDIN, « Droit du Commerce International, Sirey, paragraphe 570, pp. 663-664

4.     Article 2279 of the French Civil Code

5.     Court of Appeal of Paris, 1st Ch. A, March 24, 1999

6.     Supreme Court, , 1st civ., November 27, 2001

7.     Article 2268 of the Civil Code

8.     Supreme Court, 1st civ., June 11, 1991

9.     Court of Appeal of Paris, March 5, 2002, VALTON c/COUTURIER

10.     Article 2262 of the Civil Code

11.     Article 2229 of the Civil Code

12.     Supreme Court, 3rd Civ., July 10, 1996 Civ. III n° 186

13.     Article 2235 of the Civil Code

14.     Supreme Court Civ. 3, April 17, 1996, Bull. civ. III, n° 107

15.     Supreme Court Civ. 3, October 3, 2000, Legifrance

16.     Court of Appeal, 2nd Ch., February 5, 1996

17.     Court of Appeal of Paris, 1st B, March 30, 1990

18.     Supreme Court, Civ. Ch. May 16, 1950

19.     Articles 1 and 10 of the Ordinance of April 21, 1945

20.     Comment by Mr. Paul CHAUVEAU - Semaine Juridique 1946 - paragraph 73

21.     Decree n° 47-2105 of October 29, 1947

**Exhibit n° 1**

### Article 1583 of the Civil Code

It (the sale) is perfect (complete) between the parties, and the property is acquired by the buyer in respect of the seller, at the moment that they have agreed on the item and the price, notwithstanding the item not having been delivered or the price paid.



**Art. 1583** Elle est parfaite entre les parties, et la propriété est acquise de droit à l'acheteur à l'égard du vendeur, dès qu'on est convenu de la chose et du prix, quoique la chose n'ait pas encore été livrée ni le prix payé.

**Exhibit n° 2**

# CONVENTION

## on the Law applicable to sales of moveable and tangible goods with an international character

(...)

### Article 1

This Convention applies to sales of moveable and tangible goods with an international character.

(...)

### Article 2

The sale is ruled by the Law of the country which has been indicated by the parties.
This indication must be contained in a explicit clause or result indubitably from the provisions of the agreement.
(...)

### Article 3

In the absence of a Law declared to be applicable by the parties, under the conditions set forth in the previous Article, the sale is ruled by the internal Law of the country where the seller has his usual residence at the moment he received the order. (...)

**(...)**

### Article 7

The contracting States have agreed to introduce the provisions of Articles 1-6 of this Convention into the National Law of their respective countries.

**(...)**

# CONVENTION

## SUR LA LOI APPLICABLE AUX VENTES A CARACTÈRE INTERNATIONAL D'OBJETS MOBILIERS CORPORELS

———

Les États signataires de la présente convention,

Désirant établir des dispositions communes concernant la loi applicable aux ventes d'objets mobiliers corporels,

ont résolu de conclure une convention à cet effet et sont convenus des dispositions suivantes :

### Article 1er

La présente convention est applicable aux ventes à caractère international d'objets mobiliers corporels.

Elle ne s'applique pas aux ventes de titres, aux ventes de navires et de bateaux ou d'aéronefs enregistrés, aux ventes par autorité de justice ou sur saisie. Elle s'applique aux ventes sur documents.

Pour son application sont assimilés aux ventes les contrats de livraison d'objets mobiliers corporels à fabriquer ou à produire lorsque la partie qui s'oblige à livrer doit fournir les matières premières nécessaires à la fabrication ou à la production.

La seule déclaration des parties relative à l'application d'une loi ou à la compétence d'un juge ou d'un arbitre, ne suffit pas à donner à la vente le caractère international au sens de l'alinéa 1er du présent article.

### Article 2

La vente est régie par la loi du pays désigné par les parties contractantes.

Cette désignation doit faire l'objet d'une clause expresse ou résulter indubitablement des dispositions du contrat.

Les conditions relatives au consentement des parties, quant à la loi déclarée applicable, sont déterminées par cette loi.

### Article 3

A défaut de loi déclarée applicable par les parties, dans les conditions prévues à l'article précédent, la vente est régie par la loi interne du pays où le vendeur à sa résidence habituelle au moment où il reçoit la commande. Si la commande est reçue par un établissement du vendeur, la vente est régie par la loi interne du pays où est situé cet établissement.

Toutefois, la vente est régie par la loi interne du pays où l'acheteur a sa résidence habituelle, ou dans lequel il possède l'établissement qui a passé la commande, si c'est dans ce pays que la commande a été reçue soit par le vendeur, soit par son représentant, agent ou commis voyageur.

S'il s'agit d'un marché de bourse ou d'une vente aux enchères, la vente est régie par la loi interne du pays où se trouve la bourse ou dans lequel sont effectuées les enchères.

### Article 4

A moins d'une clause expresse contraire, la loi interne du pays où doit avoir lieu l'examen des objets mobiliers corporels délivrés en vertu de la vente est applicable, en ce qui concerne la forme et les délais dans lesquels doivent avoir lieu l'examen et les notifications relatives à l'examen ainsi que les mesures à prendre en cas de refus des objets.

### Article 5

La présente convention ne s'applique pas :

1° A la capacité des parties;

2° A la forme du contrat;

3° Au transfert de propriété, étant entendu toutefois que les diverses obligations des parties, et notamment, celles qui sont relatives aux risques, sont soumises à la loi applicable à la vente en vertu de la présente convention;

4° Aux effets de la vente à l'égard de toutes personnes autres que les parties.

### Article 6

Dans chacun des États contractants, l'application de la loi déterminée par la présente convention peut être écartée pour un motif d'ordre public.

### Article 7

Les États contractants sont convenus d'introduire les dispositions des articles 1-6 de la présente convention dans le droit national de leurs pays respectifs.

### Article 8

La présente convention est ouverte à la signature des États représentés à la septième session de la conférence de la Haye de droit international privé.

Elle sera ratifiée et les instruments de ratification seront déposés auprès du ministère des affaires étrangères des Pays-Bas.

Il sera dressé de tout dépôt d'instruments de ratification un procès-verbal, dont une copie certifiée conforme sera remise, par la voie diplomatique, à chacun des États signataires.

### Article 9

La présente convention entrera en vigueur le soixantième jour à partir du dépôt du cinquième instrument de ratification prévu par l'article 8, alinéa 2.

Pour chaque État signataire ratifiant postérieurement la convention, celle-ci entrera en vigueur le soixantième jour à partir de la date du dépôt de son instrument de ratification.

### Article 10

La présente convention s'applique de plein droit aux territoires métropolitains des États contractants.

Si un État contractant en désire la mise en vigueur dans tous les autres territoires ou dans tels autres territoires dont les relations internationales sont assurées par lui, il notifiera son intention à cet effet par un acte qui sera déposé auprès du ministère des affaires étrangères des Pays-Bas. Celui-ci en enverra, par la voie diplomatique, une copie certifiée conforme à chacun des États contractants. La présente convention entrera en vigueur pour ces territoires le soixantième jour après la date du dépôt de l'acte de notification mentionné ci-dessus.

[58]                                — 556 —

Il est entendu que la notification prévue par l'alinéa 2 du présent article ne pourra avoir effet qu'après l'entrée en vigueur de la présente convention en vertu de son article 9, alinéa 1er.

### Article 11

Tout État non représenté à la septième session de la conférence de la Haye de droit international privé pourra adhérer à la présente convention. L'État désirant adhérer notifiera son intention par un acte qui sera déposé auprès du ministère des affaires étrangères des Pays-Bas. Celui-ci en enverra, par la voie diplomatique, une copie, certifiée conforme, à chacun des États contractants. La convention entrera en vigueur, pour l'État adhérant, le soixantième jour après la date du dépôt de l'acte d'adhésion.

Il est entendu que le dépôt de l'acte d'adhésion ne pourra avoir lieu qu'après l'entrée en vigueur de la présente convention en vertu de l'article 9, alinéa 1er.

### Article 12

La présente convention aura une durée de cinq ans à partir de la date indiquée dans l'article 9, alinéa 1er, de la présente convention. Ce terme commencera à courir dès cette date, même pour les États qui l'auront ratifiée ou y auront adhéré postérieurement.

La convention sera renouvelée tacitement de cinq ans en cinq ans, sauf dénonciation.

La dénonciation devra, au moins six mois avant l'expiration du terme, être notifiée au ministère des affaires étrangères des Pays-Bas, qui en donnera connaissance à tous les autres États contractants.

La dénonciation peut se limiter aux territoires ou à certains des territoires indiqués dans une notification faite en vertu de l'article 10, alinéa 2.

La dénonciation ne produira son effet qu'à l'égard de l'État qui l'aura notifiée. La convention restera en vigueur pour les autres États contractants.

En foi de quoi les soussignés, dûment autorisés par leurs gouvernements respectifs, ont signé la présente convention.

Fait à la Haye, le 15 juin en un seul exemplaire, qui sera déposé dans les archives du Gouvernement des Pays-Bas et dont une copie, certifiée conforme, sera remise, par la voie diplomatique, à chacun des États représentés à la septième session de la conférence de la Haye de droit international privé.

Belgique :
            (1er août 1955)
      (S) VAN DER STRATEN.

Danemark :
            (23 octobre 1956)
      (S) WILHELM EICHKOFF.

Espagne :
            (12 avril 1957)
      (S) JOSE RUIZ DE ARANA Y
      BAJER, DUQUE DE BAENA.

Finlande :
            (12 avril 1957)
      (S) AARNE WUORIMAA.

France :
            (25 juillet 1955)
      (S) J.-P. GARNIER.

Italie :
            (13 avril 1956)
      (S) GIORGIO BENZONI.

Luxembourg :
            (15 juin 1955)
      (S) COLLART.

Norvège :
            (24 octobre 1956)
      (S) EDVIN ALTEN.

Pays-Bas :
            (15 juin 1955)
      (S) J. W. BEYEN.

Suède :
            (23 octobre 1956)
      (S) SVEN DAHLMAN.

EXHIBIT N° 3

## EXTRACTS FROM THE "INTERNATIONAL TRADE LAW" BOOK WRITTEN BY YVON LOUSSOUARN AND JEAN-DENIS BREDIN

### CHAPTER IV: SOLUTIONS TO CONFLICTS OF LAWS

**The Convention of The Hague on the law applying to international sales and the law of universal application for conflicts of laws**

The Convention regarding the law applying to international trade of movable and tangible goods, drafted by the Conference of The Hague, and signed on June 15, 1955[1], came into force on September 1, 1964 for the following countries: France, Belgium, Denmark, Finland, Italy and Norway. This Convention truly is a "uniform private international law"[2].

This text indeed presents the particularity of imposing the respect of its provisions to the contracting States, even when the alien element is located in a non-contracting State.

This principle is set out, certainly in inadequate terms, in article 7 of the Convention, which specifies that "the contracting States agree to introduce the provisions of articles 1 to 6 of the present Convention in their respective national laws".

Mr Droz notes with reason that said provision was not necessary, since articles 1 to 6 of the Convention do not refer at any moment, for the application of the Convention to residents or nationals of the contracting States, and that said provision is ambiguous: it could suggest that the contracting States should introduce articles 1 to 6 in their national law in order for them to become enforceable in all cases[3].

But there is no question that the sole purpose of the drafters of the Convention was to materialize by article 7 the "universal scope of the rule of conflict chosen"[4].

---

[1] Ratification of said Convention was authorized in France by a law of June 19, 1962 (*JO*, 30 June 1962, p.6339). The ratification occurred on July 30, 1963, and its publication was ordered by a decree of August 6, 1964 (*JO*, 13 August 1964). See the text of the Convention and the table of signatures and ratifications, exhibit XII.
[2] See Ph. MALAURIE, *"Unification du droit et conflits de lois, communication faite devant le Comité de droit international privé le 2 avril 1965"*, Tr. Com. fr. dr. int. pr., 1964-66, p.83 et s.; Ph. KAHN *"La Convention de La Haye sur la loi applicable aux ventes à caractère international d'objets mobiliers corporels"*, Clunet, 1966, p. 304-305.
[3] See text of the Convention, exhibit XII.
[4] DROZ, see supra, p. 669.

Case: 1:04-cv-65953 Document #: 1 Filed: 09/10/04 Page 48 of 118 PageID #:48

# DROIT
## DU
# COMMERCE
# INTERNATIONAL

par

Yvon **LOUSSOUARN**          et          Jean-Denis **BREDIN**



rédiant à l'un des
nssi bien les solu-
e classique, avant
que l'ordre choisi
s. Mais il indique

## CHAPITRE IV

## LES SOLUTIONS DE CONFLITS DE LOIS

**569. Plan.** — L'étude des solutions de droit commun précède norma-
lement, dans la méthode conflictuelle, celle des solutions conventionnelles,
tant la part est limitée du Droit conventionnel des conflits de lois. L'ordre
ici mérite d'être inversé. C'est qu'il existe un système conventionnel de
conflits de lois qui concerne la plupart des problèmes posés par la vente
internationale, de telle sorte que la place faite au droit commun n'appa-
raît que résiduelle.

**570. La Convention de La Haye sur la loi applicable aux ventes
à caractère international et le droit commun des conflits de lois.** —
Le 1ᵉʳ septembre 1964 est en effet entrée en vigueur pour la France, la
Belgique, le Danemark, la Finlande, l'Italie et la Norvège, la Convention
sur la loi applicable aux ventes à caractère international d'objets mobi-
liers corporels, élaborée par la Conférence de La Haye, et conclue le
15 juin 1955 (1). Or cette Convention constitue une véritable « loi uni-
forme de droit international privé » (2). Elle présente en effet la particu-
larité d'imposer le respect de ses dispositions aux Etats contractants,
quand bien même l'élément d'extranéité serait situé dans un Etat non
partie à la Convention. Ce qu'exprime, en termes sans doute inadéquats,
l'article 7 de la Convention qui stipule « les Etats contractants sont conve-
nus d'introduire les dispositions des articles 1 à 6 de la présente Convention
dans le droit national de leur pays respectif ». M. Droz (3) remarque avec
raison que cette disposition ne s'imposait pas, dès lors que les articles 1
à 6 de la Convention ne font nulle part allusion, pour l'application de la

(1) C'est la loi du 29 juin 1962 (J.O., 30 juin 1962, p. 6339) qui en France en a autorisé
la ratification. La ratification a été effectuée le 30 juillet 1963, et la publication ordonnée
par décret du 6 août 1964 (J.O., 13 août 1964).
    Voir le texte de la Convention et le tableau des signatures et ratifications, annexe n° XII.
(2) Voir Ph. MALAURIE, Unification du droit et conflits de lois, communication faite
devant le Comité de droit international privé le 2 avril 1965, Tr. Com. fr. dr. int. pr., 1964-
66, p. 83 et s.; Ph. KAHN, « La Convention de La Haye sur la loi applicable aux ventes
à caractère international d'objets mobiliers corporels », Clunet, 1966, p. 304-305.
(3) Op. cit., p. 669.



Convention, aux ressortissants ou nationaux des Etats contractants, mais qu'elle peut prêter à équivoque : elle pourrait suggérer que les Etats contractants devraient introduire les articles 1 à 6 dans leur droit national pour qu'ils deviennent en tous les cas obligatoires (1). Mais il n'est pas contestable que le seul but des rédacteurs de la Convention a été de concrétiser par l'article 7 la « portée universelle de la règle de conflit choisie » (2). Un traité international s'imposant, en France, dès sa publication, et sans qu'il soit besoin qu'une loi spéciale l'intègre à l'ordre juridique national (3), il faut admettre, avec l'ensemble de la doctrine (4) que *la Convention de La Haye sur la loi applicable aux ventes à caractère international d'objets mobiliers corporels constitue désormais, en ce qui concerne de telles ventes, le droit international privé français, substitué au droit jurisprudentiel ancien, qui s'impose au juge français.* Et comme la Convention de La Haye recouvre un très vaste domaine d'application (4), le droit commun des règles de conflit, n'est plus, en matière de vente internationale, susceptible que de rares applications. Encore peut-on se demander (5) si le droit international privé issu de la Convention de La Haye ne va pas jouer un rôle exemplaire, et s'étendre, par l'effort jurisprudentiel, de la vente d'objets mobiliers corporels à la vente de manière générale, et de la vente au contrat *in abstracto*, tant il est malaisé d'appliquer, dans une même matière un droit conventionnel et un droit commun sensiblement divergents.

SECTION I. — *La convention de La Haye sur la loi applicable aux ventes d'objets mobiliers corporels*

**571. Division.** — Il importe d'abord de préciser les ventes auxquelles la Convention de La Haye est applicable (6), avant de dégager les solutions de conflits de lois qu'elle comporte, et le domaine de ces solutions.

(1) V. texte de la Convention, annexe, n° XII.
(2) DROZ, *op. cit.*, p. 669.
(3) Comp. Cass. civ., 28 mars 1962, *Rev. Cr. Dr. Int. Pr.*, 1964, p. 581 et s., et l'étude de M. VALTICOS, *Rev. Cr. Dr. Int. Pr.*, 1964, p. 41.
(4) KAHN, *op. et loc. cit.*, MALAURIE, *op. et loc. cit.* ; DROZ, *op. et loc. cit.* ; LOUSSOUARN, *op. et loc. cit.*
(4) *Infra*, n° 572 et s.
(5) Cf. l'opinion de M. KAHN, *op. cit.*, p. 305.
(6) Cf. Sur la Convention et les Travaux Préparatoires, A WEILL, « Les Conventions de La Haye sur la vente à caractère international d'objets mobiliers corporels », *Travaux du Comité de D.I.P.*, 1958.59,37 ; Philippe KAHN, « La Convention de La Haye sur la loi applicable aux ventes à caractère international d'objets mobiliers corporels », *Clunet*, 1966, p. 301. Georges A. L. DROZ, « Entrée en vigueur de la Convention sur la loi applicable aux ventes à caractère international d'objets mobiliers corporels », *Rev. Cr. Dr. Int. Pr.*, 1964.633 ; Y. LOUSSOUARN, « La Convention de La Haye sur la loi applicable aux ventes à caractère international d'objets mobiliers corporels », *Mélanges La Morandière*, p. 313 et s. Voir texte de la Convention, Annexe, n° XII.

# EXHIBIT N°4

### Article 2279 of the Civil Code :

*"In respect of moveable property, possession constitutes title".*

*"Nevertheless, a person who has lost an object, or from whom an object has been stolen, may claim it from the person in possession of it, during theree years starting from the date of the loss or of the theft : but the possessor has recourse against the person from whom he (she) received it".*

**Art. 2278** Les prescriptions dont il s'agit dans les articles de la présente section, courent contre les mineurs et les majeurs en tutelle ; sauf leur recours contre leurs tuteurs.

**Art. 2279** En fait de meubles, la possession vaut titre.

Néanmoins celui qui a perdu ou auquel il a été volé une chose peut la revendiquer pendant trois ans, à compter du jour de la perte ou du vol, contre celui dans les mains duquel il la trouve ; sauf à celui-ci son recours contre celui duquel il la tient.

**BIBL.** ▶ MULLER, *RTD civ.* 1989. 697. – VIENNOIS, *RRJ* 2001/4. 1421 (revendication des créances).

## A. DOMAINE DE L'ART. 2279

**1. Meubles corporels.** L'art. 2279 est applicable aux seuls meubles corporels individualisés. ● Civ. 1re, 6 mai 1997 : *Bull. civ. I, n° 144.* ♦ La règle portant qu'en fait de meubles la possession vaut titre ne s'applique qu'aux meubles corporels susceptibles de tradition manuelle et non à des objets mobiliers non individualisés, ni à des installations pouvant constituer des immeubles par destination. ● Com. 19 janv. 1960 : *Bull. civ. III, n° 30.* ♦ Elle est inapplicable aux meubles par anticipation. ● Civ. 3e, 4 juill. 1968 : *Gaz. Pal. 1968. 2. 298.* ♦ ...A un fonds de commerce, universalité mobilière de nature incorporelle. ● Civ. 1re, 2 mars 1969 : *Bull. civ. I, n° 141.* ♦ ... Aux droits incorporels d'auteur sur une œuvre artistique (lithographie). ● Paris, 17 févr. 1988 : *D. 1989. Somm. 50,* obs. *Colombet.* ♦ ... Et, d'une façon générale, aux meubles incorporels. ● Soc. 3 juill. 1953 : *Bull. civ. IV, n° 536.* ♦ ... Aux souvenirs de famille. ● TGI Paris, 29 juin 1988 : *JCP 1989. II. 21195,* note *Agostini ;* JCP éd. N 1989. II. 165,* note *Salvage.* ♦ Mais il convient d'étendre la règle aux titres au porteur qui se transmettent par simple tradition manuelle. ● Civ. 4 juill. 1876 : *DP 1877. 1. 37.*

**2. Meubles inaliénables.** Échappent à l'art. 2279 les biens mobiliers communaux appartenant au domaine public, qui sont de ce fait inaliénables et imprescriptibles. ● Crim. 16 juin 1992 : *D. 1993. Somm. 35,* obs. *A. Robert* (objet dérobé dans un musée).

## B. CONDITIONS D'APPLICATION DE L'ART. 2279

### 1° POSSESSION

**3. Possession à titre de propriétaire.** L'art. 2279 suppose que le propriétaire véritable revendique le meuble dont il a perdu la possession entre les mains d'un tiers, défendeur au procès en revendication. ● Civ. 1re, 20 févr. 1996 : *Bull. civ. I, n° 96 ; JCP 1996. I. 3972, n° 5,* obs. *Périnet-Marquet.* ♦ Les dispositions de l'art. 2279 ne jouent au profit du possesseur qu'autant que la possession dont il se prévaut est exercée à titre de propriétaire. ● Civ. 2e, 5 avr.

1960 : *Bull. civ. II, n° 252.* ♦ Ainsi, l'art. 2279 est nécessairement écarté lorsqu'il est constaté que la détention d'un objet par une personne résulte des fonctions salariées de celle-ci au service d'un tiers. ● Soc. 3 janv. 1964 : *Bull. civ. IV, n° 9.* — V. aussi ● Angers, 22 mars 1973 : *D. 1974. 326,* note *D. Martin.* ♦ De même, une remise d'objets précieux conformément aux usages des orfèvres et bijoutiers peut, en vertu de ces usages, constituer en état de détention précaire celui au bénéfice de qui elle est intervenue, l'empêchant d'invoquer l'art. 2279. ● Com. 25 févr. 1981 : *Bull. civ. IV, n° 107.* ♦ Mais la possession peut s'exercer par l'intermédiaire d'un détenteur. Ainsi, l'art. 2279 est-il applicable à l'acheteur d'un matériel qui l'a immédiatement donné en location au vendeur par contrat de crédit-bail. ● Com. 11 mai 1993 : *Bull. civ. IV, n° 184.*

**4. Gage.** Cependant, le créancier gagiste a, sur les choses remises en gage, un droit réel qui lui permet d'invoquer la maxime de l'art. 2279, al. 1er, quand il est de bonne foi et que son nantissement est régulier (opposabilité au véritable propriétaire du gage constitué *a non domino*). ● Civ. 19 juin 1928 : *DP 1929. 1. 45* ● Angers, 26 mars 1985 : *D. 1986. 537,* note *Contamine-Raynaud* (gage constitué en méconnaissance d'une clause de réserve de propriété). — V. conf. ● Com. 28 nov. 1989 : *Bull. civ. IV, n° 300 ; D. 1990. Somm. 387,* obs. *Aynès ; D. 1991. Somm. 43,* obs. *Pérochon.* ♦ Comp. ● Com. 13 févr. 1990 : *Bull. civ. IV, n° 45* (condition de possession non satisfaite). ♦ V. note 2 ss. art. 2072.

**5. Possession viciée.** L'art. 2279 ne peut être invoqué par celui dont la possession présente les qualités de régularité requises par la loi. ● Civ. 21 oct. 1929 : *DP 1931. 1. 56.* ♦ Seule une possession exempte de vice par le sous-acquéreur lui-même ou par autrui pour lui confère à celui-ci un titre faisant obstacle à toute revendication. ● Com. 11 mai 1993 : *D. 1993. IR. 145.* ♦ V. not., sur le vice d'équivoque, ● Civ. 1re, 20 juin 1961 : *D. 1961. 641,* note *R. Savatier ; JCP 1961. II. 12352,* note *Ponsard* (bijoux de famille détenus par une épouse) ● Paris, 7 déc. 1987 : *D. 1988. 182,* note *Lindon* (souvenirs de famille). ♦ C'est au revendiquant qu'il appartient de démontrer le vice éventuel

**EXHIBIT N°5**

> POSSESSION • Adverse possession • I. Interruption • Statutory period • Stolen property •
> Painting • 2. Good faith • Stolen property • Painting. OWNERSHIP • Claim • Good faith
> possessor • Stolen property • Adverse possession • Painting.

The three-year period specified in Art. 2279, Paragraph 2 of the Civil Code has the nature of a statutory period that commences on the date of the loss or theft.

Consequently, the victims of the theft of a painting, certain that they had subsequently seen it hanging in the Orsay Museum, who filed an action for recovery on the basis of Art. 2279 of the Civil Code, more than three years after the theft, cannot allege that the prescription period commenced on the date when they discovered the work that was stolen from them in the Orsay Museum.

Furthermore, good faith is understood as the full belief of the possessor, at the time of acquisition, in the ownership of the person transferring the property to him.

In this case, the prescription cannot be set aside on the grounds that the possessor was acting in bad faith, since the disputed property was acquired by the French government on April 6, 1988, while it was being held in customs, pursuant to Art. 1 and 2 of the Law of June 23, 1941 relative to exporting works of art.

This prerogative conferred on the State is essentially based on the declaration of property value, which is the sole responsibility of the exporter, such that the State cannot be suspected of negligence in not having sought to compare the declared price to the price for which the property was acquired by its holder.

Nor can it be faulted for not having take the precaution of verifying whether or not the work was stolen, when the respondents indicate, without being contradicted, that at the time of





the acquisition, there was no circular advertising of the theft, which had been committed more than three years earlier.

Nor was it demonstrated or even alleged that the acquisition price did not correspond to the claimed value of the triptych.

Under these conditions, the application to export the transferred property, ???excluding concealment in view of a public sale, was calculated to induce belief in the legitimate ownership by the possessor from whom the work was acquired by the Orsay Museum. The contradiction between the date of purchase indicated by its heirs, corroborated by documents submitted into evidence, and the date declared when the work was submitted to customs, which can reflect a simple material error of transcription, was not alone sufficient to demonstrate the bad faith of the ministry.



Paris Court of Appeals, 1st Appeals Division, March 24, 1999 • (Delage Toriel h/w v Ministry of Culture et al) • Confirmation of decision by Paris Court of First Instance dated Jan. 7, 1998 (1st Division)



l'instruction ministérielle dont l'application lui a causé le dommage dont il demande réparation, sans vérifier si ce recours a été formé dans le délai ouvert pour l'action fiscale, auquel cas il aurait interrompu la prescription à son égard.

CASS. COM., 6 avr. 1999 • 97-14.322 • (Sté Ricard c/ Secrétaire d'État au Budget et a. tres) • Cassation de TGI Paris, 18 déc. 1996 [1re ch. civ.]

[1] Comp. Cass. com., 17 nov. 1975, D. 1993, IR p. 33, qui retient que la décision juridictionnelle doit, dans les matières soumises à la compétence de l'ordre judiciaire, avoir été rendue par la Cour de cassation.

---

POSSESSION • Prescription acquisitive • 1. Interruption • Délai préfix • Chose volée • Tableau • 2. Bonne foi • Chose volée • Tableau. PROPRIÉTÉ • Revendication • Possesseur de bonne foi • Chose volée • Prescription acquisitive • Tableau.

Le délai de trois ans prévu à l'al. 2 de l'art. 2279 c. civ. présente le caractère d'un délai préfix qui commence à courir du jour de la perte ou du vol ;

Les victimes d'un vol de tableau, certains de l'avoir vu exposé par la suite au musée d'Orsay, ayant introduit une action en revendication sur le fondement de l'art. 2279 c. civ. plus de trois ans après le vol, ne peuvent par conséquent prétendre faire partir le délai de prescription du jour où ils auraient découvert la présence au musée d'Orsay de l'œuvre qui leur a été dérobée ;

Par ailleurs, la bonne foi s'entend de la croyance pleine et entière du possesseur, au moment de l'acquisition, en la propriété de celui qui lui transmet le bien ;

En l'espèce, la prescription ne saurait être écartée aux motifs que le possesseur serait de mauvaise foi, le bien revendiqué ayant été acquis par l'État français le 6 avr. 1988 tandis qu'il était l'objet d'une procédure de rétention en douane, en application des art. 1 et 2 de la loi du 23 juin 1941 relative à l'exportation des œuvres d'art ;

Cette prérogative conférée à l'État repose essentiellement sur la déclaration de valeur de bien, laquelle est la seule responsabilité de l'exportateur, de sorte que l'État ne peut être suspecté de négligence pour ne pas avoir cherché à comparer le prix déclaré avec celui auquel le bien avait été acquis par son détenteur ;

Il ne peut pas non plus lui être reproché de ne pas avoir pris la précaution de vérifier si l'œuvre n'avait pas été dérobée, dès lors que les intimés indiquent sans être contredits, qu'il n'y avait pas, lors de l'acquisition, de « circularisation » du vol commis plus de trois ans auparavant ;

Il n'est pas plus démontré ni même allégué, que le prix d'acquisition ne correspondait pas à la valeur du triptyque revendiqué ;

Dans ces conditions, la demande d'exportation, exclusive d'une dissimulation en vue d'une vente publique, était propre à faire croire à la légitime propriété du possesseur auprès de qui l'œuvre a été acquise par le musée d'Orsay sur la date d'achat indiquée par les héritiers de celui-ci et corroborée par les pièces versées aux débats et celle qu'il a déclarée lors de la présentation de l'œuvre aux douanes, laquelle peut traduire une simple erreur matérielle de transcription, ne suffisant pas à démontrer la mauvaise foi du ministère.

CA PARIS, 1re ch. A, 24 mars 1999 • (Epx Deloge Toriel c/ Ministre de la Culture et autres) • Confirmation de TGI Paris, 7 janv. 1998 [1re ch.]

---

REDRESSEMENT ET LIQUIDATION JUDICIAIRES • Procédure • Ouverture • Cessation des paiements • Date • Report • Action en justice • Délai • Point de départ • État des créances.

Cassation, pour violation de l'art. 9 de la loi n° 85-98 du 25 janv. 1985, de l'arrêt qui, pour déclarer irrecevable comme tardive la demande, formée par assignation du 23 juin 1994, de report de la date de cessation des paiements d'une société, mise en liquidation judiciaire le 4 janv. 1993, retient qu'en l'absence de décision expresse du juge-commissaire sur la demande de dispense de vérification des créances chirographaires que le liquidateur lui a présentée le 18 avr. 1994, le point de départ du délai de quinze jours est la date de cette demande, alors qu'en l'absence de dépôt de l'état des créances prévu à l'art. 103 de la loi du 25 janv. 1985, le délai de quinze jours n'a pu commencer à courir [1].

CASS. COM., 13 avr. 1999 • 97-12.087 • (Proc. gén. CA Douai c/ Perin et qual.) • Cassation de CA Douai, 16 janv. 1997 [2e ch. civ.]

[1] Rappr. Cass. com., 26 mai 1998, D. 1998, IR p. 166.

---

RESPONSABILITÉ CIVILE • Indemnisation des victimes d'infractions • Réparation du préjudice • Faute de la victime • Lien de causalité • Viol • Stupéfiant • Approvisionnement.

Il ne saurait être fait grief à une cour d'appel d'accueillir la demande d'indemnisation par le Fonds de garantie des victimes d'actes de terrorisme et d'autres infractions, du préjudice subi par une toxicomane du fait d'un viol commis par son dealer sur prétendus motifs que, d'une part, le lien de causalité entre l'infraction et le dommage est acquis lorsque la victime se livre à une activité délictueuse de concert avec l'auteur de l'infraction, lequel en l'espèce n'aurait fait que profiter de leur activité commune pour agresser et violer sa complice et que, d'autre part la cour aurait dû rechercher si l'infraction n'avait pas été commise concomitamment à une acquisition de drogue illicite, et si ce comportement fautif de la victime n'a pas concouru à la réalisation du dommage ;

En effet, en énonçant qu'il n'y a pas de lien causal entre l'activité de la victime, consistant à se rendre sur les lieux de l'infraction pour se procurer de la drogue, et le viol dont elle a été victime, la cour d'appel peut déduire que le comportement de celle-ci n'est pas de nature à supprimer ou à réduire l'indemnisation de son préjudice.

CASS. 2e CIV., 15 avr. 1999 • 97-18.287 • (X... c/ Y... et autre) • Rejet du pourvoi contre CA Metz, 25 mars 1997 [ch. civ.]

---

RESPONSABILITÉ CIVILE • Indemnisation des victimes d'infractions • Réparation du préjudice • Situation matérielle grave • Appréciation souveraine des juges du fond.

C'est dans l'exercice de son pouvoir souverain d'appréciation des éléments de fait et de preuve qui lui sont soumis, se plaçant à la date de la demande, qu'une cour d'appel estime que l'enfant qui se trouve placé en situation de complète dépendance de l'aide

# EXHIBIT N°6

### Supreme Court, 1s Ch., November 27, 2001

*"The Court : (...)*

*But, whereas, (...), good faith which is required by the way of acquiring [property] provided for by Article 2279 of the Civil Code, does not affect the consent of the beneficiary but qualifies his possession, must be appreciated at the moment he took possession (...)"*

*EXHIBIT N° 6*

## POSSESSION

# Article 2279 du code civil.
# La bonne foi de l'acquéreur a *non domino* s'apprécie au moment de sa mise effective en possession

### SOMMAIRE DE LA DÉCISION

*La bonne foi requise par le mode d'acquérir prévu à l'art. 2279 c. civ., laquelle n'affecte pas le consentement du bénéficiaire mais qualifie sa possession, s'apprécie lors de l'entrée effective en celle-ci.*

### Cour de cassation, 1re civ.
### 27 nov. 2001

LA COUR : - Sur les deux moyens réunis : - Attendu qu'il est fait grief à l'arrêt attaqué (Montpellier, 22 octobre 1997) d'avoir dit opposable à M. Cadéac-d'Arbaud, acquéreur aux enchères pour 1 450 000 francs d'une statue en bronze signée Camille Claudel, la nullité de son aliénation par une propriétaire antérieure au prix initial de 40 000 francs, et de l'avoir condamnée, in solidum avec les acheteurs intermédiaires et le commissaire-priseur, à réparer le préjudice tiré de l'impossibilité d'une restitution en nature de l'objet pour cause de revente ultérieure à un acheteur habitant les Etats-Unis, alors, selon le premier moyen : 1° qu'en méconnaissant que la bonne foi nécessaire à l'acquisition par application de l'article 2279 du code civil s'apprécie au moment de la conclusion de la vente, même si la remise de la chose, le paiement du prix ou tel événement suspensif n'est pas accompli, la cour d'appel a violé cette disposition ; 2° qu'en ne recherchant pas si la bonne foi incontestée de M. Cadéac-d'Arbaud au moment de sa prise de possession juste après la vente ne lui permettait pas de se prévaloir d'un titre exclusif d'un droit à restitution au profit de la venderesse originaire, elle a privé sa décision de base légale au regard du même texte ; 3° qu'en niant le droit de M. Cadéac-d'Arbaud, malgré sa bonne foi et sa prise de possession, à s'opposer à la restitution de la statue à la venderesse originaire, elle a derechef violé ledit article ;

et, selon le second moyen, d'avoir : 1° en disant que, tant que la vente originaire n'était pas judiciairement annulée, M. Cadéac-d'Arbaud pouvait renoncer unilatéralement à sa propre acquisition, méconnu la perfection de celle-ci dès l'accord sur la chose et le prix et violé les articles 1582, 1983 et 1134 du code civil ; 2° en estimant que M. Cadéac-d'Arbaud aurait été en mesure de renoncer à la vente malgré la non-réalisation d'une condition suspensive constituée par l'obtention du certificat d'authenticité de l'objet, violé les articles 1134, 1168, 1174, 1179 et 1181 du code civil ; 3° méconnu, en violation de l'article 1382 du code civil, que M. Cadéac-d'Arbaud n'avait eu connaissance de la revendication d'une précédente propriétaire qu'après l'adjudication, date à laquelle, ajait que le lui avait confirmé le commissaire-priseur, son acquisition était parfaite ; 4° laissé sans réponse, en violation de l'article 455 du nouveau code de procédure civile, des conclusions soulignant que M. Cadéac-d'Arbaud n'avait revendu la chose aux enchères qu'en décembre 1994, soit six ans après l'adjudication querellée, pour faire face aux échéances du prêt contracté pour son financement, et après qu'un arrêt correctionnel ait ordonné la restitution de la statue à son profit ; 5° méconnu que M. Cadéac-d'Arbaud pouvait, sans commettre de faute, se prévaloir de son titre de possesseur de bonne foi pour refuser de rendre l'objet et le revendre à un tiers, et ainsi violé encore les articles 2279 et 1382 du code civil ;

Mais attendu, sur le premier moyen, que la bonne foi requise par le mode d'acquérir prévu à l'article 2279 du code civil, laquelle n'affecte pas le consentement du bénéficiaire mais qualifie sa possession, s'apprécie lors de l'entrée effective en celle-ci ; qu'ainsi, les juges du fond ont relevé que M. Cadéac-d'Arbaud, qui s'était porté acquéreur le 11 décembre 1988, avait appris entre Noël et le Jour de l'An, par l'expert chargé d'établir l'authenticité de l'objet, qu'une deuxième propriétaire allait contester en justice l'aliénation qu'elle en avait consentie, et que sa mise en possession, pour raison de paiement différé, s'était faite seulement le 27 janvier 1989 ; qu'ils en ont exactement déduit qu'elle n'avait produit aucun effet acquisitif ; qu'ils ont, en outre, retenu que

cette information rendait incertain l'effet translatif des aliénations intermédiaires ; qu'il était alors loisible à M. Cadéac-d'Arbaud de retarder le prix non encore payé et de refuser de retirer l'objet jusqu'à pleine clarification ; qu'en outre, après s'être acquitté et être entré en possession, il a préféré, en décembre 1994, pleinement conscient de l'incertitude persistante et malgré sa citation en référé aux fins de mise de la chose sous séquestre, la revendre aux enchères, entre la date de l'audience d'appel et celle du délibéré ; que ces constatations rendent inopérants les griefs du second moyen ;

Par ces motifs, rejette [...].

99-18.335 (n° 1790 FS-P) - *Demandeur* : Cadéac-d'Arbaud - *Défendeur* : Géronimi - *Composition de la juridiction* : MM. Lemontey, prés. - Gridel, rapp. - Mme Petit, av. gén. - SCP Waquet, Farge et Hazan, av. - *Décision attaquée* : Cour d'appel de Montpellier, 1re ch. civ. B, 22 oct. 1997 (Rejet)

Mots-clés : POSSESSION * Présomption * Meuble * Possession vaut titre * Bonne foi * Appréciation * Moment

### Note de Jean-Pierre Gridel
*Agrégé des Facultés de droit, Conseiller à la Cour de cassation*

Différences des acquisitions par la vente et par la prise de possession, lourdeurs de la machine judiciaire mais opiniâtreté des juges... et stimulant cas pratique : telles sont les observations que peut inspirer, dans la collection bien connue « Le droit et le commerce des œuvres d'art », le feuilleton ayant donné lieu à l'arrêt ci-dessus rapporté. La complexité du fait (I) aura contribué à préciser le droit (II).

I - Sauf pour les habitués de ce type de causes, l'espèce était tout de même peu ordinaire.

En 1972, T..., boulangère dans la France profonde, acquiert d'un brocanteur, pour 20 000 F, tout un lot d'objets divers. Parmi ceux-ci figure une statue en bronze (d'une hauteur de 71,5 cm, sur une base de 61,5 sur 23,5) signée Camille Claudel, sans que, eu égard au contexte, l'hypothèse d'une œuvre authentique de la grande artiste, ni même celle d'une simple valeur vénale particulière effleurent son esprit.

Le 26 nov. 1988, l'antiquaire local G..., sur l'avis téléphonique du commissaire-priseur parisien F..., qu'il a sollicité non en raison de l'origine claudélienne alors peu vraisemblable de ce bronze non répertorié et sans nom de fondeur, mais pour sa matière même et son bel aspect, et ainsi pour un intérêt marchand réel supputé par son interlocuteur entre 120 000 et 300 000 F, achète la pièce à T... pour 40 000 F. Dès le lendemain, toujours sur la suggestion de F..., et une promesse de 6 % sur le prix aux enchères à venir, G..., pour 55 000 F, revend la statue à B..., antiquaire en région parisienne, beau-frère de F..., et écran espéré efficace vis-à-vis de T... dans la bonne affaire qui s'annonce. En effet, le 11 déc. 1988, à l'Hôtel Drouot, et peut-

être en concomitance avec le succès du film *Camille Claudel*, l'objet est publiquement adjugé... à 1 450 000 F à C..., dont S... est le prête-nom conjoncturel pour raison de contrôle fiscal en cours, et qui remet sur-le-champ un chèque de garantie (convenu non approvisionné). Mais il est plus important de noter que la vente a lieu sous la condition suspensive de l'obtention du certificat d'authenticité, et avec la stipulation que l'objet ne sera délivré à notre acquéreur C... que lorsqu'il aura versé les fonds attendus d'un emprunt contracté pour la circonstance (art. 1612 c. civ.) : ce sont là deux précautions croisées qui peuvent se comprendre... Tels étaient donc les prolégomènes.

Dans les derniers jours de décembre 1988, C..., qui n'est toujours pas en possession de la statue car il n'a pas encore perçu son prêt, est informé par l'expert, petite-nièce de Camille Claudel, et spécialiste officielle d'une œuvre sur laquelle elle exerce le droit moral, que l'authenticité ne devrait pas faire de doute, mais qu'un propriétaire antérieur (Mme T..., citée en début de récit) s'apprête à introduire une action en nullité de son aliénation initiale. Sur ces entrefaites, le certificat d'authenticité est délivré le 10 janv. 1989 (« l'œuvre [...] signée Camille Claudel, sans nom de fondeur, ni numéro, est une fonte au sable, qui après expertise, malgré certains aspects récents, peut être datée de l'époque de la création du *Dieu envolé* et de *l'Implorante* (1894-1895). Il s'agit d'un exemplaire unique non répertorié à ce jour ») et, le 27 janv. 1989, C..., qui vient de recevoir les fonds attendus, s'acquitte de sa dette et est mis en possession. Le drame approche, sous l'aspect de procédures qui vont se succéder.

Une instance pénale conduit à la saisie et à la mise sous scellés de la statue (24 févr. 1989) et à la poursuite pour escroquerie de G..., B..., S... et C..., avant que la Chambre des appels correctionnels, le 27 juill. 1993, ne confirme leur relaxe (de simples réticences ou mensonges ne constituent pas les manœuvres frauduleuses de l'art. 313-1 c. pén.) et n'ordonne la restitution de l'objet à C... Mais... place au droit civil !

En janvier 1992, en effet, T... a assigné son acheteur G... en nullité de la vente pour erreur sur la substance et droit, et B... et C..., en anéantissements corrélatifs de leurs titres de sous-acquéreurs, personne ne transférant une propriété dont il n'était pas investi. Et, dès le 29 juill. 1993 (la suspension du civil par le criminel vient de prendre fin), T... demande sagement, en référé, la mise sous séquestre du bronze, dont on a vu qu'il était à nouveau entre les mains de C... (art. 1961 c. civ.). Intervient alors, le jour même, une ordonnance de refus, rétrospectivement fâcheuse, et dont T..., vivante illustration du combat pour le droit à la Ihering, relève appel. Mais, après l'audience de la cour, et tandis que l'affaire est toujours en délibéré, le 2 déc. 1994, C... vend à son tour la statue aux enchères, à un Américain qui l'emporte prestement aux États-Unis. Puis, le 21 déc. 1994, alors que le précieux objet a déjà franchi l'Atlantique, la cour d'appel, statuant en référé, rend un arrêt constituant solennellement C... séquestre du bronze litigieux. Peuvent enfin venir les temps du droit civil de fond.

Le 14 févr. 1995, le tribunal de grande instance annule exactement la vente initiale T.../G... sur le fondement de l'erreur sur la substance (art. 1109 et 1110 c. civ., T... n'ayant consenti que dans la conviction erronée mais non fautive de l'inauthenticité de l'œuvre (1)), dit

cette nullité opposable aux sous-acquéreurs successifs B... et C... dont elle fait tomber les titres, condamne *in solidum* G..., B... et C..., en restitution, ordonne les remboursements de prix, et, par une fine et rigoureuse analyse que la cour d'appel confirmera le 15 oct. 1997 - remplaçant juste la restitution en nature par une restitution en valeur - dénie à C... une acquisition *a non domino* alléguée valable par invocation de : « En fait de meubles, la possession vaut titre ». La reprise approbative et théorisée de cette motivation par la Cour de cassation constitue l'intérêt de l'arrêt rapporté.

II - Pour l'application de l'art. 2279 c. civ., la bonne foi de celui qui acquiert *a non domino* s'apprécie-t-elle au moment où il consent ? Ou au moment, à déterminer du reste, de sa mise en possession ? Telle était la riche question de droit que la particularité de l'espèce permettait de poser puisque C..., prenant acte de la résolution en chaîne des ventes antérieures, soutenait être devenu propriétaire non par transmission contractuelle du droit de G..., mais par possession acquisitive. Toutefois, une doctrine et une jurisprudence unanimes subordonnent cet effet acquisitif de la possession mobilière corporelle à la bonne foi (2), et, si C... l'était le 11 déc. 1988, ne devait-on exiger qu'il le fût surtout le 27 janv. 1989, date où s'était opérée la délivrance-retirement le mettant en puissance de la chose ? L'aval donné à cette dernière solution fournit l'occasion de rappeler ce que sont, pour la mise en œuvre de l'art. 2279, et la bonne ou mauvaise foi, et leur coïncidence utile avec la possession.

A - La mauvaise foi, appréciée souverainement par les juges du fond, consiste à avoir négligé des doutes circonstanciels raisonnables quant à la qualité de celui qui proposait le droit réel sur la chose (propriété, gage...).

La Cour de cassation, après avoir autrefois enfermé la mauvaise foi « dans le cas où le possesseur a acquis d'une personne qu'il savait n'être pas propriétaire ou n'avoir pas qualité pour lui transférer la propriété » (3), a vite admis que les juges la retinssent valablement à partir de soupçons sérieux à ce propos. Tel banquier accepte une perle en gage du prêt consenti à un négociant en bijoux qu'il sait en liquidation judiciaire, fonds vendu et actif disparu, et avec lequel il traite par l'intermédiaire d'un prête-nom, ou, encore, des valeurs mobilières génératrices d'avantages particulièrement insolites, et s'abstient de procéder à la moindre vérification (4). Une société achète au nouveau propriétaire du sol des engrais entreposés, bien que l'ancien propriétaire l'ait antérieurement informé, par téléphone puis par lettre recommandée, que ces stocks étaient demeurés siens (5). Un amateur acquiert en 1946, d'un restaurateur de tableaux, des toiles de maître détournées des dépôts où la galerie d'art de Stuttgart les avait mises à l'abri des risques de guerre, et accorde spontanément foi aux « invraisemblables explications données sur le processus » au terme duquel elles sont mises en vente (6).

le seul G... et conservé *in petto*, hypothèse pour laquelle la nullité eût été moins évidente, à raison d'arrêts récents des première et troisième Chambres civiles vivement confrontées en doctrine (cf. L. Aynès, D. 2001, p. 3236 ; D. Mazeaud, L'influence de l'erreur excusable, note sous Cass. 3e civ., 21 févr. 2001, D. 2001, p. 2702, et les références citées ; P. Chauvel, La dissimulation au cocontractant de la valeur véritable de la chose constitue-t-elle une réticence dolosive ?, JCP éd. Entreprise, 4 oct. 2001 ; R. Libchaber, Defrénois 2001, p. 703).

(2) Carbonnier, Les biens, 19e éd., PUF, 2000, n° 229 et 237 ; Cornu, introduction, Les personnes, Les biens, 9e éd., Montchrestien, 1999, n° 1636 ; Terré-Simler, Les biens, 4e éd., Dalloz, 1992, n° 423.

(3) Cass. 1re civ., 6 juill. 1886, DP 1887, 1, p. 25.

(4) Cass. req., 16 mai 1899, S. 1900, 1, p. 86 ; 11 janv. 1937, D. 1937, 1, p. 94 ; RTD civ. 1937, p. 389, note Solus.

(5) Cass. 1re civ., 13 janv. 1965, Bull. civ. I, n° 35.

(6) Cass. 1re civ., 23 mars 1965, Bull. civ. I, n° 206.

(1) J. Flour, J.-L. Aubert, E. Savaux, Droit civil, Les obligations, L'acte juridique, 9e éd., Armand Colin, 2000, n° 203 ; F. Terré, P. Simler, Y. Lequette, Droit civil, Les obligations, 7e éd., Précis Dalloz, 1999, n° 212 ; J. Ghestin, Traité de droit civil, La formation du contrat, 3e éd., LGDJ, 1993, n° 512. *Il ne s'agit donc pas de la première erreur de T..., celle commise sur la valeur vénale objective d'une belle pièce de bronze, information soupçonnée par*

Toutefois, la mauvaise foi de l'acquéreur, qui naît ainsi d'indices substantiels de nature à fragiliser le droit dont l'aliénateur se prétend titulaire et prétend ainsi transmettre, suppose un renversement de présomption (art. 2268 c. civ.) ; la charge de sa preuve pèse donc sur celui qui, dans l'espèce, combat l'effet acquisitif de l'art. 2279 c. civ. Aussi sera-t-il difficile de contester, à la barre civile, la bonne foi de celui qui a acheté et emporté un tableau offert à la vente par le propriétaire de la galerie où il était exposé (7) ; à la barre consulaire, celle de la personne qui, dans des conditions conformes aux lois et usages d'un commerce qui n'imposaient aucune vérification ou recherche, a acquis ou reçu en gage des marchandises dont elle ne pouvait *a priori* penser qu'elles étaient sous la réserve de propriété d'un tiers (8).

En l'espèce rapportée, les juges du fond avaient relevé que, si rien n'annihilait la présomption de bonne foi de C... au jour où il s'était porté acheteur, il en allait tout autrement au jour de son entrée en possession puisque, dans l'intervalle, l'expert lui-même, personne particulièrement autorisée puisqu'elle menait les investigations sur l'apparition de la statue, lui avait fait part de sa conviction de son authenticité, mais, aussi, de l'ignorance dans laquelle un propriétaire précédent en était demeuré, et de l'imminence de son action en nullité de cette vente initiale. Un débat sur la date utile d'appréciation de la bonne foi s'imposait donc.

**B – La bonne ou mauvaise foi s'apprécie au moment de la mise en effective en possession.**

Ce principe est en vérité un rappel. En 1953, la Chambre commerciale avait dit que l'acquéreur *a non domino* invoque valablement l'art. 2279 c. civ. si preuve n'est pas rapportée que, « au moment de la prise de possession », il savait son vendeur exposé à l'action en résolution de son propre auteur (9). Il prend toutefois ici un relief particulier à raison du cas, relativement peu fréquent, d'une mise en possession réelle différée ; en outre, il rend compte, aussi, de l'indifférence des doutes ou incertitudes constitutifs de la mauvaise foi, dès lors qu'ils seraient apparus seulement une fois faite l'entrée en possession. Mais encore faut-il, d'abord, s'entendre sur la date à laquelle celle-ci se réalise.

1 - Moment d'appréciation de la bonne foi, la mise en possession s'entend de l'appréhension matérielle de la chose elle-même : la loi institue propriétaire un possesseur qui, en outre, a cru recevoir la chose de son véritable propriétaire (10). C'est ainsi que celui qui a contracté de bonne foi avec un non-propriétaire mais a aliéné aussitôt, sans avoir reçu matériellement la chose entre-temps, n'est jamais devenu propriétaire par l'effet de l'art. 2279 c. civ., et doit succomber dans l'action en revendication intentée par le *verus dominus* (11).

On mesure là, à propos des corps certains, la différence d'effets des dispositions psychologiques dans l'acquisition par la vente et dans l'acquisition par la possession. Tandis que, dans le premier cas, la rencontre établie de deux volontés éthérées suffit à nouer le contrat et à investir l'acquéreur de la propriété, dans le second, c'est seulement l'appréhension ultérieure qui produira cet effet, et, encore, sauf démonstration de la mauvaise foi présente à ce moment-là.

Cette analyse permet de résoudre une difficulté, celle de la signification du récépissé remis, dans l'attente de la délivrance, à celui qui achète de façon ferme, mais en ignorant légitimement l'absence de titre de son auteur. Même si, en thèse générale, l'on peut posséder par l'intermédiaire d'un précariste, il ne sera pas permis, pour le jeu de l'art. 2279 c. civ., de voir là une mise en possession symbolique immédiate de l'acquéreur, le vendeur ou le commissaire-priseur devenant alors détenteur pour l'acquéreur que l'on tiendrait ainsi déjà pour possesseur : il ne l'est pas encore (12). Le document évoqué est en réalité une attestation de la seule qualité d'acheteur, constituant le vendeur ou le commissaire-priseur détenteur pour celui-ci et en cette qualité, et, donc, dans la mesure de l'efficacité de la vente. La bonne foi, requise pour qualifier la possession et lui faire produire son effet acquisitif, veut que celui qui se prévaut de l'art. 2279 c. civ., et qui, à la différence de l'acheteur d'un corps certain, n'est investi de la propriété que par la tradition réelle, la refuse s'il nourrit alors ou encore un doute suffisamment sérieux sur le titre de l'aliénateur. La prestation du vendeur se révèle insuffisamment certaine, c'est, en droit, un motif de suspension, voire de nullité ou de résolution du contrat, et, en fait, il en allait d'autant plus ainsi que C... n'avait rien payé, ni par lui-même, ni par prête-nom.

2 – Sans doute sous l'influence d'une jurisprudence pénale aujourd'hui abandonnée - qui qualifiait de receleur celui qui, ayant valablement acquis *a non domino* par sa prise de possession de bonne foi, conservait l'objet tout en ayant appris depuis l'escroquerie ou l'abus de confiance commis au préjudice du précédent propriétaire (13) -, la première Chambre civile, en un arrêt discuté et sans lendemain, avait cru pouvoir dire que cet acquéreur anéantissait sa possession et donc le bénéfice de l'art. 2279 c. civ. s'il remettait plus ou moins spontanément la chose à la victime de la fraude (14). Mais il est bien admis aujourd'hui que la bonne foi lors de l'entrée en possession fait acquérir définitivement, même si l'on est constitué ensuite séquestre de la chose (15), ou si, l'ayant rachetée à l'occasion d'une liquidation menée par le syndic avec l'autorisation du tribunal, l'on apprend ensuite que la personne liquidée n'était qu'emprunteur ou dépositaire (16).

Après l'entrée effective en possession, la mauvaise foi survenante est inopérante à détruire la propriété. Mais une bonne foi qui cesse avant la mise en possession est impuissante à rendre celle-ci utile. Par l'arrêt rapporté, la Cour de cassation aura veillé tant à l'autonomie du mode d'acquérir si particulier inscrit à l'art. 2279 c. civ. qu'à la détermination d'un ensemble cohérent. ∎

---

(7) Cass. 1re civ., 24 nov. 1970, Bull. civ. I, n° 312.

(8) Cass. com., 14 nov. 1989, Bull. civ. IV, n° 290 ; 19 mai 1987, *ibid.*, n° 120 ; 1er oct. 1985, *ibid.*, n° 224, où l'on retrouve une application particulière et édulcorée de la jurisprudence de l'apparence.

(9) Cass. com., 7 janv. 1953, Bull. civ. III, n° 10. L'importance de cette date est grande puisque, par ailleurs, l'héritier succédant à la personne du défunt, c'est au moment de l'entrée en possession de celui-ci qu'il faut rechercher la bonne ou mauvaise foi quant à qualifier la possession de celui-là (Cass. 1re civ., 16 juin 1971, D. 1971, Jur. p. 566, note A. B. ; RTD civ. 1972, p. 153, obs. Bredin).

(10) Cass. civ., 12 déc. 1921, D. 1922, 1, Jur. p. 28.

(11) Cass. com., 11 mai 1993, Bull. civ. IV, n° 184 ; D. 1993, IR p. 145.

(12) Cf., analogiquement, pour une lettre de voiture, impuissante à réaliser la mise en possession réelle de l'art. 1141 c. civ., Cass. com., 23 juin 1952, Bull. civ. III, n° 248.

(13) Cass. crim., 24 nov. 1977, D. 1978, Jur. p. 42, note S. Kehrig.

(14) Cass. 1re civ., 5 oct. 1972, JCP 1973, II, n° 17485, note Bénabent.

(15) Cass. 1re civ., 4 janv. 1972, Bull. civ. I, n° 4.

(16) Telle était l'hypothèse dans deux des arrêts de la complexe affaire *Schlumpf* : Cass. com., 28 juin 1994, arrêts n° 92-17.311 S et 92-17.312 T.

© Dalloz - La photocopie non autorisée est un délit

# EXHIBIT N°7

Art. 2268 Good faith is always presumed, and it is up to the person alleging bad faith to prove it.

contrat écrit. ● Civ. 3e, 20 févr. 1979 : *Bull. civ. III, n° 40.*

**5.** Le titre putatif est impuissant à fonder l'usucapion décennale. ● Civ. 1re, 6 nov. 1963 : *Bull. civ. I, n° 483.* ◆ L'exigence d'un titre réel implique que l'acte invoqué concerne exactement, dans sa totalité, le bien que le possesseur a entre les mains et qu'il entend prescrire. ● Civ. 3e, 26 nov. 1970 : *D. 1971. 127* ● 6 mai 1987 : *D. 1987. IR. 125.* ◆ Ne constitue pas un juste titre permettant une usucapion abrégée un règlement de copropriété définissant un lot conférant à son titulaire un droit d'usage et de jouissance sur une partie délimitée d'un mur séparatif (emplacement pour affichage). ● Civ. 3e, 5 oct. 1994 : *Bull. civ. III, n° 167 ; Defrénois 1995. 804, obs. Atias ; RTD civ. 1996. 426, obs. Zenati.* ◆ ... Non plus qu'un état descriptif de division d'un immeuble en copropriété. ● Civ. 3e, 30 avr. 2002 : *préc. note 3.*

**6.** Un acte revêtu d'une fausse signature ne constitue pas un juste titre au sens de l'art. 2265 ● Civ. 3e, 30 nov. 1982 : *Bull. civ. III, n° 237.*

**7.** Le juste titre invoqué par le possesseur en vue de lui permettre de bénéficier d'une prescription abrégée doit avoir acquis date certaine opposable au revendiquant. ● Civ. 3e, 16 janv. 1969 : *D. 1969. 453.*

**8.** Même en l'absence de transcription, l'acte par lequel la partie qui invoque l'usucapion abrégée a été mise en possession du terrain constitue un juste titre, dès lors que cet acte était susceptible de transférer la propriété. ● Civ. 3e, 31 janv. 1984 : *D. 1984. 396, note Aubert.*

**9. Bonne foi.** La bonne foi, au regard de l'art. 2265, consiste en la croyance de l'acquéreur, au moment de l'acquisition, de tenir la chose du véritable propriétaire. ● Civ. 3e, 18 janv. 1972 : *Bull. civ. III, n° 39.*

**10.** La bonne foi du possesseur est appréciée souverainement par les juges du fond. ● Civ. 3e, 27 mars 1969 : *Bull. civ. III, n° 271* ● Civ. 3e, 18 janv. 1972 : *préc. note 9* ● 31 janv. 1984 : *préc. note 8.* ◆ Ils doivent relever la bonne foi du possesseur au moment de son acquisition. ● Civ. 3e, 7 avr. 1994 : *Bull. civ. III, n° 80 ; D. 1995. Somm. 192, obs. A. Robert.*

**11. Délai.** Si l'acquéreur par juste titre et de bonne foi d'un immeuble en prescrit la propriété par dix ou vingt ans, le délai de prescription ne court qu'autant que le véritable propriétaire ne s'est pas trouvé dans l'impossibilité d'agir. Ainsi, l'exproprié dont le bien a été cédé par l'expropriant à un tiers postérieurement à l'ordonnance d'expropriation était dans l'impossibilité absolue d'agir en revendication contre ce dernier avant que la cassation de cette ordonnance le restitue dans son droit de propriété. ● Civ. 3e, 18 oct. 1977 : *Bull. civ. III, n° 346.*

**12.** La prescription décennale est acquise lorsque la possession s'est prolongée pendant le temps requis, compte tenu des causes qui en ont interrompu ou suspendu le cours. Les juges du fond ajoutent donc aux exigences de l'art. 2265 en limitant à la seule période de dix ans ayant suivi immédiatement l'acquisition *a non domino* le délai pendant lequel la possession peut être prise en considération. ● Civ. 1re, 28 nov. 1962 : *Bull. civ. I, n° 508.*

**13.** Les art. 2265 et 2266 prennent expressément en considération le domicile du véritable propriétaire. Si l'art. 2265 emploie l'expression d'habitation en même temps que celle de domicile, cette expression doit être entendue dans son acception de domicile légal et non dans celle de résidence effective. ● Req. 16 déc. 1935 : *Gaz. Pal. 1936. 1. 218.*

**Art. 2266** Si le véritable propriétaire a eu son domicile en différents temps, dans le ressort et hors du ressort, il faut, pour compléter la prescription, ajouter à ce qui manque aux dix ans de présence, un nombre d'années d'absence de celui qui manque, pour compléter les dix ans de présence.

**BIBL.** ▶ COLLOMB, JCP 1990. I. 3455 (délai de la prescription abrégée).

**Art. 2267** Le titre nul par défaut de forme, ne peut servir de base à la prescription de dix et vingt ans.

Dès lors que la nullité des transferts de propriété est relative et non absolue, les actes constituent un juste titre. ● Civ. 3e, 3 nov. 1977 : *Bull. civ. III, n° 366.*

**Art. 2268** La bonne foi est toujours présumée, et c'est à celui qui allègue la mauvaise foi à la prouver.

**Art. 2269** Il suffit que la bonne foi ait existé au moment de l'acquisition.

---

a vente, celle de rdu ré- vendu. 180 ; R., efrénois

posses- un bien 17 avr.

: rente 1 à ses

tionnés

) : « Les et non- ales plus

n pres- t de la et par

9. I. 175, . 2002 : te de la r. 1968 :

idée sur un trans- n'est pas t. 1972 : ibid. III, CP 2001. efrénois m. 2001. I. civ. III, (il appar- fice, que riétaire). de droit, partage. titue pas apparte- e délibé- s été ap- ivie d'un

**EXHIBIT N°8**

*Cour of Cassation* [Court of Final Appeal]
1ˢᵗ Civil Law Chamber
Public hearing of 11 June 1991

**Partially quashed**

Appeal No.: 89-20422
Published in the *Bulletin*

**Presiding Judge: Mr Massip, Senior Appeal Judge in said capacity**
*Rapporteur*: Mr Savatier
Advocate-General: Mr Gaunet
Counsel: SCP Vier & Barthélemy, SCP Waquet, Farge & Hazan.

## FRENCH REPUBLIC

### IN THE NAME OF THE FRENCH PEOPLE

On 3 April 1975, Joanny Veyrat died leaving as successors his three children born of his first marriage, Mr Michel Veyrat, Mrs Monique Chaix and Mrs Marie-Jeanne Canet, as well as his second wife, Mrs Pascal whom he married on 3 July 1970 under the legal framework separating the estates of the spouses, and the child born of this marriage, René Veyrat. The children born of the first marriage summonsed Mrs Pascal and her son seeking settlement of the succession. The lower court, allowing their claim, ordered Mrs Pascal in particular to repay to the estate in succession those sums of money representing part of the price for a property which she had purchased by auction in 1972 and the price for another property which she had purchased, in 1974, for FRF 190,000. The first instance court considered that Joanny Veyrat had paid for these properties with his own funds and these payments constituted disguised liberalities. The judgement of the Court of Appeal, now under appeal, decided that these sales were disguised donations giving rise to a duty to repay to the estate in succession, and that repayment was to be made of the value of the donated property at the time of settlement in its condition as it was at the time of the donation. The appealed judgement also decided on the value of a donation in favour of Mrs Canet, on the deferred salary requested by Mr Michel Veyrat and on the action for recovery of property by the children of the first marriage over bearer bonds discovered in a safety deposit box rented by Mrs Pascal. Finally, the Court of Appeal refused to order the swearing of a decisive oath by Mr Michel Veyrat, who denied having received a sum of money from his father as a loan.

[...]

In order to state that the bearer shares placed in a bank safety deposit box rented by Mrs Pascal should be added back into the estate in succession, the Court of Appeal held that the content of the safety deposit box cannot be of a public nature, that the cohabitation of the spouses did not allow an "absolute individualisation" of this content and that Mrs Pascal cannot prove that she was in a position to save up such a large sum, although the resources of her husband made the acquisition of the bonds possible.

However, the holding of bearer bonds, not liable to be of common use [by the spouses], in a safety deposit box which she rented without hiding her acts, is not such as to cause a defect in possession by Mrs Pascal who, as defendant in an action for recovery of property exercised in the name of the succession, was not obliged to prove the origin of these bonds since possession alone granted her title.



## La jurisprudence de la Cour de cassation et les arrêts des cours d'appel et tribunaux.

| Retour au formulaire | Liste de résultats<br>◀ Suivant ▶<br>◀ Précédent ▶ | | | | | |
|---|---|---|---|---|---|---|

**Document 10 / 18**

© Cour de Cassation / SDE

Cour de Cassation
Chambre civile 1
Audience publique du 11 juin 1991

**Cassation partielle.**

N° de pourvoi : 89-20422
Publié au bulletin

Président :M. Massip, conseiller doyen faisant fonction
Rapporteur :M. Savatier
Avocat général :M. Gaunet
Avocats :la SCP Vier et Barthélemy, la SCP Waquet, Farge et Hazan.

# REPUBLIQUE FRANCAISE

# AU NOM DU PEUPLE FRANCAIS

Attendu que, le 3 avril 1975, Joanny Veyrat est décédé en laissant pour lui succéder ses trois enfants nés de son premier mariage, M. Michel Veyrat, Mmes Monique Chaix et Marie-Jeanne Canet, ainsi que sa seconde épouse, Mme Pascal, avec laquelle il s'était marié le 3 juillet 1970, sous le régime de la séparation de biens, et l'enfant né de cette union, René Veyrat ; que les enfants du premier lit ont assigné Mme Pascal et son fils en liquidation de la succession ; que le Tribunal, faisant droit à leur demande, a notamment condamné Mme Pascal à rapporter à la succession les sommes d'argent représentant partie du prix d'une propriété qu'elle avait acquise par adjudication en 1972 et le prix d'une autre propriété qu'elle avait achetée, en 1974, pour 190 000 francs ; que les premiers juges ont estimé que Joanny Veyrat avait payé de ses deniers ces propriétés et que ces versements constituent des libéralités déguisées ; que l'arrêt attaqué a décidé que ces ventes étaient des donations déguisées rapportables et que le rapport est dû de la valeur du bien donné à l'époque du partage d'après son état à l'époque de la donation ; qu'il a aussi statué sur la valeur d'une donation dont avait bénéficié Mme Canet, sur le salaire différé demandé par M. Michel Veyrat et sur l'action en revendication de titres au porteur découverts dans un coffre loué par Mme Pascal, formée par les enfants du premier lit ; qu'enfin la cour d'appel a refusé de déférer le serment décisoire à M. Michel Veyrat, qui contestait avoir reçu de son père une somme d'argent, à titre de prêt.

Sur le sixième moyen, pris en ses deux branches :
Attendu que Mme Pascal et M. René Veyrat font grief à la cour d'appel d'avoir retenu la date du partage pour estimer la valeur des immeubles successoraux, alors, selon le moyen, d'une part, que l'arrêt est entaché

d'une contradiction entre le dispositif et les motifs qui retiennent la date du rapport de l'expert tout en indexant les sommes proposées par celui-ci, et que, d'autre part, en retenant une somme revalorisée en fonction d'une indexation, les juges du second degré ont violé l'article 824 du Code civil ;
Mais attendu que, dans son dispositif, la cour d'appel s'est bornée à énoncer exactement la règle de l'évaluation au jour du partage ; que sa décision, dont les motifs relatifs aux modalités de cette évaluation n'ont pas autorité de chose jugée quant à la valeur des biens objets du partage à intervenir, n'encourt donc pas les critiques du moyen ;

Sur le deuxième moyen et le quatrième moyen, pris en ses deux branches : (sans intérêt) ;
Mais sur le premier moyen, pris en ses deux premières branches : (sans intérêt) ;
Et sur le troisième moyen, pris en ses deux branches :
Vu les articles 2229 et 2279 du Code civil ;

Attendu que, pour dire que les titres au porteur placés dans un coffre bancaire loué par Mme Pascal doivent être réintégrés dans la succession, la cour d'appel retient que le contenu du coffre ne peut avoir un caractère public, que la cohabitation des époux ne permettait pas une " individualisation absolue " de ce contenu et que Mme Pascal ne peut établir qu'elle a été en mesure d'économiser une somme aussi importante, alors que les ressources de son mari rendaient possible l'acquisition des bons ;

Attendu cependant que la détention de titres au porteur, non susceptibles d'un usage commun, dans un coffre qu'elle avait loué sans se dissimuler n'est pas de nature à vicier la possession de Mme Pascal, qui, défenderesse à l'action en revendication exercée au nom de la succession, n'avait pas à prouver l'origine de ces meubles, sa seule possession valant titre ;

Attendu qu'en statuant comme elle l'a fait la cour d'appel a violé les textes susvisés ;
Et enfin, sur le cinquième moyen :
Vu l'article 1358 du Code civil ;
Attendu que, pour refuser le serment décisoire que Mme Pascal entendait déférer à M. Michel Veyrat sur la réalité d'un prêt de 21 000 francs qui lui aurait été consenti par son père en mars 1975, la cour d'appel retient que, s'il est établi qu'il a reçu l'argent de son père, il n'a pu être démontré qu'il s'agissait d'un prêt en l'absence d'écrit du fils établissant une reconnaissance de dette et que l'attitude adoptée par celui-ci, qui conteste avoir reçu un prêt, rend inutile le serment ;
Attendu cependant que déférer le serment aurait eu pour effet de trancher le litige portant sur la nature de prêt de la somme dont l'arrêt attaqué admet qu'elle a été remise, si bien que c'est précisément parce que celui à qui devait être déféré le serment contestait ce point que l'offre de serment décisoire devait être accueillie ; qu'en statuant par le seul motif dépourvu de pertinence qu'elle a retenu la cour d'appel a violé le texte susvisé ;
PAR CES MOTIFS, et sans qu'il y ait lieu de statuer sur les autres griefs du pourvoi :

CASSE ET ANNULE, mais seulement en ce qu'il a décidé que les titres de l'emprunt d'Etat 1973 font partie de la succession, et en ce qu'il refusé de déférer le serment décisoire à M. Michel Veyrat, l'arrêt rendu le 6 septembre 1989, entre les parties, par la cour d'appel de Grenoble ; remet, en conséquence, quant à ce, la cause et les parties dans l'état où elles se trouvaient avant ledit arrêt et, pour être fait droit, les renvoie devant la cour d'appel de Lyon

Publication : Bulletin 1991 I N° 199 p. 130

Décision attaquée : Cour d'appel de Grenoble, 1989-09-06
Titrages et résumés 1° SUCCESSION - Partage - Evaluation - Date - Date de la jouissance divise - Dispositif d'une décision énonçant le principe - Motifs retenant l'estimation de l'expert assortie d'une indexation - Contradiction entre les motifs et le dispositif (non)

1° N'encourt pas les griefs tirés de la violation de l'article 824 du Code civil et d'une contradiction entre le dispositif et les motifs la décision qui se borne, dans son dispositif, à énoncer exactement la règle de l'évaluation des biens successoraux au jour du partage, ses motifs, retenant l'estimation de l'expert assortie d'une indexation, n'ayant pas autorité de la chose jugée.

1° CHOSE JUGEE - Motifs - Absence d'autorité
1° CASSATION - Moyen - Motifs de la décision attaquée - Contradiction - Contradiction entre les motifs et le dispositif - Applications diverses - Motifs non contradictoires avec le dispositif - Succession - Partage - Evaluation - Date - Date de la jouissance divise - Dispositif d'une décision énonçant le principe - Motifs retenant l'estimation de l'expert assortie d'une indexation

2° POSSESSION - Caractères - Caractère public - Détention de titres au porteur - Détention d'un coffre-fort

**EXHIBIT N°9**

## AUCTIONEERS

Duties and liability - Sale by public auction - Painting (unusual statement on the back) - Origin - Despoliation during the Occupation - Duty to determine its origin - Wrongful breach by the auctioneer (yes) - Risk as to the possibility to resell - Loss of a chance for the buyer to avoid its acquisition - Loss - Compensation by the auctioneer

Is inadmissible, a petition seeking the nullity of the sale of a painting by public auction brought against an auctioneer where it is proven that the auctioneer communicated the name and address of the painting's owner in the course of proceedings, such that the auctioneer cannot be considered to be acting as representative for an anonymous owner; as a consequence, the purchaser should have brought an action for nullity against the heirs of the seller after his death.

Concerning the claim for damages also brought against the auctioneer, for having failing to call on an expert assessor with a view to determining the origin of the painting which bore a statement on the back revealing, as demonstrated by the expert assessor who was called upon by another auctioneer entrusted by the buyer with the resale which he abandoned, that this was property which had been the object of despoliation by the occupying forces during the Second World War, it has not been demonstrated how the lack of an expert assessor at the time of the sale was in itself a wrongful act, since the primary duty of the expert knowledgeable in the art is to give his opinion as to the authenticity of the appraised work and not as to its legal status. Moreover, in the absence of elements which may cast a doubt on the origin of the work, an auctioneer cannot be criticised for failing to proceed with research in order to determine the list of successive owners who had previously held the painting.

However, as the auctioneer was unaware of the meaning of the statement appearing on the back of the painting, its unusual nature should have drawn his attention, as art professional, guarantor of the legality of the sale, and prompt him, before putting the painting on sale, to inform himself as to its origin. Where he fails to prove that he fulfilled this duty, his professional liability may be sought and retained.

It is irrelevant that the buyer, acting in good faith at the time of the acquisition of the work, may claim to be its legitimate owner or that any possibility of claim for recovery of the painting is excluded as a result of the expiry of time limits provided for this purpose by law, with even the thirty-year prescription being acquired.

Although it cannot be said to be certain that the buyer, informed by the auctioneer of the meaning of the statement in question, would have decided not to purchase the painting, nonetheless the fact remains that, as a consequence of the auctioneer's breach of duty, he has lost a serious chance to avoid the acquisition of property with an origin which creates a risk as to the possibility of reselling it. The loss arising under this loss of a chance, as the painting was purchased at the price of FRF 130,000 excluding costs and fees, will be compensated by ordering the auctioneer to pay the sum of EUR 10,000 in damages.

Paris Court of Appeals (1st Chamber Section A) 5 March 2002; Valton v. Couturier, De Nicolay and S.C.P. Couturier-De-Nicolay - Mr Cavarroc, Presiding Judge; Mrs Pénichon, Mr Savatier, Appeal Judges - Me Guibert and Me Gaultier, *Avocats*; S.C.P. Fisselier-Chiloux-Boulay and S.C.P. Gaultier-Kistner-Gaultier, *Avoués*.

{ 30634 }

SWORN TRANSLATOR
Gérard DELAUNAY
19, rue J.J. Rousseau
75001 PARIS
01.40.39.97.12
FOR THE PARIS COURT OF APPEAL

La traduction est certifiée conforme au document original en langue *française* - ne varietur - et visée par moi
A PARIS, le 17 juin 2003
Gérard DELAUNAY

**1) BANQUES**

Responsabilité – Prêt – Prêts successifs – Déclaration sur l'honneur de l'emprunteur – Effets

**2) CONTRATS ET OBLIGATIONS**

Exécution – Clause pénale – Révision – Conditions – Clause manifestement excessive – Appréciation

**3) INTÉRÊTS**

Anatocisme – Crédit à la consommation – Intérêts échus (art. 1154 du Code civil) – Application (oui)

1) L'emprunteur qui s'est successivement fait consentir, à un mois d'intervalle, deux prêts sur la foi de déclarations sur l'honneur relatives à sa situation personnelle et familiale dont il résultait qu'elle pouvait normalement faire face aux remboursements desdits prêts, est mal fondé à prétendre que la banque aurait failli à son devoir de conseil en lui consentant ces crédits, l'entière responsabilité du choix d'accroître en toute connaissance de cause sa dette de remboursement incombant à ce souscripteur majeur jouissant de toutes ses facultés physiques, psychiques et mentales.

2) Une indemnité de résiliation contractuelle stipulée, conformément aux articles D. 311-11 et D. 311-12 du Code de la consommation, à un taux de 8 % est dépourvue de tout caractère manifestement excessif de nature à justifier une minoration en application de l'article 1152 alinéa 2 du Code civil.

3) Aucune disposition du Code de la consommation ne s'oppose à la capitalisation des intérêts conformément aux prévisions générales et d'ordre public de l'article 1154 du Code civil, ni l'article L. 311-32 qui ne vise que les « indemnités ou les coûts » limitativement énumérés par les articles L. 311-29 à L. 311-31 et non pas les intérêts « stricto sensu » et leur capitalisation, ni l'article L. 311-30 qui, en prévoyant expressément le paiement par l'emprunteur défaillant des intérêts échus demeurés impayés, réserve nécessairement au prêteur le droit d'en réclamer la capitalisation.

C. Versailles (1re ch.), 11 janvier 2002 : S.A. Société générale c. Linda Boucherit – M. Chaix, prés. : Mme Le Boursicot et M. Clouet, cons. – Mes Arbellier-Wagmann et Touati, av. : S.C.P. Jupin-Algrin et Lissarrague-Dupuis, avoués.

---

**COMMISSAIRES-PRISEURS**

Obligations et responsabilité – Vente aux enchères publiques – Tableau (mention insolite au dos du) – Origine – Spoliation pendant l'occupation – Obligation de se renseigner sur son origine – Manquement fautif du commissaire-priseur (oui) – Aléa quant à la possibilité de revente – Perte de chance de l'acquéreur d'éviter d'en faire l'acquisition – Préjudice – Réparation par le commissaire-priseur

Doit être déclarée irrecevable la demande en annulation de la vente aux enchères publiques d'un tableau, dirigée contre un commissaire-priseur dont il est établi qu'il a communiqué au cours de l'instance le nom et l'adresse de son propriétaire, de sorte que le commissaire-priseur ne peut être considéré comme son prête-nom et qu'il appartenait en conséquence à l'acheteur d'assigner en nullité les héritiers du vendeur après le décès de celui-ci.

S'agissant de la demande de dommages et intérêts dont le commissaire-priseur fait également l'objet, pour s'être abstenu de recourir à un expert en vue de déterminer l'origine du tableau qui portait au dos une mention révélant, ainsi qu'il a montré l'expert auquel a eu recours un autre commissaire-priseur chargé par l'acquéreur de la revente à laquelle il fut renoncé, qu'il s'agissait d'un bien ayant fait l'objet d'une spoliation par les occupants au cours de la seconde guerre mondiale, il n'est pas démontré en quoi l'absence d'un expert lors de la vente était en elle-même constitutive d'une faute, dès lors que la fonction première de l'homme de l'art est de se prononcer sur l'authenticité de l'œuvre soumise à son expertise et non sur son statut juridique. Par ailleurs, ne peut être fait grief à un commissaire-priseur en l'absence d'éléments de nature à faire naître un doute dans son esprit quant à l'origine de l'œuvre, de ne pas s'être livré à un travail de recherche destiné à établir la liste des propriétaires successifs entre les mains desquels elle s'est trouvée.

Toutefois, dans l'ignorance où le commissaire-priseur était de la signification de la mention figurant au dos du tableau, son caractère insolite aurait dû attirer son attention de professionnel de l'art, garant de la régularité de la vente, et l'inciter, avant de mettre le tableau en vente, à se renseigner sur son origine. Faute de rapporter preuve de ce qu'il a satisfait à cette obligation, sa responsabilité civile professionnelle est susceptible d'être engagée.

Il est sans importance que l'acquéreur, de bonne foi au moment de l'acquisition de l'œuvre puisse s'en prétendre légitime propriétaire ou qu'il soit exclue toute possibilité de revendication de

VENDREDI 30 AOÛT AU MARDI 3 SEPTEMBRE 2002 GAZETTE DU PALAIS

*Cour d'Appel de Paris 5 Mars 2002*

N° 30634-3



SWORN TRANSLATOR
Gérard DELAUNAY
19, rue J.J. Rousseau
75001 PARIS
01.40.39.97.12
FOR THE PARIS COURT OF APPEAL

SWORN TRANSLATOR
Gérard DELAUNAY
19, rue J.-J. Rousseau
75001 PARIS
01.40.39.07.12
FOR THE PARIS COURT OF APPEAL

tableau, en raison de l'expiration des délais pré-vus à cet effet par la législation, la prescription trentenaire étant même acquise.

S'il ne peut être tenu pour certain qu'informé par le commissaire-priseur de la signification de la mention en cause, l'acquéreur aurait pris la décision de ne pas acheter le tableau, il n'en demeure pas moins qu'il a perdu, à raison de la faute du commissaire-priseur, une chance sérieuse d'éviter de faire l'acquisition d'un bien dont l'origine fait peser un aléa sur la possibilité d'en assurer la revente. Le préjudice résultant de cette perte de chance, le tableau ayant été acquis au prix de 130.000 F (hors frais, sera réparé par la condamnation du commissaire-priseur à payer à l'acquéreur la somme de 10.000 euros à titre de dommages et intérêts.

C. Paris (1re ch. sect. A), 5 mars 2002 ; Valton c. Couturier, De Nicolay et S.C.P. Couturier-De Nicolay – M. Cavarroc, prés. ; Mme Pénichon, M. Savatier, cons. – Mes Guibert et Gaultier, av. ; S.C.P. Fisselier-Chiloux-Boulay et S.C.P. Gaultier-Kistner-Gaultier, avoués.

**NOTE** ■ En matière de vente publique de meubles, la jurisprudence fait peser sur le commissaire-priseur qui y procède un devoir de conseil qui trouve son application dans les hypothèses les plus diverses. Il s'impose à lui dans le cas de la vente d'un véhicule d'occasion dont il est tenu de vérifier l'exactitude de la puissance administrative attestée par le vendeur (C. Paris, 2 mai 2000, Gaz. Pal. 2001, 1, somm. p. 1045). Mais aussi lors de la vente d'une toile de maître, s'il a manqué de vigilance lors de la rédaction du catalogue de vente en y portant des mentions qui affirment ou peuvent laisser accroire son authenticité à l'acquéreur (C. Lyon, 28 septembre 1989, D. 1989, I.R. 301; C. Paris, 14 mars 1997, Gaz. Pal 1997, 2, somm. p. 482 et notre note; C. Paris, 5 décembre 1997, D. 1998, I.R. 27).

Toute affirmation erronée, tout défaut de vigilance de sa part seront sanctionnés par une déclaration judiciaire de responsabilité envers l'acquéreur, notamment s'il a omis de consulter un expert, car il lui appartient de faire procéder à toutes investigations utiles en vue de s'assurer de l'authenticité de l'œuvre. Le plus souvent, il sera déclaré responsable in solidum avec le vendeur (Cass. 1re civ., 27 avril 1997, Gaz. Pal 1997, 2, panor. p. 291) et parfois même il pourra l'être, solidairement avec son expert, des conclusions erronées de celui-ci (C. Paris, 5 mai 1989, D. 1989, I.R. 174). Sa responsabilité sera engagée dans le cadre d'une action en résolution de la vente pour inexécution, ou anulation pour erreur sur les qualités substantielles de la chose vendue. Elle le sera pour faute quasi délictuelle si le commissaire-priseur n'apparaît pas dans la vente que comme mandataire d'un vendeur identifié ; pour faute contractuelle si, le vendeur étant resté inconnu, le commissaire-priseur a été son prête-nom. Condamné à garantir à l'acheteur la

restitution du prix par l'acquéreur, il pourra être également à indemniser son préjudice moral ou celui résultant de l'indisponibilité de l'œuvre jusqu'à la restitution de son prix à l'issue de l'instance.

Bien que certaines décisions récentes aient considéré que le devoir de conseil du commissaire-priseur allait jusqu'à s'assurer de la légitimité de la détention par le vendeur de livres rares et anciens vendus par son intermédiaire, ainsi que du respect des règles relatives à l'exportation des objets d'art (Cass. 1re civ., 18 janvier 2000, Gaz. Pal. 2000, 1, p. 758), ce qui témoigne d'une certaine prolifération des cas où la responsabilité du commissaire-priseur peut être utilement invoquée, il ne semble pas que jusqu'ici le devoir de conseil mis à sa charge ait excédé le cadre de l'obligation de moyens, dont le corollaire implique que l'acquéreur se voie imposer la charge de la preuve du manquement du commissaire-priseur, donc de sa faute.

On peut désormais en douter à la lecture des motifs de l'arrêt rapporté de la Cour d'appel de Paris qui estime engagée la responsabilité civile professionnelle d'un commissaire-priseur, faute par lui d'avoir « rapporté la preuve qu'il avait satisfait à son obligation » de se renseigner sur l'origine d'un tableau, d'où une certaine connotation d'obligation de résultat, d'une part ; d'autre part, en raison de la « perte d'une chance sérieuse d'éviter » de faire l'acquisition d'un tableau dont l'origine fait peser un aléa sur la possibilité d'en assurer la revente ».

Il s'agissait en l'espèce d'un amateur qui s'était porté acquéreur aux enchères publiques d'un tableau comportant, au dos du panneau de bois sur lequel il avait été peint, une inscription consistant dans les lettres M.A.B. (en allemand « Militar Aktion Bilder »), ainsi qu'un numéro. Ces mentions, ainsi que le signala un expert consulté par un autre commissaire-priseur que l'acheteur avait chargé de la revente de la toile, correspondaient aux saisies faites par l'occupant, au cours des années 1940-1945, de tableaux destinés à être transportés en Allemagne. Or, lors de son achat, l'acquéreur n'avait pas été alerté au sujet de cette particularité par le commissaire-priseur qui n'avait pas cherché à percer le sens du sigle sybillin. Quant au commissaire-priseur chargé de procéder à la revente du tableau, il y renonça, faute de pouvoir garantir à un acheteur un titre de propriété inattaquable.

C'est dans ces conditions que placé dans une situation peu enviable, l'acquéreur du tableau décida d'assigner le commissaire-priseur qui avait présidé à son acquisition et il fut débouté par les premiers juges, sa demande d'annulation de la vente étant déclarée irrecevable et sa demande de dommages et intérêts rejetée en considération, tant de l'absence de faute du commissaire-priseur que de l'inexistence du préjudice par lui allégué.

La Cour confirme à bon droit ce jugement du chef de l'irrecevabilité de la demande d'annulation de la vente. C'est en effet à tort que l'acquéreur prétendait que le nom du propriétaire du tableau ne lui avait

mière instance le commissaire-priseur avait, par conclusions, précisé le nom et l'adresse de ce propriétaire. Puisqu'il était décédé avant l'assignation, seuls ses héritiers auraient dû être assignés en annulation et non le commissaire-priseur, qui avait été son mandataire et non son prête-nom.

Restait la demande de dommages et intérêts que, concurremment, l'acheteur avait dirigée contre le commissaire-priseur, et la Cour n'hésite pas à y faire droit.

Certes, selon elle, il ne pouvait être reproché au commissaire-priseur de n'avoir pas consulté un expert avant la vente, comme lui en faisait grief l'acquéreur, car celui-ci ne démontrait pas en quoi l'avis d'un homme de l'art était nécessaire, et son absence constitutive d'une faute puisque sa mission première n'aurait pas été de se prononcer sur le statut juridique de l'œuvre d'art, mais sur son authenticité. Pas davantage ne pouvait-il être reproché au commissaire-priseur l'absence d'éléments de nature à faire naître un doute quant à l'origine de l'œuvre, de ne s'être pas livré à une recherche particulière pour établir la liste des propriétaires successifs.

On peut émettre des réserves sur une telle motivation car, lors de la tentative de revente du tableau, c'est bien un expert, celui qu'avait consulté l'autre commissaire-priseur qui avait été pressenti, qui avait découvert que le toile provenait d'une spoliation. D'autre part, peu conforme à la jurisprudence qui impose au commissaire-priseur de s'assurer de la légitimité de la détention du vendeur (Cass. 1ʳᵉ civ., 18 janvier 2000 précitée), elle n'est pas davantage en accord avec les motifs pour lesquels l'arrêt commenté fait finalement droit à la demande de dommages et intérêts de l'acquéreur, en énonçant que, professionnel de l'art garant de la régularité de la vente, l'attention du commissaire-priseur aurait dû être attirée par la mention insolite figurant au dos du tableau (M.A.B.) qui désignait, comme l'avait indiqué le service des archives du Ministère des affaires étrangères, une œuvre d'art dont le propriétaire avait été spolié au cours de la dernière guerre mondiale. Le problème de son origine était donc bien en cause et il aurait pu être résolu par voie expertale.

Quoiqu'il en soit, la Cour estime que, même s'il n'était pas tenu de recourir à un expert, le commissaire-priseur avait manqué à son devoir et que sa responsabilité civile professionnelle était susceptible d'être engagée faute de s'être renseigné au sujet de la mention dont le caractère insolite aurait dû mobiliser son attention.

Pour indemniser l'acquéreur, la Cour avait enfin à caractériser le préjudice qu'il avait subi. Certes, ayant acquis de bonne foi, il pouvait se prétendre légitime propriétaire et il n'était pas exposé à la revendication du propriétaire spolié puisqu'étaient expirés les délais pour ce faire prévus par la législation, la prescription trentenaire étant même acquise.

Mais le commissaire-priseur n'était pas pour autant tiré d'affaire. Car « in cauda venenum », la Cour tire argument de ce que, même en l'absence de toute possibilité de revendication, l'acheteur gardait sur les bras une toile dont l'origine était illicite ; que, même s'il n'était pas certain qu'informé de la signification des lettres M.A.B. il aurait renoncé à l'acheter, il pesait sur cette œuvre un aléa quant à la possibilité de la revendre et que, par la faute du commissaire-priseur, l'acquéreur avait perdu une chance sérieuse d'éviter de l'acheter, alors qu'elle était grevée d'un tel aléa.

On peut être également rester sceptique devant une telle motivation, en la confrontant à la jurisprudence selon laquelle, pour donner lieu à réparation d'un dommage né et actuel, la chance dont la perte est invoquée doit être certaine (Starck par Laurent et Boyer. Droit civil. Obligations. Responsabilité délictuelle n° 101). En effet, ce n'est pas sans contradiction que la Cour énonce, tout d'abord, qu'il n'était pas certain que, s'il avait été informé de la signification des lettres M.A.B., l'amateur aurait renoncé à se porter acquéreur, puis qu'il avait perdu une chance sérieuse de renoncer à acquérir le tableau, par la faute du commissaire-priseur. Celui qui prend un risque doit en assumer les conséquences.

Puisque la Cour admettait qu'il n'était pas exclu que, même informé, il eût évité de faire l'acquisition de la toile, elle ne pouvait dans le même temps considérer qu'il avait subi à cet égard la moindre perte de chance, pas plus d'ailleurs qu'en raison de l'aléa qui aurait présidé à une tentative de revente d'un tableau qui, comme la femme de César, devait nécessairement être à l'abri de tout soupçon.

Pourtant, en retenant la responsabilité du commissaire-priseur, la Cour en tire de lourdes conséquences puisqu'elle le condamne à payer à l'acquéreur la somme de 10.000 euros, soit plus de la moitié, hors frais, du prix d'acquisition qui s'élevait à 130.000 F.

Aussi criticable soit-il dans sa motivation, cet arrêt reste néanmoins remarquable par la rigueur de la solution qu'il donne au problème de la responsabilité d'un commissaire-priseur. Il est dans la ligne de la jurisprudence qui lui impose des obligations de plus en plus lourdes à l'occasion de l'exécution de son devoir de conseil, qui n'est normalement qu'une obligation de moyens. Au-delà de l'obligation de s'assurer de l'authenticité de l'œuvre d'art, il va jusqu'à indemniser l'acheteur à l'occasion de la perte de chance qu'il subit d'éviter de l'acquérir, en raison de la suspicion qui l'entache et risque de grever d'un aléa sa revente, et ceci, même s'il n'est pas exclu qu'informé, par le commissaire-priseur des « particularités » de l'œuvre il aurait persisté dans son intention de l'acquérir. Il semble alors qu'on s'éloigne de l'obligation de moyens pesant sur le commissaire-priseur pour parvenir aux confins de l'obligation de résultat qui pèse sur tout professionnel. N'est-il d'ailleurs pas significatif que la Cour ait énoncé que le commissaire-priseur était responsable, « faute d'avoir rapporté la preuve » qu'avant de le mettre en vente il avait satisfait à son obligation de se renseigner sur l'origine du tableau, cette carence dans l'administration de la preuve suffisant à caractériser sa faute ? Au moins dans les termes, elle semble avoir renversé la

charge de la preuve en présumant, sauf preuve contraire qui n'était pas faite, que le commissaire-priseur était responsable en vertu d'une obligation de résultat, alors que dans le cadre d'une obligation de moyens la preuve de la faute était à la charge de l'acquéreur.

HENRI VRAY
Premier président honoraire de la Cour d'appel de Limoges

## VENTE

**Consentement – Vices du consentement – Vente aux enchères – Statue vendue comme représentant un roi d'Égypte déterminé – Présentation de l'œuvre au catalogue – Avis de l'expert du vendeur – Certification de l'authenticité de l'œuvre – Indication d'une controverse possible à ce sujet – Expertise judiciaire – Affirmation du caractère authentique – Erreur alléguée par l'acheteur – Conditions d'élaboration d'autres avis contestant l'authenticité – Pertinence (non) – Analyse de la roche – Authenticité de l'œuvre établie – Erreur déterminante de l'acquisition (non) – Dol prétendu par l'acheteur – Certification de l'authenticité par l'expert du vendeur – Dissimulation délibérée d'opinions différentes (non) – Obligation d'en faire état (non) – Dol établi (non) – Obligations du vendeur – Obligation de délivrer la chose convenue – Action en résolution de la vente – Statue présentée comme celle de Sésostris III – Identification probable avec un autre roi d'Égypte – Connaissance par l'acquéreur d'une discussion possible sur l'authenticité – Identité de la statue vendue avec celle présentée à la vente – Datation compatible avec le règne de Sésostris III – Conformité avec la statue vendue (oui) – Résolution de la vente (non)**

Il est constant que :

– d'une part que lors d'une vente publique a été adjugée une statue présentée au catalogue comme étant celle de Sésostris III (Égypte – Moyen Empire) et que, l'authenticité de cette statue ayant été mise en cause dans un article de journal, les acquéreurs ont refusé d'en prendre possession et d'en payer le prix, demandant l'annulation de la vente pour erreur sur les qualités substantielles de la chose vendue ou dol et, pour la première fois en appel, sa résolution pour non-conformité de la chose vendue avec celle convenue ;

– d'autre part qu'il résulte du rapport de l'expert du vendeur, figurant à la suite de la description de la statue dans le catalogue, que cette sculpture comporte des hiéroglyphes malhabiles et de facture très grossière, effacées par un polissage, qui ont pu modifier l'approche de l'œuvre en aboutissant à un résultat contraire à l'effet recherché, mais que, tranchant avec la maîtrise exceptionnelle de l'œuvre, elles ne sauraient remettre en cause l'authenticité de l'objet ;

qu'ainsi, si l'expert a indiqué que l'authenticité de la statue pouvait être remise en cause en raison de l'existence de ces inscriptions, elle était à son avis authentique ;

– enfin, que s'il résulte du rapport des deux experts judiciaires qu'en aucun cas cette statue ne remonte au règne de Sésostris III (1872-1854 av. J.-C.) et ne constitue pas davantage un portrait contemporain de ce roi, rien ne permet de condamner son authenticité, dès lors qu'elle devrait s'inscrire comme la seule image commémorative connue à ce jour du grand Bienfaiteur Sesostris Kha-Kaou-Re exécutée dans un atelier royal, et que pour cette raison la statue devient un témoignage historique de grande valeur.

En cet état, il y a lieu de constater que les acquéreurs, qui soutiennent que la qualité essentielle de leur consentement à acquérir était la certitude d'acheter une œuvre authentique, avaient précisément été informés par l'expert du vendeur, affirmant l'authenticité de la statue, que les circonstances rapportées pouvaient faire naître un doute sur son authenticité, de sorte qu'ils ne pouvaient ignorer le risque de la voir contester après la vente, malgré l'avis de l'expert. Alléguant qu'il s'agirait d'un faux moderne inspiré des statues de Sésostris III exposées aux musées de Brooklyn et de Baltimore, c'est à eux qu'il appartient d'établir que la sculpture n'est pas authentique ou, à tout le moins, qu'un doute sérieux affecte son authenticité. C'est en vain qu'à cet effet ils produisent différents avis dont l'un émane d'une personne qui n'a pas procédé contradictoirement et qu'ils ont rémunérée, et les autres de scientifiques étrangers qui, catégoriques quant au caractère de faux moderne, ont reconnu n'être pas spécialistes de la période et ne se sont prononcés qu'au vu de photographies médiocres, l'un deux étant même opposé par une rivalité et de graves différends avec l'auteur d'une expertise de l'œuvre concluant à son authenticité. Cette polémique ne suffit pas à convaincre la Cour de son caractère sérieux, de nature à contredire les avis des experts judiciaires, respectivement Conservateur général honoraire des Musées nationaux et Conservateur en chef des antiquités égyptiennes au Musée du Louvre qui, après avoir vu, touché et regardé la statue sous différents angles, ont estimé, aux termes d'une étude scientifique menée contradictoirement, que la sculpture n'était pas une œuvre moderne mais antique, alors par ailleurs que l'étude minéralogique et pétrographique de la roche dans laquelle elle a été façonnée, réalisée par le Musée de minéralogie de l'École des Mines de Paris a révélé qu'il s'agit d'une roche provenant de gisements situés

**EXHIBIT N°10**

EXHIBIT N° 10

Section II. Thirty-year prescription

Art. 2262. All actions, both actions to enforce a right in personam and actions to enforce a right in rem, are barred after thirty years. A party who invokes this prescription is not obliged to produce a title, and an objection deriving from bad faith cannot be enforced against him.

**Art. 2258** La prescription ne court pas contre l'héritier bénéficiaire, à l'égard des créances qu'il a contre la succession.

Elle court contre une succession vacante, quoique non pourvue de curateur.

**Art. 2259** Elle court encore pendant les trois mois pour faire inventaire, et les quarante jours pour délibérer.

## ● CHAPITRE V  DU TEMPS REQUIS POUR PRESCRIRE

RÉP. CIV. v¹ᵉ *Prescription acquisitive*, par SOHM-BOURGEOIS ; *Prescription extinctive*, par SOHM-BOURGEOIS.

## ● SECTION PREMIÈRE  DISPOSITIONS GÉNÉRALES

BIBL. GÉN. ► LE BARS, JCP 2000. I. 256 (computation des délais de prescription et de procédure).

**Art. 2260** La prescription se compte par jours, et non par heures.

Le dernier jour du délai, lorsque le délai est fixé par année ou par mois, est celui qui porte le même quantième que le premier jour. ● Soc. 24 févr. 1961 : *Bull. civ. IV, n° 252.*

**Art. 2261** Elle est acquise lorsque le dernier jour du terme est accompli.

**1.** Le jour pendant lequel se produit un évènement d'où court un délai de prescription ne compte pas dans ce délai ; la prescription est acquise le dernier jour à minuit du terme accompli. ● Com. 8 mai 1972 : *Bull. civ. IV, n° 136.*

**2.** L'acquisition d'un immeuble par prescription est opposable à tous sans avoir à être publiée. ● Civ. 3ᵉ, 13 nov. 1984 : *D. 1985. 345, note*

*Aubert ; RTD civ. 1985. 747, obs. Giverdon et Salvage-Gerest.*

**3.** L'usucapion rétroagit à la date où la possession a commencé. ● Civ. 3ᵉ, 10 juill. 1996 : *Bull. civ. III, n° 180 ; R., p. 287 ; D. 1998. 509, note Reboul ; Defrénois 1996. 1426, obs. Atias* (la vente d'un terrain par un autre que le possesseur, au cours du délai de prescription, est une vente de la chose d'autrui).

## ● SECTION II  DE LA PRESCRIPTION TRENTENAIRE

**Art. 2262** Toutes les actions, tant réelles que personnelles, sont prescrites par trente ans, sans que celui qui allègue cette prescription soit obligé d'en rapporter un titre, ou qu'on puisse lui opposer l'exception déduite de la mauvaise foi.

ᵇ¹ Sur la prescription (décennale) des actions en responsabilité dirigées contre les professionnels ou établissements de santé, V. C. santé publ., art. L. 1142-28, supra, ss. art. 1384 (II. Autres textes en matière de responsabilité).

BIBL. ► Proposition de modification des art. 2262 et 2270-1 (généralisation à dix ans du délai maximal de prescription extinctive) : R. 2001, p. 20.

**A. PRESCRIPTION EXTINCTIVE**

**1° DOMAINE**

**1. Principe.** Toutes les actions tant réelles que personnelles sont prescrites par trente ans. Il en est ainsi même des actions en nullité absolue. La prescription trentenaire commence à courir à

compter du jour où l'acte irrégulier a été passé. ● Civ. 1ʳᵉ, 26 janv. 1983 : *Bull. civ. I, n° 39 ; R., p. 44 ; D. 1983. 317, note Breton ; RTD civ. 1983. 773, obs. Patarin et 749, obs. Chabas.* ♦ L'action fondée sur une nullité d'ordre public est soumise à la prescription de l'art. 2262, non à la prescription quinquennale de l'art. 1304. ● Com. 20 oct. 1998 : *Bull. civ. IV, n° 243* (nullité

# EXHIBIT N°11

### Article 2229 of the Civil Code :

*"In order to prescribe, the possession must be continuous and not interrupted, peaceful, open and as an owner."*

priété par titre ou par témoins. ● Civ. 3ᵉ, 9 janv. 1969 : *Bull. civ. III, nᵒ 40* ● 25 mars 1992 : *ibid. III, nᵒ 105*.

**6. ... possession utile.** En l'état d'une contestation relative à la propriété d'un immeuble, la possession d'une des parties, bien que d'une durée insuffisante pour parvenir à la prescription acquisitive, donne à l'intéressé le rôle de défendeur à l'action en revendication. ● Civ. 1ʳᵉ, 22 déc. 1964 : *Bull. civ. I, nᵒ 598*. ♦ Lorsque, pour rejeter une action en revendication, les juges du fond se fondent sur l'absence de preuve du droit du demandeur, ils n'ont pas à rechercher si la possession du défendeur présente les caractères d'une possession utile. ● Civ. 3ᵉ, 15 févr. 1968 : *Bull. civ. III, nᵒ 62*.

**7. ... possession équivoque.** Constatant que la possession invoquée était équivoque, les juges du fond peuvent en déduire que la possession est atteinte d'un vice l'empêchant de valoir comme présomption de propriété. ● Com. 18 oct. 1994 : *Bull. civ. IV, nᵒ 309*.

**Art. 2229** Pour pouvoir prescrire, il faut une possession continue et non interrompue, paisible, publique, non équivoque, et à titre de propriétaire.

### A. EXISTENCE DE LA POSSESSION

**1. Nécessité d'actes matériels.** La possession légale utile pour prescrire ne peut s'établir à l'origine que par des actes d'occupation réelle et se conserve tant que le cours n'en est pas interrompu ou suspendu. ● Civ. 3ᵉ, 15 mars 1977 : *JCP 1980. II. 19281, note Régnier*. ♦ Les juges du fond ne peuvent retenir que la prescription est acquise par une possession trentenaire sans relever d'actes matériels de nature à caractériser la possession, alors que l'existence d'actes de cette nature était contestée. ● Civ. 3ᵉ, 15 mars 1978 : *Bull. civ. III, nᵒ 123*. ♦ Pour déclarer un immeuble acquis par la prescription, il ne suffit pas d'énoncer que les demandeurs détiennent un acte de notoriété relatif à leur possession trentenaire et qu'ils paient les impôts fonciers afférents à la parcelle concernée, sans relever des actes matériels de nature à caractériser la possession. ● Civ. 3ᵉ, 27 avr. 1983 : *Bull. civ. III, nᵒ 98.* – V. conf. ● Civ. 3ᵉ, 3 oct. 1990 : *Bull. civ. III, nᵒ 179* ● 11 juin 1992 : *ibid. III, nᵒ 199* ; *D. 1993. Somm. 36, obs. A. Robert ; RD imm. 1993. 53, note Bergel ; Defrénois 1992. 1521, obs. Defrénois-Souleau* ● 30 juin 1999 : *Bull. civ. III, nᵒ 159 ; D. 1999. IR. 209 ; JCP 2000. II. 10399, note Celerien ; ibid. I. 211, nᵒ 2, obs. Périnet-Marquet ; Defrénois 1999. 1054, obs. Atias ; RD imm. 1999. 624, obs. Bruschi.* ♦ V. aussi, sur l'exigence d'actes matériels de possession, ● Civ. 3ᵉ, 13 janv. 1999 : *Bull. civ. III, nᵒ 12 ; JCP 1999. I. 175, nᵒ 5, obs. Périnet-Marquet* ● 23 mai 2002 : *D. 2002. IR. 1807 (office du juge dans la recherche des actes matériels de possession).*

Si l'existence d'un acte notarié constatant une usucapion ne peut, par elle-même, établir celle-ci, il appartient au juge d'en apprécier la valeur probante quant à l'existence d'actes matériels de nature à caractériser la possession invoquée. ● Civ. 3ᵉ, 4 oct. 2000 : *Bull. civ. III, nᵒ 158 ; D. 2000. IR. 274 ; JCP 2001. I. 305, nᵒ 4, obs. Périnet-Marquet ; RD imm. 2001. 148, obs. Bruschi.*

**2. Conservation de la possession « solo animo ».** Si la possession légale d'un fonds immobilier, quand elle a été une fois acquise au moyen d'actes matériels de détention ou de jouissance accompli *animo domini*, peut se conserver par la seule intention du possesseur, c'est à la double condition qu'il n'y ait pas eu renonciation expresse ou tacite et que la possession ait été exercée dans toutes les occasions comme à tous les moments où elle devait l'être d'après la nature de la chose possédée, sans intervalles anormaux assez prolongés pour constituer des lacunes et rendre la possession discontinue. ● Civ. 11 janv. 1950 : *D. 1950. 125, note Lenoan* ● Civ. 1ʳᵉ, 3 mai 1960 : *Bull. civ. I, nᵒ 230*.

**3. Possession et indivision.** La qualité d'indivisaire n'exclut pas en elle-même une possession *animo domini* ; le propriétaire indivis peut s'être comporté en propriétaire exclusif, ce qu'il y a lieu de rechercher. ● Civ. 3ᵉ, 12 oct. 1976 : *Bull. civ. III, nᵒ 341* ● 1ᵉʳ avr. 1992 : *ibid. III, nᵒ 113 ; D. 1993. Somm. 32, obs. A. Robert (2ᵉ esp.).* ♦ Le caractère exclusif de la possession d'un propriétaire indivis ne peut être établi par l'existence d'actes incompatibles avec cette seule qualité. ● Civ. 3ᵉ, 27 nov. 1985 : *Bull. civ. III, nᵒ 158* ● 22 janv. 1992 : *ibid. III, nᵒ 29* ● 1ᵉʳ avr. 1992 : *ibid. III, nᵒ 113 ; Defrénois 1992. 1137, obs. Souleau.* ♦ Dans le cas d'un lot de copropriété : ● Civ. 3ᵉ, 26 mai 1993 : *RD imm. 1993. 411, obs. Capoulade et Giverdon.* ♦ L'héritier qui prétend avoir acquis un immeuble par usucapion doit rapporter la preuve d'actes manifestant à l'encontre de ses cohéritiers son intention de se comporter en propriétaire exclusif. ● Civ. 1ʳᵉ, 27 oct. 1993 : *Bull. civ. I, nᵒ 304 ; D. 1995. Somm. 332, obs. Grimaldi.* ♦ V. aussi *infra*, notes 14 et 17.

**4. Possession et copropriété.** Le droit de copropriété peut s'acquérir par prescription. ● Civ. 1ʳᵉ, 16 avr. 1959 : *Bull. civ. I, nᵒ 198.* ♦ Ainsi, la possession exercée *animo domini* sur une venelle par une utilisation commune avec les voi-

# EXHIBIT N°12

### Supreme Court, 3rd Ch., July 10, 1996 :

*"The acquisitive prescription is retroactive to the date at which the possession started".*

*(...)*

*"But whereas, having noted that the possession since 1953 of the disputed piece of land by the INRA meets the conditions required by Article 2229 of the Civil Code, this Institute is founded to invoke the benefit of the thirty-year acquisitive prescription,*

*the Court of Appeal has exactly concluded, without violating the principle of contradiction, that Mrs CHAUVETON has sold, by an authentic act of September 19 and October 25, 1978, a piece of land that did not belong to her (...)".*

TROISIÈME PARTIE

TROISIÈME CHAMBRE CIVILE

*Président* : M. Beauvois. – *Rapporteur* : Mme Fossereau. – *Avocat général* : M. Baechlin. – *Avocat* : M. Jacoupy.

A RAPPROCHER :

3ᵉ Civ., 18 mars 1992, Bull. 1992, III, n° 97 (1), p. 57 (cassation partielle), et l'arrêt cité.

## N° 180

## PRESCRIPTION ACQUISITIVE. – Effets. – Effet rétroactif. – Date de départ de la possession.

*L'usucapion rétroagit à la date où la possession a commencé à courir.*

**10 juillet 1996.** Rejet.

Sur le moyen unique :

Attendu, selon l'arrêt attaqué (Bordeaux, 31 janvier 1994), que, suivant un acte authentique des 19 septembre et 25 octobre 1978, Mme Chauveton, aux droits de laquelle se trouvent les consorts Chauveton, a vendu une parcelle de terre à la Communauté urbaine de Bordeaux (CUB) ; que la CUB, ayant constaté que la parcelle était occupée par l'Institut national de la recherche agronomique (INRA), a assigné les consorts Chauveton en délivrance et, en cas d'impossibilité, en résolution de la vente et remboursement du prix et l'INRA en déclaration de jugement commun ;

Attendu que les consorts Chauveton font grief à l'arrêt de dire que l'INRA était légitime propriétaire de la parcelle, d'annuler la vente conclue entre Mme Chauveton et la CUB et d'ordonner la restitution du prix, alors, selon le moyen, d'une part, que ni la Communauté urbaine ni l'INRA n'avaient, dans leurs conclusions, sollicité l'application de l'article 1599 du Code civil ; que la cour d'appel, qui a soulevé le moyen d'office sans provoquer les explications des parties, a violé le principe du contradictoire et l'article 16 du nouveau Code de procédure civile ; d'autre part, que seul le défaut de qualité de propriétaire du vendeur au moment où devrait s'effectuer l'effet translatif de vente entraîne la nullité de la vente ; que l'INRA ne pouvant avoir acquis le bien litigieux par prescription trentenaire qu'en 1983, Mme Chauveton en était bien propriétaire lors de l'aliénation en 1978 consentie à la CUB ; que, par suite, la cour d'appel, en considérant qu'elle avait vendu une parcelle qui ne lui appartenait pas, ce qui entraînait l'annulation de la vente, a violé par fausse application l'article 1599 du Code civil ;

Mais attendu qu'ayant relevé que la possession de la parcelle litigieuse par l'INRA depuis 1953 présentait les conditions requises par l'article 2229 du Code civil, cet établissement était fondé à se prévaloir de la prescription acquisitive trentenaire, la cour d'appel en a exactement déduit, sans violer le principe de la contradiction, que Mme Chauveton avait vendu, par acte authentique des 19 septembre et 25 octobre 1978, une parcelle qui ne lui appartenait pas et que la vente de la chose d'autrui étant nulle, il y avait lieu de prononcer la nullité de cette vente et d'ordonner la restitution du prix de vente ;

D'où il suit que le moyen n'est pas fondé ;

PAR CES MOTIFS :

REJETTE le pourvoi.

N° 94-21.168. *Consorts Chauveton contre Communauté urbaine de Bordeaux et autres.*

*Président* : M. Beauvois. – *Rapporteur* : M. Pronier. – *Avocat général* : M. Baechlin. – *Avocats* : M. Odent, la SCP Boré et Xavier, la SCP Nicolaÿ et de Lanouvelle, la SCP Boulloche, la SCP Tiffreau et Thouin-Palat.

## N° 181

## PUBLICITÉ FONCIÈRE. – Transferts successifs. – Priorité de transcription. – Opposabilité par le vendeur à son premier acquéreur (non).

*Le vendeur qui a vendu le même bien à deux acquéreurs successifs n'étant pas un tiers au sens de l'article 30 du décret du 4 janvier 1955 ne peut invoquer, à l'encontre du premier acquéreur, l'opposabilité de la seconde vente publiée en premier.*

**10 juillet 1996.** Rejet.

Sur le moyen unique :

Attendu, selon l'arrêt attaqué (Rouen, 9 mars 1994), statuant sur renvoi après cassation, que M. Bonjour, locataire de locaux d'habitation appartenant à M. Barthélemy, ayant reçu de celui-ci, le 30 octobre 1985, un congé avec offre de vente de l'appartement loué, a accepté l'offre le 17 décembre suivant ; qu'après que le bail consenti à M. Bonjour eut été renouvelé avec effet jusqu'au 1ᵉʳ juin 1986, M. Barthélemy a vendu l'appartement à la société civile immobilière Aylerith (SCI) ; que le locataire a alors assigné le bailleur et l'acquéreur pour faire reconnaître la perfection de la vente en sa faveur et prononcer la nullité de la vente consentie à la SCI ; que celle-ci a réclamé le remboursement du prix d'achat ;

Attendu que M. Barthélemy fait grief à l'arrêt de déclarer parfaite la vente consentie à M. Bonjour et d'annuler la vente conclue avec la SCI, alors, selon le moyen, d'une part, que le droit de préemption prévu par les articles 10 et 11 de la loi du 22 juin 1982 n'est pas applicable au locataire dont le titre locatif n'est pas remis en cause ; qu'en l'état des écritures de M. Barthélemy faisant valoir que l'appartement devait être vendu en son état d'occupation à la société Aylerith, de telle sorte que le congé délivré sur le fondement de l'article 10 au locataire, M. Bonjour, était entaché d'une erreur de droit, la cour d'appel ne pouvait écarter l'erreur pour un motif inopérant tiré de ce que la promesse de vente avait été consentie la veille du congé, sans rechercher si la vente remettait en cause le titre locatif de M. Bonjour ; qu'elle a ainsi entaché sa décision d'un manque de base légale au regard des articles 1109 du Code civil et 10 de la loi du 22 juin 1982, d'autre part, qu'aux termes de l'article 30-1 du décret du 4 janvier 1955, les ventes d'immeuble doivent être publiées, à peine d'inopposabilité aux tiers titulaires sur le même immeuble de droits concurrents publiés ; qu'ainsi, saisie par M. Barthélemy de conclusions faisant valoir que la vente consentie à la société Aylerith

## EXHIBIT N°13

### Article 2235 of the Civil Code

*"To complete the period of prescription, one may join to his period of possession, the one of its principal, in whichever manner one has succeeded, whether as universal or particular heir, or whether for lucrative purposes or for a consideration".*

**Art. 2234** Le possesseur actuel qui prouve avoir possédé anciennement, est présumé avoir possédé dans le temps intermédiaire, sauf la preuve contraire.

**Art. 2235** Pour compléter la prescription, on peut joindre à sa possession celle de son auteur, de quelque manière qu'on lui ait succédé, soit à titre universel ou particulier, soit à titre lucratif ou onéreux.

**1. Illustration : usufruitier.** L'usufruit étant un droit réel, démembrement du droit de propriété, le possesseur d'un tel droit peut joindre à la sienne la possession à titre de propriétaire de son auteur. ● Civ. 1re, 13 févr. 1963 : *Gaz. Pal. 1963. 2. 82.*

**2. ... acquéreur.** Un acquéreur ne peut joindre à sa possession celle de son vendeur pour prescrire un bien resté en dehors de la vente. ● Civ. 3e, 17 avr. 1996 : *Bull. civ. III, n° 107.* ◆ Solution inverse lorsque le bien a été compris dans la vente : ● Civ. 3e, 3 oct. 2000 : *Defrénois 2001. 452, obs. Atias.*

**3. ... servitude.** Pour apprécier la durée de la prescription acquisitive, la possession d'une servitude au profit d'un fonds dominant ne peut être cumulée avec la possession d'une servitude au profit d'un autre fonds dominant. ● Civ. 3e, 15 déc. 1999 : *Bull. civ. III, n° 248 ; JCP 2000. I. 265, n° 20, obs. Périnet-Marquet ; AJDI 2000. 731, obs. D. Talon.*

**4. Possession viciée.** A la différence du successeur particulier, l'héritier succède aux vices de la possession de son auteur. ● Civ. 1re, 16 juin 1971 : *D. 1971. 566, note A.B.*

## ● CHAPITRE III DES CAUSES QUI EMPÊCHENT LA PRESCRIPTION

**RÉP. CIV.** Vis *Prescription acquisitive*, par SOHM-BOURGEOIS ; *Prescription extinctive*, par SOHM-BOURGEOIS.

**Art. 2236** Ceux qui possèdent pour autrui ne prescrivent jamais par quelque laps de temps que ce soit.

Ainsi, le fermier, le dépositaire, l'usufruitier, et tous autres qui détiennent précairement la chose du propriétaire, ne peuvent la prescrire.

*Sur la prescription trentenaire établie au profit de l'État des sommes déposées à la Caisse des dépôts et consignations, V. C. mon. fin. (Ord. n° 2000-1223 du 14 déc. 2000), art. L. 518-24. — C. com.*

*En ce qui concerne la prescription des dépôts dans les caisses d'épargne, V. C. mon. fin., préc., art. L. 221-5 (JO 16 déc. 2000).*

*Sur l'attribution à l'État des dépôts et avoirs en banque n'ayant fait l'objet d'aucune opération ni réclamation depuis trente ans, V. Code du domaine de l'État, art. L. 27, infra, ss. art. 2277.*

*La propriété d'un bien culturel sorti illicitement du territoire français et qui se trouve sur le territoire d'un autre État membre de la Communauté européenne est dévolue à l'État lorsque le propriétaire du bien demeure inconnu à l'issue d'un délai de cinq ans à compter de la date à laquelle l'autorité administrative a informé le public de la décision ordonnant le retour du bien (L. n° 95-877 du 3 août 1995, art. 20).*

**1. Détention précaire : notion.** Est détenteur précaire celui qui détient un bien dans des conditions excluant l'*animus domini*. ● Civ. 1re, 10 juin 1986 : *D. 1988. Somm. 14, obs. A. Robert.*

**2. Illustrations : usufruitier et droit de propriété.** Si l'usufruitier peut être détenteur du droit réel d'usufruit, il résulte des termes de l'art. 2236 qu'il n'est que détenteur précaire à l'égard du droit de propriété et que le nu-propriétaire possède par son intermédiaire. ● Civ. 1re, 13 févr. 1963 : *Gaz. Pal. 1963. 2. 82*

● 3 juin 1997 : *Bull. civ. I, n° 189 ; JCP 1997. I. 4060, obs. Périnet-Marquet ; Defrénois 1997. 1321, note Dagorne-Labbe.* ◆ V. aussi note 4 ss. art. 2228.

**3. ... mandataire détenteur de fonds.** La détention de deniers ne fait pas présumer l'existence d'un don manuel lorsque leur remise a été effectuée en vertu d'un titre impliquant une obligation de restitution. La possession des deniers perçus par un mandataire en exécution du mandat est ainsi entachée de précarité. ● Civ. 1re, 14 juin 1977 : *Bull. civ. I, n° 276.*

# EXHIBIT N°14

## Supreme Court, 3rd Ch, April 17, 1996

(...)

*"But whereas by stating correctly that a buyer cannot join to his possession the one of his seller in order to prescribe [by acquisition] a good that was not part of the sale (...), the Court of Appeal did legally justify its decision on these grounds."*

Attendu qu'au moment du renouvellement du bail le preneur ne peut refuser l'introduction d'une clause de reprise à la fin de la sixième année suivant ce renouvellement au profit du conjoint ou d'un ou de plusieurs descendants majeurs ou mineurs émancipés, qui devront exploiter personnellement dans les conditions fixées à l'article L. 411-59 ;

Attendu, selon l'arrêt attaqué (Reims, 9 février 1994), que M. Paul Dethune a pris à bail, en 1961, des terres à vigne qu'il s'est obligé à planter et maintenir en vigne ; qu'il a mis les terres en culture après avoir obtenu des droits de plantation ; que les époux Marcel Dethune, bailleurs, ont, par la suite, demandé l'insertion, au bail, d'une clause de reprise sexennale au profit de leurs descendants ;

Attendu que, pour limiter la clause de reprise à la terre à appellation nue, l'arrêt retient que les droits de plantation et de replantation après arrachage doivent être considérés comme ayant un caractère mobilier appartenant à l'exploitant en considération de la personne duquel ils ont été accordés, qu'il soit propriétaire ou fermier ;

Qu'en statuant ainsi, alors que les droits de plantation et de replantation sont attachés à l'exploitation viticole, la cour d'appel a violé les textes susvisés ;

PAR CES MOTIFS, et sans qu'il y ait lieu de statuer sur le second moyen :

CASSE ET ANNULE, dans toutes ses dispositions, l'arrêt rendu le 9 février 1994, entre les parties, par la cour d'appel de Reims ; remet, en conséquence, la cause et les parties dans l'état où elles se trouvaient avant ledit arrêt et, pour être fait droit, les renvoie devant la cour d'appel d'Amiens.

N° 94-13.521.
Époux Dethune
contre M. Paul Dethune.

*Président :* M. Beauvois. – *Rapporteur :* M. Bourrelly. – *Avocat général :* M. Weber. – *Avocats :* la SCP Lyon-Caen, Fabiani et Thiriez, M. de Nervo.

A RAPPROCHER :

3° Civ., 20 mars 1996, Bull. 1996, III, n° 79, p. 52 (rejet), et les arrêts cités ;
3° Civ., 3 avril 1996, Bull. 1996, III, n° 98, p. 63 (cassation partielle).

N° 106

BAIL RURAL. – Bail à ferme. – Statut du fermage. – Domaine d'application. – Objet principal du bail. – Location de droits incorporels d'un fonds de commerce (non).

*N'est pas soumis aux dispositions du statut du fermage le bail dont l'objet est la location de droits incorporels d'un fonds de commerce et non celle d'un bien immobilier.*

17 avril 1996. Rejet.

Sur le moyen unique :

Attendu, selon l'arrêt attaqué (Amiens, 7 avril 1994), statuant sur contredit, que les époux Alexandre Lallement, propriétaires, aux droits desquels se trouve Mme Lallement, ont

assigné les époux Jean-François Lallement devant le tribunal d'instance, aux fins de résiliation du bail qu'ils leur avaient consenti ; que ceux-ci ont soulevé l'incompétence de ce Tribunal au profit du Tribunal paritaire des baux ruraux ;

Attendu que les époux Jean-François Lallement font grief à l'arrêt de renvoyer les parties devant le tribunal de grande instance, alors, selon le moyen, d'une part, que le statut, d'ordre public, du fermage est applicable aux locations ayant pour objet les bassins aménagés servant à l'élevage piscicole ; que la cour d'appel qui, pour écarter l'application du statut du fermage à un contrat de location portant exclusivement sur une exploitation piscicole, s'est fondée sur la volonté des parties, a violé les articles L. 415-10, L. 415-12 du Code rural, ensemble l'article 27 de la loi du 1er août 1984, d'autre part, que la renonciation ne se présume pas et ne peut être déduite que d'actes manifestant sans équivoque la volonté de son auteur ; que la cour d'appel qui, pour écarter l'application de plein droit du statut du fermage à un contrat en cours, a retenu qu'il ne pouvait, après vingt-quatre ans d'application, être changé de régime légal, sans constater aucun acte manifestant sans équivoque la volonté des preneurs de renoncer au bénéfice des dispositions résultant de la loi du 1er août 1984, a violé les articles L. 415-10, L. 415-12 du Code rural, ensemble l'article 27 de la loi du 1er août 1984 ;

Mais attendu que, ayant retenu que l'objet du bail était la location de droits incorporels d'un fonds de commerce et non celle d'un bien immobilier, la cour d'appel en a exactement déduit, sans avoir à constater l'existence d'actes manifestant une renonciation à des textes dont elle écartait l'application, que les dispositions du statut du fermage n'étaient pas applicables ;

D'où il suit que le moyen n'est pas fondé ;

PAR CES MOTIFS :

REJETTE le pourvoi.

N° 94-14.956.
Époux Lallement
contre Mme Alexandre Lallement et autre.

*Président :* M. Beauvois. – *Rapporteur :* M. Chollet. – *Avocat général :* M. Weber. – *Avocats :* MM. Vincent, Boullez.

A RAPPROCHER :

3° Civ., 16 juillet 1975, Bull. 1975, III, n° 251, p. 190 (rejet), et l'arrêt cité ;
3° Civ., 10 mai 1989, Bull. 1989, III, n° 105, p. 58 (rejet).

N° 107



PRESCRIPTION ACQUISITIVE. – Conditions. – Possession. – Durée. – Jonction des possessions. – Jonction de la possession du demandeur à celle de son auteur. – Condition.

*Un acquéreur ne peut joindre à sa possession celle de son vendeur pour prescrire un bien resté en dehors de la vente.*

17 avril 1996. Rejet.

Sur le moyen unique :

Attendu, selon l'arrêt attaqué (Montpellier, 29 mars 1994), que M. Mateu, qui invoquait la prescription acquisitive de la propriété d'une ruelle sur laquelle s'ouvrait la façade de sa

maison d'habitation, a assigné son voisin, M. Julien, qui avait implanté un portail métallique à l'entrée de la ruelle, afin d'obtenir la suppression de ce portail ;

Attendu que M. Mateu fait grief à l'arrêt de dire qu'il n'est pas propriétaire de la ruelle et de le débouter, en conséquence, de sa demande, alors, selon le moyen, 1° que la prescription acquisitive trentenaire n'exige de celui qui s'en prévaut d'autre condition que la possession trentenaire et que le possesseur peut joindre sa possession à celle de ses auteurs, de quelque manière qu'il leur a succédé ; que, dès lors, en affirmant, pour refuser le bénéfice de la prescription acquisitive à M. Mateu, que le délai de 30 ans n'était pas rempli parce qu'il n'avait pas démontré que son acte de propriété emportait abandon à son profit des droits susceptibles d'être nés des actes de prescription invoqués, la cour d'appel, qui, uniquement saisie d'un moyen tiré de la prescription trentenaire, s'est ainsi attachée au contenu du titre de propriété de M. Mateu au lieu de vérifier s'il justifiait de la possession de la ruelle par ses auteurs et lui-même qu'il invoquait, a statué par un motif inopérant et privé sa décision de base légale au regard des articles 2235 et 2262 du Code civil ; 2° que, dans ses écritures, M. Mateu avait expressément fait valoir, témoignages à l'appui, que ses auteurs et lui-même avaient exclusivement utilisé, sans opposition, le passage sur la ruelle, depuis la fin du XIX° siècle jusqu'en 1961, pour accéder à leur immeuble par la porte ouvrant sur cette ruelle ; que dès lors, en affirmant qu'il n'avait invoqué comme seul acte de maîtrise de fait l'existence d'une porte sur le passage et que cette porte constituait la seule sortie de l'immeuble jusqu'en 1961, la cour d'appel a dénaturé les termes clairs et précis des conclusions de M. Mateu et ainsi violé l'article 4 du nouveau Code de procédure civile ; 3° que la possession légale utile pour prescrire s'établit par des actes matériels de possession ; qu'il s'ensuit qu'en se bornant à affirmer que la porte sur la ruelle ne constituait pas un acte de disposition à titre de propriétaire et non équivoque, en l'absence d'autres éléments, sans rechercher, comme elle y était expressément invitée, offre de preuve à l'appui, si l'utilisation exclusive du passage sur la ruelle par M. Mateu et ses auteurs depuis la fin du XIX° siècle jusqu'en 1961 pour accéder à leur immeuble par cette porte, ne constituait pas des actes matériels de possession, la cour d'appel a privé sa décision de base légale au regard de l'article 2229 du Code civil ; 4° que, subsidiairement, la prescription est acquise lorsque la possession s'est prolongée pendant le temps requis, compte tenu des causes qui en ont interrompu ou suspendu le cours ; qu'en retenant, par motifs adoptés des premiers juges, que M. Mateu ne justifiait pas d'une possession utile sur la ruelle, parce que, suivant le rapport de l'expert Passio, il ne l'utilisait qu'irrégulièrement depuis 1961, sans vérifier, comme il l'était soutenu, si antérieurement depuis la fin du XIX° siècle, soit pendant plus de trente années consécutives, ses auteurs et lui-même ne l'avaient pas exclusivement utilisé pour accéder à la porte de leur immeuble ouvrant sur cette ruelle, la cour d'appel a, de nouveau privé sa décision de base légale au regard de l'article 2262 du Code civil ;

Mais attendu qu'ayant exactement énoncé qu'un acquéreur ne peut joindre à sa possession celle de son vendeur pour prescrire un bien resté en dehors de la vente et ayant constaté que M. Mateu ne rapportant pas la preuve de ce que l'acte par lequel il était devenu propriétaire de son fonds contenait également abandon des droits susceptibles d'être nés du fait des actes de prescription invoqués, la condition de délai de 30 ans n'était pas remplie, la cour d'appel a, par ces seuls motifs, légalement justifié sa décision ;

PAR CES MOTIFS :

REJETTE le pourvoi.

N° 94-15.748.      *M. Mateu*
*contre M. Julien.*

*Président :* M. Beauvois. — *Rapporteur :* Mme Di Marino. — *Avocat général :* M. Weber. — *Avocats :* la SCP Guiguet, Bachellier et Potier de la Varde, M. Parmentier,.

---

A RAPPROCHER :

3° Civ., 29 mai 1970, Bull. 1970, III, n° 373 (1), p. 271 (rejet).

# N° 108

## PROPRIETE. — Voisinage. — Troubles. — Action en réparation. — Défendeur. — Bailleur de l'immeuble d'où provient le trouble.

*La victime d'un trouble de voisinage émanant d'un immeuble donné en location peut en demander réparation au propriétaire.*

*Viole le principe selon lequel nul ne doit causer à autrui un trouble anormal de voisinage la cour d'appel qui, pour débouter un syndic de copropriété de ses demandes en exécution de travaux et au paiement de dommages-intérêts, retient que l'inaction du locataire ne peut être reprochée à la bailleresse qui avait adressé à celui-ci une mise en demeure de mettre un terme aux nuisances.*

**17 avril 1996.**      **Cassation partielle.**

Sur le moyen unique :

Vu le principe selon lequel nul ne doit causer à autrui un trouble anormal de voisinage ;

Attendu, selon l'arrêt attaqué (Montpellier, 29 mars 1994), que la société civile immobilière Blaise Bruno (SCI), propriétaire d'un local à usage commercial dans un immeuble en copropriété, l'a donné à bail à Mme Tichelilline ; que se plaignant de nuisances acoustiques, Mme Pecheur, agissant en qualité de syndic de la copropriété et en son nom personnel, a assigné la SCI et Mme Tichelilline en exécution de travaux et paiement de dommages-intérêts ;

Attendu que, pour débouter Mme Pecheur de ses demandes à l'encontre de la SCI, l'arrêt retient que les travaux de mise en conformité des lieux sont, selon le bail, à la charge de la locataire et que son inaction ne peut être reprochée à la bailleresse qui a adressé à Mme Tichelilline des mises en demeure de mettre un terme aux nuisances ;

Qu'en statuant ainsi, alors que la victime d'un trouble de voisinage trouvant son origine dans l'immeuble donné en location, peut en demander réparation au propriétaire, la cour d'appel a violé le principe susvisé ;

PAR CES MOTIFS :

CASSE ET ANNULE, mais seulement en ce qu'il a débouté Mme Pecheur, agissant en qualité de syndic de la copropriété et en son nom personnel, de ses demandes formées à l'encontre de la SCI Blaise Bruno, l'arrêt rendu le 29 mars 1994, entre les parties, par la cour d'appel de Montpellier ; remet, en conséquence, quant à ce, la cause et les parties dans l'état où elles se trouvaient avant ledit arrêt et, pour être fait droit, les renvoie devant la cour d'appel d'Aix-en-Provence.

N° 94-15.876.      *Mme Pecheur*
*contre Mme Tichelilline et autres.*

# EXHIBIT N°15

### Supreme Court, 3rd Ch, October 3, 2000

*"Regarding Article 2235 of the Civil Code ; whereas to complete the prescription , one may join to its possession, that of its principal, whatever manner in which one has succeeded to him, whether as a universal or particular heir, or in a lucrative way or for a consideration";*

*"Whereas; judging in this way, the Court of Appeal has violated the above mentioned provision, since the spouses RABECHAULT could not join to their possession that of their seller, because the good was not part of the sale".*



.gouv.fr

LE SERVICE PUBLIC DE LA DIFFUSION DU DROIT

Jeudi 17 juin 2004

## La jurisprudence de la Cour de cassation et les arr ts des cours d'appel et tribunaux

| Retour au formulaire | Liste de r sultats **Suivant** **Précédent** | | | | |
|---|---|---|---|---|---|

**Document 7 / 10**

Cour de Cassation
Chambre civile 3
Audience publique du 3 octobre 2000                                    Cassation

N¡ de pourvoi : 98-20646
In dit titr

Pr sident : M. BEAUVOIS

# REPUBLIQUE FRANCAISE

# AU NOM DU PEUPLE FRANCAIS

AU NOM DU PEUPLE FRANCAIS

LA COUR DE CASSATION, TROISIEME CHAMBRE CIVILE, a rendu l'arr t suivant :
Sur le pourvoi form  par :
1 / M. Philippe Rabbe,
2 / Mme Rabbe,
demeurant ensemble 11 bis, rue Paul Bourget, 78370 Plaisir,
en cassation d'un arr t rendu le 9 juin 1998 par la cour d'appel de Versailles (4e chambre civile), au profit :
1 / de M. Jacques Rabechault,
2 / de Mme Fabienne Rodrigue,  pouse Rabechault,
demeurant ensemble13, rue Paul Bourget, La Boissi re, 78370 Plaisir, d fendeurs  la cassation ;
Les demandeurs invoquent,   l'appui de leur pourvoi, le moyen unique de cassation annex  au pr sent arr t ;
LA COUR, compos e selon l'article L. 131-6, alin a 2, du Code de l'organisation judiciaire, en l'audience publique du 12 juillet 2000, o  taient pr sents : M. Beauvois, pr sident, Mme Di Marino, conseiller rapporteur, Mlle Fossereau, conseiller doyen, M. Sodini, avocat g n ral, Mme Berdeaux, greffier de chambre ;

Sur le rapport de Mme Di Marino, conseiller, les observations de la SCP Guiguet, Bachellier et Potier de la Varde, avocat des poux Rabbe, de la SCP Waquet, Farge et Hazan, avocat des poux Rabechault, les conclusions de M. Sodini, avocat g n ral, et apr s en avoir d lib r conform ment la loi ;

Sur le moyen unique :

Vu l'article 2235 du Code civil ;

Attendu que pour compl ter la prescription, on peut joindre sa possession celle de son auteur, de quelque mani re qu'on lui ait succ d , soit titre universel ou particulier, soit titre lucratif ou on reux ;

Attendu, selon l'arr t attaqu (Versailles, 9 juin 1998), que les poux Rabechault ont, par acte du 23 octobre 1991, assign leurs voisins, les poux Rabbe, afin de faire reconna tre leur droit de propri t exclusive sur une parcelle comprise entre la propri t Rabechault, la propri t Rabbe, la propri t Hourtoule et la rue Paul Bourget Plaisir ;

Attendu que pour dire que les poux Rabechault ont acquis la propri t de cette parcelle par prescription trentenaire, l'arr t, qui constate que leur acte d'acquisition ne mentionne pas cette parcelle, retient qu'il r sulte des attestations produites que de fa on incontestable, depuis 1954, les auteurs des poux Rabechault, avant ceux-ci se sont comport s en propri taires de la parcelle, qu'ils l'ont d blay e et entretenue de fa on continue, qu'ils y ont fait passer des canalisations d s 1955, que le permis de construire qu'ils avaient d pos en 1957 pr voyant ouvertures et canalisations sur le terrain n'avait fait l'objet d'aucun recours et que depuis aucune opposition sur l'usage qu'ils en faisaient de fa on vidente comme propri taires n'a t tablie avant un incident dat de 1987 ;

Qu'en statuant ainsi, alors que les poux Rabechault ne pouvaient joindre leur possession celle de leur vendeur pour prescrire un bien rest en dehors de la vente, la cour d'appel a viol le texte susvis ;

PAR CES MOTIFS :

CASSE ET ANNULE, dans toutes ses dispositions, l'arr t rendu le 9 juin 1998, entre les parties, par la cour d'appel de Versailles ;

remet, en cons quence, la cause et les parties dans l' tat o elles se trouvaient avant ledit arr t, pour tre fait droit, les renvoie devant la cour d'appel de Paris ;

Condamne les poux Rabechault aux d pens ;

Vu l'article 700 du nouveau Code de proc dure civile, rejette la demande des poux Rabechault ;

Dit que sur les diligences du procureur g n ral pr s la Cour de Cassation, le pr sent arr t sera transmis pour tre transcrit en marge ou la suite de l'arr t cass ;

Ainsi fait et jug par la Cour de Cassation, Troisi me chambre civile, et prononc par le pr sident en son audience publique du trois octobre deux mille.

---

D cision attaqu e : cour d'appel de Versailles (4e chambre civile) 1998-06-09
Titrages et r sum s PRESCRIPTION ACQUISITIVE - Condition - Possession - Jonction des possessions - Bien situ en dehors de la vente - Exclusion.

Codes cit s : Code civil 2235.

| T l charger le document en RTF | Copier ou envoyer l'adresse de ce document | Aide |

# EXHIBIT N°16

### Court of Appeal of Paris, 2nd CH., February 5, 1996

**Possession** - *"Possession stops to be public and becomes secret when the possessor conceals the material acts of the possession from the persons who would have an interest to know them ; the vice of secrecy is a relative vice, which can only be invoked by the person from whom the possession was concealed".*

11. — TABLEAU DE JURISPRUDENCE (1966). *EXHIBIT N 20*

l'autre enfant ayant assigné son frère en résolution de la vente, faute par lui d'avoir réglé, à leur échéance, un certain nombre des annuités, les juges d'appel, après avoir constaté la volonté de la mère également créancière, de ne pas « se prévaloir de la clause résolutoire, « mais de continuer l'exécution », affirment à bon droit « que l'action en ré-« solution d'une vente est indivisible « entre les vendeurs », ce principe, s'il cesse de recevoir application en ce qui concerne l'héritier acquéreur, demeurant applicable aux autres ayants-droit (Civ. 1re R., 24 mai 1966 ; *dame Dufresne*).

Ventes (Fraudes et délits assimilés). — Le juge qui, statuant sur les conclusions de la partie civile, autorise, à titre de dommages-intérêts, l'insertion de sa décision, n'est pas obligé de se conformer, en ce qui concerne cette publication, aux prescriptions de l'article 7 de la loi du 1er août 1905 (Crim. R., 23 *mai* 1966 ; *Tuillier*).

— Commet le délit de tromperie sur les qualités substantielles de la marchandise vendue, prévu et réprimé par l'article 1er, alinéa 1er, de la loi du 1er août 1905, celui qui vend comme véhicule neuf une voiture automobile de l'année précédente ayant déjà été utilisée, alors que l'acheteur a été laissé dans l'ignorance de ces faits (Crim. R., 23 *mai* 1966 ; *Tuillier*).

## COURS D'APPEL ET TRIBUNAUX

**Accidents du travail.** — Un salarié se trouve au temps et au lieu du travail tant qu'il est soumis à l'autorité et à la surveillance de son employeur ; tel est le cas des ouvriers qui se trouvent dans les dépendances d'une usine alors que, venant de la voie publique, ils ont déjà franchi le portail la séparant de ces dépendances ou que, se dirigeant vers la route, ils n'ont pas encore franchi ledit portail (Amiens, 24 *février* 1966 ; *Alta c. Hadjadj*).

MM. Gruffy, prés. ; Tison, av. gén.

**Appel** (en matière civile). — En admettant que l'appel ne puisse profiter au garanti, l'appel de celui-ci est valable comme appel incident sur l'appel du demandeur qui, malgré sa qualification éventuel, constitue, en fait, un appel principal. Au surplus, par application de l'article 445, paragraphe 4, du Code de Procédure civile, cet appel du garanti serait en tout cas valable comme appel provoqué par l'appel principal du garant, recevable de ce fait en tout état de cause, l'article 445 n'exigeant pas qu'il y ait indivisibilité entre l'action principale et l'action en garantie (Grenoble 1re Ch., 31 *janvier* 1966 ; *X... c. veuve Sombardier*).

MM. Lefrançois, prés. ; Cheynet, subst. gén.

**Assurances terrestres.** — S'agissant d'une police garantissant la responsabilité de l'assuré en cas de dommages causés aux tiers, à l'occasion de l'utilisation

de son véhicule pour des déplacements privés ou administratifs en rapport avec les fonctions administratives du souscripteur, étant précisé qu'en aucun cas le véhicule ne devait servir à l'exercice d'une autre profession, l'assureur est tenu cependant à garantie au cas d'accident survenu alors que le véhicule prêté était conduit par celui-ci pour se rendre à son travail. Le risque n'est pas en principe exclu de la garantie, mais il aurait donné lieu à la perception d'une prime plus élevée. A défaut de la déclaration préalable d'une telle aggravation du risque, l'assuré, dont la mauvaise foi n'est par ailleurs pas établie, encourt la sanction prévue par l'article 22 de la loi du 13 juillet 1930 (Lyon, 1re Ch., 10 novembre 1965 ; *Garantie Mutuelle des Fonctionnaires c. Hernandez et autres*).

M. Lavraud, prés.

**Banqueroute.** — L'article 4 de la loi du 10 juin 1947 sur l'assainissement des professions commerciales édictant cessation d'activité commerciale en cas de condamnation à plus de trois mois d'emprisonnement pour des faits qualifiés à l'article 1er, dans les trois mois à compter du moment où la décision est devenue définitive, n'est pas applicable si la décision intervenue n'a pas prévu la sanction complémentaire d'interdiction d'exercer le commerce et n'a pas fixé la durée de cette interdiction. Le fait d'avoir continué l'exercice de la profession n'est donc pas un élément du délit de banqueroute. L'article 614-7, 4°, qui vise le défaut de présentation du commerçant en état de cessation de payement au syndic, n'est pas applicable au débiteur en état de règlement judiciaire, l'application du texte devant être restrictive (Trib. gr. inst. Cambrai, 2 février 1966 ; *Min. pub. c. Hocquet*).

MM. Cozette, prés. ; Ergal, proc. Rép.

**Chose jugée.** — L'autorité de la chose jugée au pénal ne s'attache qu'au dispositif du jugement et aux motifs qui en sont le soutien nécessaire. A la différence de la négation de l'intervention dans l'accident de la chose dont le prévenu avait la garde, le simple doute sur cette intervention n'a pas autorité de chose jugée dans l'action en responsabilité fondée sur l'article 1384, alinéa 1er, du Code civil (Trib. gr. inst. Seine, 4e Ch., 15 *février* 1966 ; *Mallet c. R.A.T.P.*).

MM. Thurlet, prés. ; Gauthier, subst.

**Exceptions et fins de non-recevoir.** — La procédure instituée à l'article 169 du Code de Procédure civile a uniquement pour objet de faire déterminer et désigner la juridiction compétente pour statuer sur un litige ; elle ne saurait être utilisée pour faire constater la nullité éventuelle d'une procédure, en raison de l'inobservation des règles de forme, et faire mettre à néant une décision ayant statué sur le fond du litige, sans pour autant parvenir à la désignation de la juridiction compétente (Paris, 3e Ch., 10 *février* 1966 ; *Mielgo Huergo c. sa femme*).

MM. Hubert, prés. ; Agnès, subst. gén.

**Faillite-Règlement judiciaire.** — Il ne peut être retenu au profit d'un courtier le fait que les déclarations de faillites qu'il a encourues sont antérieures à l'ordonnance du 3 janvier 1959 ; toute loi, même présentant un caractère pénal, tant par les sanctions qui y sont prévues, que par la peine accessoire qu'elle institue, doit recevoir une application immédiate, sauf disposition expresse du législateur ; en particulier, la conséquence de cet effet immédiat, en ce qui concerne l'incapacité accessoire attachée à une condamnation principale ou à la qualité de failli, est de rendre désormais passible de cette incapacité toute personne encourant la condamnation à laquelle elle s'attache ou déclarée en faillite, quelle que soit la date de la condamnation principale ou du prononcé de la faillite. Par contre, l'article 1er de la loi du 30 août 1947 a entendu différer son application immédiate aux commerçants exerçant au moment de sa promulgation, même s'ils avaient été auparavant condamnés ou déclarés en faillite et non réhabilités ; il s'ensuit, *mutatis mutandis*, que par application de l'ordonnance du 3 janvier 1959, le courtier, quoique sous le coup de deux faillites successives, avait conservé le droit d'exercer la profession de V.R.P. dans les conditions où il l'exerçait à la date de mise en vigueur de cette ordonnance (Lyon, 5e Ch., 6 décembre 1965 ; *Sté des Forges de Collonges c. David*).

MM. Coste, prés. ; Malleret, subst. gén.

— Une personne déclarée en faillite antérieurement, et non réhabilitée, ne peut modifier en quelque manière les conditions d'exercice de son négoce ou de sa représentation, portant ainsi atteinte à l'état de choses existant à cette époque ; s'agissant d'un V.R.P. au service des Forges de V... depuis 1956, qui a cessé toute représentation pour leur compte à la fin de l'année 1960, pour reprendre, en janvier 1961, une activité distincte de représentant pour le compte des Forges de C..., l'incapacité dont le V.R.P. était frappé, à cette époque, par suite de la mise en vigueur de l'ordonnance du 3 janvier 1959, lui interdisait d'entreprendre cette activité (Lyon, 5e Ch., 6 décembre 1965 ; *Sté des Forges de Collonges c. David*).

MM. Coste, prés. ; Malleret, subst. gén.

**Possession.** — La possession ne cesse d'être publique pour devenir clandestine que lorsque le possesseur dissimule les actes matériels de possession qu'il accomplit aux personnes qui auraient intérêt à les connaître ; le vice de clandestinité est un vice relatif, dont seule peut se prévaloir la personne à qui la possession a été dissimulée (Paris, 2e Ch., 5 février 1966 ; *Wuillaume c. Mauclert*).

MM. Lebrun, prés. ; Gulphe, av. gén.

**Preuve.** — Les liens affectifs durables qui unissaient deux concubins, leur vie commune pendant dix ans environ, leur volonté certaine de la poursuivre et de passer ensemble leurs vieux jours constituent un ensemble de circonstances qui mettaient l'un d'eux dans l'impossibilité morale de réclamer à l'autre une recon-

**EXHIBIT N°17**

**POSSESSION. Action for recovery of property. Rare books. Precarious and equivocal possession. Proof (no). - PARIS Court of Appeals, 30 March 1990.**

Where the person claiming recovery of property fails to establish with any document other than his declaration of despoliation that the books claimed for recovery were at his father's domicile during the war, where the successive legacies were not accompanied by any inventory of movables, and where said person fails to provide proof, though the onus is on him, that the possession by the person holding the books is precarious and equivocal, then the alleged defect in possession may be inferred neither from the lack of proof of the initial acquisition of the books by the possessor's grandparents, which may not be automatically excluded in this case, nor from the holding of the books, after the war, in a private library where children were forbidden entrance and the content of which did not require any particular measure of publication, nor from their postponed removal, nor from their packaging at that time;

In view of a possession certified to not only by the possessor's mother, but also by a friend, which continued peacefully beyond the period for acquisitive prescription, whether this were to be three-year or thirty-year prescription, the first instance judges rightly decided that the action for recovery of property could not succeed.

**PARIS Court of Appeals, 1st Chamber Section B, 30 March 1990 - (de Caissaigne de Beaufort de Miramon Fitz James v. SCP [professional partnership] Daussy-Ricqles et al.) - Mr Guerder, Presiding Judge - Mrs Ferrand-Amar and Mr Tailhan, Appeal Judges - Mr Angé, Deputy Director of Public Prosecution before the Court of Appeals - SCP Tevtaud, SCP Taze-Bernard, Belfayol-Broquet and SCP Fanet, *Avocats* [Barristers] - M$^e$ Geouffre de la Pradelle, M$^e$ de Ricqles Marjolin and M$^e$ Bordèche, *Avoués* [procedural lawyers before the Court of Appeals] - Judgement of the Paris *Tribunal of grande instance* [lower civil court] 1st Chamber of 30 November 1988, upheld.**

N° 30634 - 1

SWORN TRANSLATOR
Gérard DELAUNAY
19, rue J.J. Rousseau
75001 PARIS
01.40.39.97.12
FOR THE PARIS COURT OF APPEAL

La traduction est certifiée conforme au document original en langue française - ne varietur - et visée par moi A. PARIS, le 17 juin 2003
Gérard DELAUNAY

Poltarin et Balling, avoués. — M^e Boukris, Hanicque, Coasi, Mauriac^et Bellemare, av. — Rejet du pourvoi contre T. com. Paris, 9^e ch., 15 sept. 1988.

[1 et 2] Les règles relatives à la revendication des meubles perdus ou volés trouvent depuis quelques années un domaine d'élection dans des espèces relatives à des automobiles dérobées à leur propriétaire (V. par exemple, en nous limitant à des arrêts commentés dans la présente chronique, Lyon, 8 juin 1989 ci-Civ. 1^re, 22 nov. 1988, D. 1990, Somm. 86 ; Paris, 17 janv. 1989, D. 1987, I.R.510. Le délai pour agir est de trois ans à compter de la perte ou du vol (art. 2279, 2^e al.) : « le possesseur actuel est dé bonne foi, circonstance dont la preuve résulte de l'achat « dans une foire ou dans un marché, ou chez un marchand vendant des choses pareilles ». Le revendiquant ne peut reprendre son bien qu'en l'indemnisant du prix payé(art. 2280). L'acquéreur doit également pouvoir agir en garantie d'éviction contre son vendeur (Weill, Terré et Simler, n^o 427 s. : Malaurie et Aynès, n^os 583 et 584). Ces principes sont bien établis, et la courde Paris a eu en faire une application judicieuse dans une hypothèse assez complexe.

Une « Peugeot 205 » appartenait à la société Lokauto. Elle lui fut dérobée une trois individus qui réussirent à la faire immatriculer successivement au nom de chacun d'eux, que nous appellerons M..., C... et P... Le docteur Martin X... acheta le véhicule et sit[?]ur C..., qu'il ne connaissait pas (en fait, il régla le prix à un intermédiaire au moyen d'un chèque sans nom de bénéficiaire), et la revente deux mois plus tard à la société PAH ; celle-ci le revendit à son tour à la société Sava auto, qui le revendit à la société SVICA. Et cette dernière la revendit à un particulier, du nom de R... C'est dans la brigade de répression des banditisme saisit la voiture, au détriment de R... La chaîne se déroula alors en sens inverse : la société SVICA/indemnisa M..., qui lui fournissant une action contre Peugeot 205, se retourna contre la société Sava, qui en fit autant contre la société PAB, laquelle agit en garantie contre le docteur Martin X..., situation que le langage populaire concernerais qualifié de « retour à l'envoyeur ». Ces demandes de garantie firent l'objet d'une procédure devant le tribunal de commerce de Paris, qui les accueillis toutes par un jugement du 15 sept. 1988. Les données juridiques se compliquèrent devant la cour d'appel qui, après avoir dillusé le recours y à l'art. 2280, en une application nuancée de la mise en œuvre de la garantie du vendeur.

Sur le premier point, la société SVICA, appelant principal, soutenait que la société SVICA n'était pas tenue d'indemniser le dernier acquéreur dépossédé par une décision de l'autorité publique. Mais c'était perdre de vue qu'une saisie par la police ne fait perdre que la détention matérielle et n'affecte pas la possession : la « détention précaire » est simplement déplacée (Civ. 1^re, 22 nov. 1988, D. 1990, Somm. 86, et nos obs.). Paris, 27 juin, 1981, D. 1982, I.R.510, et nos obs.), et le droit à indemnisation par le vendeur parfaitement justifiée. Cet argument pourrait être à notre sens plus fort/que celui que la cour a tiré du fait qu'il s'agissait d'une conséquence de/la « préexistence du vice affectant la chose vilée », en d'autres termes d'une vente de la chose d'autrui. Aussi, après avoir écarté l'art. 2280 la juridiction d'appel se tourne-t-elle très logiquement vers une application des règles de garantie dans la vente.

Sur ce second point, la cour fait une application judicieuse des principes gouvernant la matière. Elle relève tout d'abord que l'origine du trouble de droit était antérieure à la vente. Elle recherche ensuite si le préjudice n'est pas imputable à l'acquéreur, ou qui serait de nature à supprimer ou à diminuer la responsabilité contractuelle du vendeur (ce principe, affirmé dans un cas particulier par l'art. 1646 c. civ., a reçu de nombreux développements en droit positif (cf. Rép. civ. Dalloz, v^o Vente (obligations du vendeur), par F. Maléurie, n^os 275 s.). Elle en trouve la preuve dans le fait que les acquéreurs successifs du véhicule volé, y compris le docteur Martin X..., n'ont pu effectuer les vérifications élémentaires qui leur auraient permis de découvrir la réalité de la situation. Les quatre vendeurs successifs ayant contribué chacun pour une quart à la réalisation du dommage, la SVICA n'obtiendra de la Sava que les trois quarts de l'indemnité versée au dernier acquéreur évincé, la Sava ne pourra en réclamer que la moitié à la PAB, et celle-ci le quart au docteur Martin X... : c'est véritablement de la justice distributive.

---

**POSSESSION. Revendication. Livres rares. Caractère précaire et équivoque. Preuve (non).** — PARIS, 30 mars 1990.

Dès lors que le revendiquant n'établit par aucun document distinct de sa déclaration de spoliation que les ouvrages revendiqués se trouvaient au domicile de son père pendant la guerre, que les legs successifs n'ont été assortis d'aucun inventaire mobilier et qu'il n'apporte pas la preuve, qui lui incombe, du caractère précaire et équivoque de la possession par la personne qui les détient, le vice allégué de la possession ne peut être déduit ni de l'absence de justification de l'acquisition initiale des ouvrages par les grands-parents de la revendicante, qui ne peut être automati-

RECUEIL DALLOZ SIREY, 1991, 3^e CAHIER. — SOMMAIRES COMMENTÉS

---

quement exclue en l'espèce, ni de la détention des ouvrages, après-guerre, dans une bibliothèque privée dont l'accès était interdit aux enfants et dont le contenu n'exigeait aucune mesure particulière de publication, ni de leur déménagement différé, ni de leur empaquetage à cette occasion :

En l'état d'une possession attestée non seulement par la mère de la possédante, mais par une amie, et prolongée paisiblement au-delà du délai d'usurpation, que celle-ci fût triennale ou trentenaire, les premiers juges ont décidé à bon droit que l'action en revendication ne pouvait prospérer (1).

PARIS, 1^re ch. B, 30 mars 1990. — (de Châteaigne de Beaufort de Miramon Fitz James et SCP Dausay-Ricques et autre). — M. Guerder, pr. — Mme Ferrand-Amar et M. Tailran, conseillers. — M. Ange, av. gén. — SCP Teytaud. SCP Taze-Bernard. Baffayol-Ricques Marjolin et Bardèche, av. — Confirmation de TGI Paris, 1^re ch., 30 nov. 1988.

(1) Nous nous contenterons de mentionner cet arrêt, qui confirme, avec des motifs à peu près semblables, le jugement du tribunal de grande instance de Paris du 30 nov. 1988, précédemment commenté dans cette chronique (D. 1990, Somm. 87, et nos obs.).

---

**PROPRIÉTÉ. Voisinage. Troubles :** 1. Faute. Résidence secondaire. Terrain enclavé. Exploitation agricole. Hangars. Construction. Démolition sous astreinte ; 2. Faute. Nécessité (non). Gravité exceptionnelle. Construction. Règles d'urbanisme. Conformité. Zone pavillonnaire. Milieu urbain. Privation de lumière. Moins-value ; 3. Inconvénients normaux. Gêne. Dépassement. Panneaux publicitaires. Implantation. Trouble prévisible. Réglementation. Respect. Nature du quartier. Appréciation ; 4. Inconvénients normaux. Gêne. Dépassement. Bruit. Ball-trap. Stands de tir. Déplacement. — DIJON, 29 juin 1989, VERSAILLES, 30 nov. 1989, TGI PARIS, 7 juin 1989 à TGI PÉRIGUEUX, 7 nov. 1989.

Des hangars, des séchoirs à maïs et une maison ayant pour effet de masquer complètement la vue au sud et à l'est, la privation de cet élément constitue un préjudice certain pour les occupants d'une maison acquise pour les loisirs :

Le comportement des propriétaires de ces éléments pourrait ne pas s'analyser comme une volonté de nuire à leurs voisins et considérée comme fautive que si la nécessité leur avait imposé le choix des emplacements litigieux de leurs constructions ;

Vainement les propriétaires font valoir l'art. L. 112-16 c. constr., hab. qui refuse l'indemnisation du propriétaire qui acquiert un immeuble alors que les nuisances agricoles existent déjà et se poursuivent dans les mêmes conditions en conformité avec les dispositions législatives ou réglementaires dès lors que, selon eux, en acquérant l'exploitation agricole, ils ont dû en modifier radicalement les conditions d'une exploitation, les résultats de celle-ci étant si nouveaux qu'elle était vendue (1^re espèce).

L'établissement d'une faute n'est pas nécessaire pour mettre en œuvre la responsabilité de celui qui cause à son voisinage un trouble excédant les inconvénients normaux du voisinage :

Bien que les autorisations administratives pour construire soient délivrées sous réserve du droit des tiers, la conformité de la construction aux règles d'urbanisme n'exonère pas le propriétaire, maître d'ouvrage, de sa responsabilité envers son voisin pour trouble anormal de voisinage :

Si, en milieu urbain dans une zone de construction pavillonnaire, des propriétaires ne peuvent se plaindre du seul fait de la construction d'une maison sur un terrain voisin, ils sont néanmoins fondés à invoquer le trouble que l'implantation de cette construction leur cause, si elle est à l'origine d'un préjudice excédant les inconvénients normaux de voisinage ;

Ainsi, dans une propriété, subissant du fait d'une privation de lumière, et de cette diminution d'agrément, une moins-value importante évaluée en pourcentage à 40 p. 100, il s'agit là d'un trouble d'une gravité exceptionnelle qui excède largement l'inconvénient que les propriétaires pouvaient s'attendre à subir du fait de l'implantation de leur habitation dans un milieu d'entre urbain

---

SWORN TRANSLATOR
Gérard DELAUNAY
19, rue J.J. Rousseau
75001 PARIS
01.40.39.97.12
FOR THE PARIS COURT OF APPEAL
N° 30634-1

# EXHIBIT N°18

## Supreme Court, Civil Section, May 16, 1950

The Court : On the 1st mean : considering article 21 of the Ordinance of April 21, 1945.

Whereas Sir Eminente, an Israelite of Italian nationality, cancelled in July 1943 the lease of premises where he run a stock-in-trade ; that he started after the War, a plea in abatement of this termination founded on Article 11 of the Ordinance of April 21, 1945.

Whereas precisely, the appeal reproaches to the challenged judgment (Aix, February 12, 1947) to have, in contradiction with the dismissal given by his opponent, declared his action admissible on the grounds that the fact that he was Italian could not deprive him of the benefit of the text referred to, which does not exclude foreigners, even nationals from countries allied to Germany.

Whereas indeed, the Ordinance of April 21, 1945, which came into force while the hostilities were still in hand, proceeds from the Ordinance of November 12, 1943, concerning the execution of the previous declaration by Allied Nations of the January 5, [1943] which tried to put a stop to the expropriation methods used by governments against which those Nations were at war, against the countries they had assaulted and sacked ; that the enemy citizens were not among the persons protected by the former declaration and were therefore and consequently excluded from the benefit of the Ordinance of April 21, 1945 ; it follows that, by deciding, like it did, the challenged judgment has violated the above-mentioned provisions ; (...)

... donc à bon droit que, pour accueillir la demande du
propriétaire du fonds servant tendant à faire cesser le trouble
apporté à sa possession, un jugement déclare que le proprié-
taire du fonds enclavé n'a pas fait la preuve de la possession
du droit de passage auquel il prétend (2).

(Lavoine C. Cons. Lavoine et autres.) — ARRÊT

LA COUR; — Sur le moyen unique pris en ses deux
branches : — Attendu qu'il résulte des énonciations du
jugement confirmatif attaqué (Trib. civ. Lure/1er juin 1943)
que, pour accueillir la demande d'André Lavoine tendant
à faire cesser le trouble apporté à sa possession par Roussey,
premier d'Arsène Lavoine, en passant sur le terrain du
demandeur pour desservir des parcelles enclavées, le
tribunal, se fondant sur des enquêtes ordonnées avant dire
droit, a déclaré qu'Arsène Lavoine n'avait pas fait la
preuve de la possession du droit de passage auquel il
prétendait sur le fonds d'André Lavoine ; — Attendu
qu'il le pourvoi fait grief au jugement attaqué de n'avoir
pas admis que, s'agissant de parcelles enclavées, le passage
pour les desservir était de droit et pouvait s'exercer sur
toutes les fonds contigus ; qu'il soutient, d'autre part, que
les mesures d'instruction ordonnées, résultait la preuve
qu'Arsène Lavoine avait exercé le passage depuis plus d'un
an sur le fonds de Lavoine André ; — Mais attendu que
si la servitude du passage existe de plein droit en faveur
d'un fonds enclavé et grève tous les fonds qui l'entourent,
il n'en est pas de même de l'assiette de ce passage, qui, à
défaut d'entente entre les parties intéressées, ne peut
être déterminée que par le juge et conformément aux
prescriptions de l'art. 683 c. civ. ; que, d'autre part, en
déclarant d'après les témoignages par eux analysés et
comparés, « qu'il en résultait la conviction qu'André
Lavoine a bien justifié du trouble apporté à sa possession
et qu'Arsène Lavoine n'a pas fait la preuve de la possession
paisible et non équivoque du la servitude de passage »,
les juges du fond n'ont fait qu'user de leur pouvoir sou-
verain d'appréciation ; d'où il suit que le jugement attaqué,
qui est motivé et ne comporte aucune dénaturation des
documents de la cause, n'a violé aucun des textes visés
au moyen ;

Par ces motifs, rejette.

Du 15 mai 1950. - Ch. civ., sect. civ. - MM. Lyon-Caen,
pr., Maire, rap., - Rey, av. gén. - Labbé, av.

NOTE. — (1 et 2) Le propriétaire d'un fonds enclavé a le droit
d'obtenir à travers les fonds voisins, et moyennant indemnité,
un droit de passage. Ce droit existe en vertu de la loi et sans
aucun titre. Mais aussi longtemps que l'assiette du passage et
l'indemnité due ne sont pas fixées, le passage est exercé sans droit
et constitue, s'il est dommageable, un quasi-délit. Il peut alors
donner lieu à des dommages-intérêts ou à une complainte pos-
sessoire (V/Civ. 24 janv. 1922, D. P. 1925. 1. 68 ; Crim. 26 oct.
1934, D. H. 1934. 542 ; Nouv. Rép., v° Servitudes, n°s 342 et
441 ; Aubry et Rau, Cours de droit civil français, 6e éd., t. 3,
§ 243, p. 41, note 23). L'indemnité due au propriétaire du fonds
servant ne doit pas nécessairement être payée avant tout exer-
cice du droit de passage. Mais si le propriétaire qui use du son
droit en passant sur le fonds ne peut être considéré comme vio-
lant le droit de propriété, c'est à la condition qu'il respecte
l'assiette préalablement fixée (V. Req. 7 mai 1870, D. P. 79.
1. 460).

## COUR DE CASSATION
(CH. CIV., SECT. CIV.)

16 mai 1950

GUERRE DE 1939, OCCUPATION, ACTES DE SPOLIATION,
NULLITÉ, SPOLIÉ SUJET ENNEMI.

*L'ordonnance du 21 avr. 1945 procédant de l'ordonnance
du 12 nov. 1943, relative à la mise à exécution de la déclaration
des Nations Unies du 5 janv. 1943 qui tendait à faire échec
aux méthodes d'expropriation des gouvernements ennemis,*
exclut de son bénéfice les ressortissants ennemis, ceux-ci
n'étant pas au nombre des personnes protégées par ladite
déclaration (1) ;

*Dès lors, doit être cassé l'arrêt qui déclare recevable la
demande en nullité d'une résiliation de bail formée par un
israélite italien (2).*

(Consortium de groupage Fer et Route
C. Eminente.) — ARRÊT

LA COUR; — Sur le premier moyen : — Vu l'art. 11
de l'ordonnance du 21 avr. 1945 ; — Attendu que le sieur
Eminente, israélite de nationalité italienne, résilia en
juillet 1943 le bail des locaux dans lesquels il exploitait à
Marseille un fonds de commerce ; qu'il introduisit, après
la guerre, une demande en nullité de cette résiliation fondée
sur l'art. 11 de l'ordonnance du 21 avr. 1945 ; — Attendu
que justement le pourvoi reproche à l'arrêt attaqué (Aix,
12 févr. 1947) d'avoir, contrairement à la fin de non-rece-
voir opposée par ses adversaires, déclaré sa demande rece-
vable au motif que le fait, d'être Italien ne pouvait le
priver du bénéfice du texte invoqué, qui n'excepte aucun
étranger, même ressortissant des pays alliés de l'Allemagne ;
— Attendu, en effet, que l'ordonnance du 21 avr. 1945,
intervenue alors que les hostilités étaient encore en cours,
procède de l'ordonnance du 12 nov. 1943, relative à la
mise à exécution de la déclaration des Nations Unies du
5 janvier précédent, tendant à faire échec aux méthodes
d'expropriation pratiquées par les gouvernements avec
lesquels ces nations étaient en guerre, contre le pays qu'ils
avaient assaillis et pillés ; que les ressortissants ennemis
n'étaient pas du nombre des personnes protégées par ladite
déclaration et se trouvent, dès lors, par voie de conséquence,
exclus du bénéfice de l'ordonnance du 21 avr. 1945 ; d'où
il suit qu'en statuant ainsi qu'il l'a fait, l'arrêt attaqué
a violé le texte ci-dessus visé ;

Par ces motifs, et sans qu'il soit besoin de statuer sur
le second moyen, casse..., renvoie devant la cour d'appel
de Nîmes.

Du 16 mai 1950. - Ch. civ., sect. civ. - MM. Mongibeaux,
1er pr. - Lemaire, rap. - Rey, av. gén. - David et Mayer, av.

NOTE. — (1 et 2) V. conf. Paris, 27 avr. 1948 (D. 1948. 367).
— Contra : Paris, 23 juill. 1945 (Gaz. Pal. 1945. 2. 123). — V.
Philonenko, Les actes de spoliation et le droit, t. 1, n°s 299 et s.

## COUR DE CASSATION
(CH. CIV., SECT. COM.)

16 mai 1950

RÉQUISITIONS, BIENS, ORDRE PRÉTENDU IRRÉGULIER,
ACTE ADMINISTRATIF, RÉFÉRÉ, INCOMPÉTENCE.

*Le juge des référés excède les limites de sa compétence
lorsque, pour ordonner l'expulsion de la S. N. C. F. d'un
immeuble réquisitionné, il apprécie la validité de la réquisition
initiale et de l'acte administratif qui en avait prorogé
l'exercice (1).*

(Époux Charin C. S. N. C. F.) — ARRÊT

LA COUR; — Sur le moyen unique : — Attendu qu'il
résulte de l'arrêt attaqué (Nancy, 26 juill. 1946) et de ses
qualités, que le juge des référés de Nancy a ordonné
l'expulsion de la S. N. C. F. d'un immeuble dont les
époux Charin étaient locataires et qui, après son occupation
du fait par les troupes allemandes, puis par les troupes
américaines, avait fait l'objet, le 15 févr. 1945, au profit
du réseau, d'un ordre de réquisition du préfet de Meurthe-
et-Moselle, lodit ordre devenu caduc le 1er octobre suivant,
par l'effet d'une mesure générale, et néanmoins « maintenu
jusqu'à nouvel ordre » par le préfet, le 8 janv. 1946 ;
que la cour d'appel ayant infirmé cette décision en raison
de l'incompétence du premier juge, le pourvoi lui en fait

## EXHIBIT N°19

Ordinance n°45-770 of April 21, 1945
Second Application of the Ordinance of November 12, 1943 on nullity of acts of despoliation perpetrated by or under the supervision of the enemy and ordering restitution to victims of these acts of such of their properties as have been disposed of

"The provisional Government of the French Republic, ..."

(...)

### TITLE I

#### Despoliations and Compulsory Sales

*"Art. 1 : Individuals or legal entities or their heirs and assigns whose properties, rights and interests have been disposed of, even if with their substantive assistance, as a consequence of seizures, provisional administration, management, liquidation, confiscation, or any other exorbitant ordinary-law measures in effect on June 10, 1940, and performed either by virtue of alleged laws, decrees and decisions, rules and regulations, or by decisions of the de facto authority claiming to be the government of the French State, or by or at the order of or upon inspiration of the enemy, may, on the basis of the order of November 12, 1943, relative to the reestablishment of Republican law on the mainland, cause said measures to be declared null and void".*

*"This nullity is by operation of law".*

*"Art. 10. In the case of tangible moveable property, application will be made, - with the exception of the provisions of Article 2280 of the Civil Code -, of the second paragraph of Article 2279 of the same Code concerning lost or stolen moveable property. However, the deadline for claiming recovery wil be one year starting at the legal date of cessation of hostilities".*

fermage afférente à la période de jouissance antérieure à l'entrée en vigueur de la loi. Depuis lors, M. Savatier s'est prononcé avec une grande netteté dans le même sens (*Lois nouvelles*, 1944, I. 24, §16).

Or l'ordonnance redresse cette interprétation — ou plutôt modifie avec rétroactivité la loi, sous couleur d'interprétation. Elle décide que la loi n'est applicable qu'aux fermages afférents à la période de jouissance commençant à courir le 15 sept. 1943. Par suite, les majorations éventuellement perçues (c'est-à-dire pour une période de jouissance antérieure à ladite date) doivent être restituées ou compensées avec les fermages à échoir. Le texte ajoute que ces majorations ne donnent pas lieu à l'amende civile, cela va de soi, puisque le bailleur les a perçues de bonne foi, conformément à l'interprétation qu'il paraissait la bonne dans sa teneur initiale.

11. — En revanche, toutes les autres modifications offrent le caractère des dispositions nouvelles et ne peuvent, sans rétroactivité, atteindre les accords ou les jugements définitifs, conclus ou rendus sous l'empire de la loi ancienne et conformément à ses prescriptions. Ainsi, le rajustement des fermages qui, au 1er sept. 1939, étaient inférieurs ou supérieurs à la valeur locative réelle, demeure acquis. De même, lorsqu'un prix forfaitaire en espèces était stipulé, la conversion de ce prix en quantités de denrées demeure acquise, même s'il elle n'a pas été basée sur le cours moyen de ces denrées pendant l'année 1939. Ce n'est donc qu'au cas où le bail ainsi établi viendrait à prendre fin et à être remplacé par un nouveau bail au cours de la période de stabilisation, qu'il y aura lieu de tenir compte des modifications apportées par l'ordonnance commentée.

Mais si les dispositions interprétatives de l'ordonnance n'ont pas d'effet rétroactif, certaines ont, à notre avis, un effet immédiat. Notamment, pour fixer la date d'un fermier, à chaque échéance postérieure à l'entrée en vigueur de l'ordonnance, on devra se référer aux cours moyens des denrées-étalons depuis l'échéance précédente, non compris le dernier mois (supra, n° 3, 2° cas). En obligeant les parties à se plier à cette règle nouvelle, on ne remet pas, en effet, en question ce qui a été régulièrement convenu ou jugé sous l'empire de la loi ancienne. La conversion dont il s'agit n'a pas été réglée une fois pour toutes, à la différence de celle visée *supra*, n° 2, 3° cas, a; elle doit être recommencée à chaque échéance. Il n'y a donc pas de droit acquis.

Pierre Voirin,

*Professeur à la Faculté de droit de Nancy.*

## ALSACE ET LORRAINE, ASSURANCES SOCIALES, MALADIE-MATERNITÉ.

Ordonnance n° 45-754 du 19 avril 1945, *Portant réorganisation de l'assurance maladie-maternité dans les départements du Bas-Rhin, du Haut-Rhin et de la Moselle* (J. O. 20 avr., p. 2238, E., J. O. 1er mai, p. 2458)

## SOCIÉTÉ, SOCIÉTÉS PAR ACTIONS, TITRES, FORME, DÉPÔT. — VALEURS MOBILIÈRES, ACTIONS, FORME, DÉPÔT.

Arrêté du 20 avril 1945, *Portant obligation de mettre les actions au nominatif ou de les déposer à la caisse centrale de dépôts et de virements de titres* (J. O. 21 avr., p. 2257; E., J. O. 22 avr., p. 2573).

Le ministre de l'économie nationale et des finances, — Vu l'acte dit loi du 3 févr. 1943 relative à la forme des actions, — Arrête :

Art. 1er. — Les actions des sociétés françaises

figurant sur les listes annexées au présent arrêté devront, avant les dates pour chacune de ces listes, revêtir la forme nominative ou être mises en dépôt à la caisse centrale de dépôts et de virements de titres.

Art. 2. Les personnes qui justifieront avoir été empêchées par suite de circonstances résultant de l'état de guerre de mettre au nominatif ou de déposer à la caisse en temps voulu les actions au porteur visées à l'art. 1er du présent arrêté pourront être relevées des déchéances et exemptées de l'amende prévue par l'art. 4 de la loi précitée en application de l'art. 4 de la loi susvisée d'avoir procédé à la mise au nominatif ou au dépôt à la caisse dans un délai de quatre mois à partir de la date à laquelle à partir de l'empêchement.

Elles ne pourront en aucun cas bénéficier de cette disposition après l'expiration du délai de quatre mois à dater de la cessation légale des hostilités.

Il sera statué sur leur demande, au vu des justifications qu'elles auront produites, par le directeur départemental de l'enregistrement en cas de résidence en France, et à défaut de domicile en cas de résidence en France, par le directeur des résidence à Paris.

Art. 3. Les sociétés émettrices dont les actions sont visées à l'art. 1er devront déposer à la caisse centrale de dépôts ou les virements de titres dans les délais prévus audit article les formules d'actions au porteur en échange desquelles ont été délivrés des certificats nominatifs.

Art. 4. Les propriétaires de titres perdus ou volés qui auront fait opposition conformément aux lois en vigueur, auront un délai de quatre mois à compter soit de la mainlevée d'opposition, soit de sa radiation à l'office du bulletin des oppositions, soit de l'expiration du délai de dix ans prévu par l'art. 15 de la loi du 15 juin 1872 ou du délai de trois ans prévu par l'art. 6 du décret-loi du 30 oct. 1935, pour effectuer la mise au nominatif de ces titres ou leur dépôt à la caisse centrale de dépôts et de virements de titres.

Art. 5. Le présent arrêté sera publié au *Journal officiel de la République française.*

(V. au § 5. les listes annexées.)

## ACCIDENTS DU TRAVAIL, FONDS DE GARANTIE, ALIMENTATION, CONTRIBUTION DES EMPLOYEURS.

Arrêté du 3 avril 1945, *Reprenant le barème annexé au décret du 16 déc. 1940 (alimentation du fonds de garantie institué par la loi du 9 avr. 1898 sur les accidents du travail)* (J. O. 20 avr., p. 2237).

(V. le texte de cet arrêté, B. L. D. 1945. 152).

## GUERRE DE 1939 : 1° OCCUPATION. ACTES DE SPOLIATION, NULLITÉ; 2° ALSACE ET LORRAINE, ACTES DE SPOLIATION, NULLITÉ (art. 32); 3° ALGÉRIE, COLONIES, ACTES DE SPOLIATION, NULLITÉ (art. 23).

Ordonnance n° 45-770 du 21 avril 1945, *Portant deuxième application de l'ordonnance du 12 nov. 1943 sur la nullité des actes de spoliation accomplis par l'ennemi ou sous son contrôle et édictant la restitution aux victimes de ces actes de ceux de leurs biens qui ont fait l'objet d'actes de disposition* (J. O. avr., p. 2283; E., J. O. 29 avr., p. 2438).

Le Gouvernement provisoire de la République française, — Vu l'avis de l'Assemblée consultative exprimé en sa séance de 15 mars 1945; — Le comité juridique entendu, — Ordonne :

### TITRE 1er

#### Des spoliations et ventes forcées.

Art. 1er. Les personnes physiques ou morales en leurs ayants cause dont les biens, droits ou intérêts ont été l'objet, même avec leur concours maintien, d'actes de disposition accomplis en conséquence de mesures de séquestre, d'administration provisoire, de gestion, de liquidation, de confiscation ou de toutes autres mesures exorbitantes du droit commun en vigueur en 18 juin 1940 et accomplis, soit en vertu des prétendus lois, décrets et arrêtés, règlements ou décisions de l'autorité de fait se disant gouvernement de l'État français, soit par l'ennemi, sur son ordre ou sous son inspiration, pourront, sur le fondement, tant de l'ordonnance du 12 nov. 1943 relative à la nullité des actes de disposition accomplis par l'ennemi ou sous son contrôle, que de l'ordonnance du 9 août 1944 relative au rétablissement de la légalité républi-

caine sur le territoire continental, en faire constater la nullité.

Cette nullité est de droit.

Art. 2. Lorsque la nullité est constatée, le propriétaire dépossédé reprend ses biens, droits ou intérêts exempts de toutes charges et hypothèques dont l'acquéreur et les acquéreurs successifs les auraient grevés.

Il les reprend avec leurs augments et accessoires.

Art. 3. Les actes d'administration conformes aux dispositions de l'art. 1374 c. civ. demeurent valables. Toutefois le propriétaire dépossédé peut demander la restitution des sommes d'administration qui lui portent préjudice au jour de la demande.

Art. 4. L'acquéreur ou les acquéreurs successifs sont considérés comme possesseurs de mauvaise foi au regard de la propriétaire dépossédé.

Ils ne pourront en aucun cas invoquer le droit de rétention.

Ils doivent restituer les fruits naturels, industriels et civils à partir de la date à laquelle remonte la nullité sous réserve de l'application des dispositions de l'ordonnance de 12 oct. 1944 tendant à redresser les profits illicites, modifiée, complétée et codifiée par l'ordonnance du 18 janv. 1945.

Cependant, au cas où il y aurait lieu à l'application des dispositions relatives aux profits illicites ci-dessus visées, l'acquéreur ou ses ayants droit seront, en tout état de cause, tenus au payement de montant de la confiscation sans que les pourraisons du Trésor puissent en aucun cas affecter les droits, biens ou intérêts de propriétaire dépossédé, augmentés des fruits normaux effectivement provenus d'opérations régulières.

En cas de difficultés, ces fruits normaux seront estimés à dire d'expert et au besoin par comparaison avec les comptes d'exploitation d'entreprises similaires.

La qualification de mauvaise foi ne sera pas retenue contre les personnes physiques ou morales qui pourront établir qu'elles ne se sont portées acquéreurs que sur demande de l'autorité de fait se disant gouvernement de l'État français et qu'en vue d'éviter le transfert à l'occupant d'actifs meubles et immeubles intéressant l'économie nationale ou le patrimoine artistique de la nation, ou de sauvegarder les droits des propriétaires dépossédés au second avec eux derniers.

La qualification de mauvaise foi ne s'appliquera en aucun cas aux établissements publics qui, en vertu d'actes ou d'instructions de l'autorité de fait, auront été se porter acquéreurs des biens visés par l'ordonnance, notamment pour en assurer la conservation.

Les personnes visées aux deux alinéas précédents n'en seront pas moins tenues à la restitution des fruits.

Art. 5. Le sous-acquéreur de bonne foi évincé en vertu des dispositions de l'art. 2 bénéficie d'un droit de recours à l'encontre de ceux agents d'affaires, rédacteurs d'actes, intermédiaires quelconques qui se sont notamment abstenus de révéler l'origine de bien cédé.

Ce droit est exercé selon la procédure prévue aux art. 17 et suivants de la présente ordonnance.

Art. 6. Les propriétaires dépossédés rembourseront à l'acquéreur le prix versé par celui-ci ainsi que les intérêts s'afférents servis par la dépositaire, le tout dans la mesure où il en aura profité. L'acquéreur sera subrogé dans les droits éventuels du propriétaire dépossédé à l'égard des sommes qui auraient été prélevées sur le prix et ces intérêts à quelque titre que ce soit.

En toute hypothèse, l'acquéreur a droit au remboursement des sommes qu'il aurait régulièrement payées comme tiers détenteur, en sus du prix stipulé.

Toutefois, les courtages ou commissions versés soit à des agents de publicité, soit à des agents immobiliers ou agents d'affaires quelconques par le commissariat aux questions juives et par tous administrateurs provisoires, seront remboursés par sous-la nom déduction des frais bruts dont ils devront produire justification.

Il en sera de même pour les honoraires perçus par les experts, architectes ou autres, qui se seront prêtés à des opérations préliminaires d'expertise ou d'estimation ayant permis de faciliter la mise en vente des biens spoliés.

Tout acquéreur évincé qui fonde à poursuivre tout agent d'affaires, courtier ou intermédiaire quelconque de mauvaise foi en restitution de tous courtages et commissions.

Sur le montant des sommes à restituer à l'acquéreur, il sera affecté au profit du Trésor un prélèvement égal à 10 p. 100 de son acquisition lorsque celle-ci aura été affectée de mauvaise foi. Ce prélèvement sera prononcé dans les formes prévues à l'art. 30 (5° alinéa).

Art. 7. L'acquéreur est tenu de rembourser tous les dommages causés par son fait et par sa faute.

Si, à la suite de l'inséviabilité ou de la non-présence des détenteurs, l'indemnité en question

**TITRE II**

*Actes accomplis avec le consentement de l'intéressé et relatifs à des biens, droits ou intérêts n'ayant pas fait préalablement l'objet des mesures exorbitantes du droit commun.*

Art. 11. ...

**TITRE III**

*Dispositions communes.*

Art. 12. ...

Art. 13. ...

Art. 14. ...

**TITRE IV**

*Procédure.*

Art. 17. ...

Art. 18. ...

Art. 19. ...

Art. 20. ...

**TITRE V**

*Dispositions diverses.*

Art. 25. ...

Art. 26. ...

Art. 27. ...

Art. 28. ...

préciser la nature et la situation desdits biens, droits et intérêts, le nom ou la raison sociale des personnes physiques ou morales à qui ils appartiennent ou ont appartenu, les conditions dans lesquelles est intervenue la détention ou l'acquisition, ainsi que, s cas échéant, les modalités de l'aliénation survenue ultérieurement. Cette prescription s'est, toutefois, pas applicable aux administrateurs séquestres, administrateurs provisoires, gérants ou liquidateurs déjà tenus à déclaration en vertu de l'art. 9 de l'ordonnance du 14 nov. 1944 susvisée.

Quiconque a reçu en dépôt des objets mobiliers à titre gratuit ou à titre onéreux, depuis le 16 juin 1940, et ne les a pas déjà restitués est autorisé, suivant la même procédure, à faire une déclaration spéciale comprenant le nom et la dernière adresse connue du déposant, une description détaillée du bien mobilier mis en dépôt, le nom et l'adresse du dépositaire.

Les dépositaires, à titre professionnel, qui sont astreints à la tenue d'une comptabilité, sont dispensés de cette déclaration.

**Art. 28.** Sera punie d'un emprisonnement de deux mois à un an et d'une amende de 3.000 à 300.000 fr. toute personne qui n'aura pas formulé, dans le délai légal, la déclaration prévue par l'art. 28 ci-dessus.

Sera puni des peines prévues par l'art. 175, alin. 1er, c. pén., tout administrateur séquestre, administrateur provisoire, gérant ou liquidateur qui, directement ou indirectement ou par personne interposée, aura acquis, au tout ou en partie, les biens, droits ou intérêt dont la gestion lui avait été confiée.

Sera puni des peines prévues aux art. 406 et 408, alin. 1er c. pén. tout acquéreur des biens ayant fait l'objet des mesures visées à l'art. 1er qui aura revendu lesdits biens en violation de la clause de contrat d'aliénation lui imposant un délai d'inaccessibilité.

Sera puni des peines prévues par l'art. 408, alin. 3, c. pén., tout acquéreur qui, par des manœuvres frauduleuses, aura dissipé ou tenté de dissiper les biens visés à l'art. 1er, ou plus généralement aura mis obstacle à la restitution éventuelle desdits biens.

Aucune exception tirée de l'existence d'une procédure pénale instituée en vertu du présent article ne pourra être opposée devant le juge saisi à l'effet de suspendre la procédure établie par les articles précédents.

**Art. 30.** Toutes conventions de complaisance conclues postérieurement au 16 juin 1940 avec des tiers, par les personnes physiques ou morales visées à l'art. 26 de la présente ordonnance, à l'effet de transférer des biens, droits ou intérêts de toute sorte avec réserve des droits ou cédant par clause occulte entre les parties, pourront être prouvées par tous les moyens.

**Art. 31.** Tout objet confié à un tiers, postérieurement au 16 juin 1940, par les mêmes personnes physiques ou morales sera considéré comme un dépôt nécessaire et pourra être prouvé par tous les moyens.

**Art. 32.** Un décret fixera pour les départements du Bas-Rhin, du Haut-Rhin et de la Moselle les modalités d'application de la présente ordonnance en ce qui concerne les services compétents pour en assurer l'exécution et les conditions dans lesquelles les déclarations devront être produites.

**Art. 33.** La présente ordonnance est applicable à l'Algérie.

Des décrets règleront ses conditions d'application dans les territoires relevant du ministère des colonies.

**Art. 34.** La présente ordonnance sera publiée au *Journal officiel* de la République française et exécutée comme loi.

NOTE. — La présente ordonnance, « qui s'inscrit dans le cadre de la déclaration de Londres du 5 janv. 1943, permet, par une procédure aussi rapide et peu coûteuse que possible, aux propriétaires dépossédés de rentrer légalement en possession de leurs biens, droits et intérêts, par application du principe de la nullité des actes de transfert » (*Exposé des motifs*).

Le projet a été transmis par le Gouvernement à l'Assemblée consultative, qui l'a examiné le 15 mart 1945, et en 2e séances (J. O. 16 mars, p. 493 et 510).

V. l'ordonnance du 12 nov. 1913, D. A. 1944. L. 94; — l'ordonnance du 14 nov. 1944, *supra*, p. 4, et B. L. D. 1944. 377; — l'ordonnance du 2 févr. 1945, *supra*, p. 38, et B. L. D. 1945. 52; — le décret du 2 févr. 1945, *supra*, p. 39.

**TRAVAIL, MAIN-D'ŒUVRE, DÉPLACEMENT, TRAVAUX NÉCESSAIRES A L'ÉCONOMIE DU PAYS — CONTRAT DE TRA-**

---

**VAIL, SALAIRE, INDEMNITÉS, TRAVAILLEURS DÉPLACÉS, RÉINTÉGRATION.**

*Arrêté du 20 avril 1945,*

*fixant les modalités d'application de l'ordonnance du 2 févr. 1945 portant attribution d'indemnités en faveur des travailleurs momentanément déplacés* (J. O. 22 avr., p. 2295).

(V. le texte de cet arrêté, B. L. D. 1945. 156.)

**SANTÉ ET SALUBRITÉ PUBLIQUES, ENFANCE, POUPONNIÈRES, CRÈCHES, CONSULTATIONS DE NOURRISSONS, GOUTTES DE LAIT, RÉGLEMENTATION.**

*Décret n° 45-732 du 21 avril 1945, relatif à la réglementation des pouponnières, des crèches, des consultations de nourrissons et des gouttes de lait* (J. O. 22 avr., p. 2305; R., J. O. 13 mai, p. 2730).

**PRISONNIERS DE GUERRE ET DÉPORTÉS, CONTRÔLE MÉDICAL. — SANTÉ ET SALUBRITÉ PUBLIQUES, PRISONNIERS, TRAVAILLEURS ET DÉPORTÉS RAPATRIÉS.**

*Ordonnance n° 45-802 du 21 avril 1945, instituant le contrôle médical des prisonniers, travailleurs et déportés rapatriés* (J. O. 22 avr., p. 2338).

(V. le texte de cette ordonnance, B. L. D. 1945. 57.)

**MINES-MINIÈRES-CARRIÈRES, OUVRIERS, RETRAITE, TEXTE VALIDÉ.**

*Ordonnance n° 45-803 du 24 avril 1945, validant les actes promulgués postérieurement au 16 juin 1940 relatifs au régime spécial de retraite des ouvriers mineurs et assimilés, de leurs veuves et de leurs orphelins* (J. O. 25 avr., p. 2339).

Le Gouvernement provisoire de la République française, — Ordonne :

**Art. 1er.** Sont validés les actes de l'autorité de fait se disant gouvernement de l'État français, cités : 1er Loi du 4 févr. 1941 portant modification du régime de retraites des ouvriers mineurs;

2e Loi du 22 août 1941 apportant des modifications au régime de retraites des ouvriers mineurs;

3e Loi du 3 avr. 1943 relative à la situation des ouvriers mineurs allocataires ou retraités qui continuent à travailler à la mine;

4e Loi du 31 août 1942 améliorant le régime de retraites des ouvriers mineurs;

5e Décret du 2 mars 1943 relatif au calcul de la retraite des ouvriers ardoisiers;

6e Loi du 28 oct. 1943 relative à l'extension des dispositions de la législation spéciale de retraites des ouvriers mineurs aux ouvriers et employés occupés dans les entreprises de recherches de mines;

7e Loi du 15 nov. 1943 apportant des améliorations au régime des retraites des ouvriers mineurs.

**Art. 2.** La présente ordonnance sera publiée au *Journal officiel* de la République française et exécutée comme loi.

NOTE. — V. la loi du 4 févr. 1941, D. A. 1941. L. 102; — la loi du 22 août 1941, D. A. 1941. L. 133; — la loi du 3 avr. 1943, D. A. 1943, L. 122 et B. L. D. 1942. 294; — la loi du 31 août 1942, D. A. 1943. L. 162 et B. L. D. 1942. 495; — la loi du 28 oct. 1943, J. O. 8 févr. et 23 mars 1944; — la loi du 15 nov. 1943, J. O. 3 déc.

**PROPRIÉTÉ, MATÉRIEL DES ENTREPRISES DU BÂTIMENT ET DES TRAVAUX PUBLICS, REDISTRIBUTION, DEMANDE, DÉLAI. — TRAVAUX PUBLICS, ENTREPRISES, MATÉRIEL, REDISTRIBUTION, DEMANDE, DÉLAI.**

*Ordonnance n° 45-618 du 28 avril 1945, portant prorogation du délai prévu à l'art. 7 de l'ordonnance n° 45-69 du 16 janv. 1945 relative à la redistribution du matériel des entreprises du bâtiment et des travaux publics* (J. O. 27 avr., p. 2386).

Le Gouvernement provisoire de la République française, — Ordonne :

**Art. 1er.** L'art. 7 (1er alinéa) de l'ordonnance du 16 janv. 1945 est modifié comme suit :

« Les entreprises susceptibles d'acquérir le matériel transféré devront en faire la demande avant le 31 mai 1945 ou dans un délai de trois mois après la libération du territoire où se trouve le siège de l'entreprise. »

**Art. 2.** La présente ordonnance sera publiée

---

au *Journal officiel* de la République [française] exécutée comme loi.

NOTE. — L'art. 7 de l'ordonnance du [...] (*supra*, p. 30) précise que [...] délai d'acquérir le matériel transféré devr... la demande dans un délai d'un mois à [...] la publication de l'ordonnance ou de la [...] territoire où se trouve le siège de l'ent... ce délai n'est arrivé rien insuffisant po... aux entreprises d'examiner s'il leur c... de passer leur candidature en rachat [...] transféré. La présente ordonnance a [...] de le prolonger.

**CONCESSION ADMINISTRAT..., ENTREPRISE CONCÉDÉE, AGENT, RÉINTÉGRATION. — CO... ET INDUSTRIE, ENTREP... VRETIONNÉES, AGENTS RÉVOQ... TÉGRATION. — ALGÉRIE, CO... CONCESSION ADMINISTRATIVE, ... ET INDUSTRIE, ENTREPRISES, RÉVOQUÉS, RÉINTÉGRATION (art...**

*Ordonnance n° 45-819 du 28 av... concernant la réintégration des age... ployés des services concédés ou sub... dévoués pour des motifs d'ordre... raison de leur appartenance à d... tions dites secrètes ou pour avoir... daient pas la nationalité fran... originaire ou altérés par la loi du ... 1940 ou les textes subséquents* (J. [...] p. 2387).

(V. le texte de cette ordonnance, B.L.D...

**PEINE, CONDAMNATIONS, AM... Ordonnance n° 45-816 du 28 av... autorisant l'annulation de certaines... nations** (J. O. 27 avr., p. 2386; ... 3 mai, p. 2508).

Le Gouvernement provisoire de la ... française... — Ordonne :

**Art. 1er.** Seront annulées les con... prononcées par les juridictions répressiv... nature, en raison des poursuites exercée... à l'inspiration du gouvernement de fa... 16 juin 1940 et le faite de la libération,... pourront être rapportées que ces poursuites... pas été intentées si des considérations... ne les avaient pas déterminées.

L'instance en annulation sera déférée... bres de révision instituées par l'ordon... juillet 1945 modifiées par ordonnance du... (V. les effets de l'annulation seront ceux... l'ordonnance du 29 nov. 1944 susvisée.

**Art. 2.** La présente ordonnance se... au *Journal officiel* de la République f... exécutée comme loi.

NOTE. — V. l'ordonnance 6 juill. 1... 1944. II. 52; — l'ordonnance du 5 déc. 1... p. 5; — l'ordonnance du 29 nov. 1944, s...

**ENSEIGNEMENT, CONSEIL S... DE L'ENSEIGNEMENT PUBLIC, CRÉ...**

*Ordonnance n° 45-820 du 28 av... portant création d'un conseil sup... l'enseignement public* (J. O. ... p. 2387).

NOTE. — Ce nouveau conseil exerc... voirs antérieurement conférés au conseil... de l'instruction publique et au conseil... de l'enseignement technique. Jusqu'à ce... définitivement constitué, sa place tant le 31... un comité permanent transitoire exe... pouvoirs dévolus en matière disciplinaire... tieuse aux deux conseils précités.

V. les lois du 27 févr. 1880 et 18 déc. 1... tives au conseil supérieur de l'instruction... D. P. 80. 4. 56 et D. P. 1934. 4. 414; — les ... 35 juill. 1919 et le décret du 23 juill. 19... nant l'enseignement technique, D. P. 19... et J. O. 23-29 juill. 1919.

**CONTRIBUTIONS DIRECTES... SUR LES BÉNÉFICES DES PROFESS... COMMERCIALES, MÉDECINS, CHIR... DENTISTES, SAGES-FEMMES. — MÉD... IMPÔT CÉDULAIRE, BÉNÉFICE... BLE, MÉDECINS, DENTISTES, SAGES...**

*Ordonnance n° 45-831 du 27 av... relative à la détermination du bénéf... sable des médecins, chirurgiens... et sages-femmes* (J. O. 28 avr., p...

Le Gouvernement provisoire de la R... française, — Ordonne :

**Art. 1er.** Pendant la période d'applic...

## EXHIBIT N°20

"Recovery of despoliated goods"
"(Analysis of the Ordinance of April 21, 1945, and of the Case-Law)"
"by Mr Paul CHAUVEAU
Honorary Dean of the University of Law of Algiers,
Lawyer member of the Bar'

## V - PROCEDURE, DELAYS, CONSERVATORY MEASURES

"73.        *The procedure has been organised by the Ordinance of April 21, 1945, with the clear aim to obtain rapid solutions and to liquidate as soon as possible the operation of restitution to depossessed owners. They [the Legislator] did not want that possessors remained too long uncertain about their rights with a threat hanging over their heads : it would have created an annoying public disorder. To this effect, a deadline has been imposed to file a claim for recovery".*

le début : convient-il de procéder à une refonte générale du Code civil ?

Peut-être, si la machine législative fonctionnait avec méthodes et les garanties fournies par la Constitution de l'an VIII, en vigueur au temps de la confection dudit Code, pourrait-on répondre par l'affirmative. Mais avec les us, les méthodes ont bien changé. Aux garanties fournies par la participation du Conseil d'Etat, la prescription des amendements, s'est vu substituer le désordre des textes de circonstance, votés, dans une atmosphère de réunion publique, sous l'empire parfois des passions déchaînées, à coups d'amendements (35) qui ont tôt fait de défigurer le texte primitif, par une assemblée généralement incompétente et irresponsable, en sorte de donner naissance souventes fois à un monstre juridique, dont tout législateur digne de ce nom récuserait la paternité. Il suffit de lire la rédaction de certains des textes, — dont le verbiage contraste étrangement avec la concision lapidaire de certains articles du style Napoléon — pour constater que le tableau que nous venons de tracer n'est point poussé au noir.

Lorsque, de nos jours, un de nos fournisseurs veut faire l'éloge de l'article proposé, il a pour nous alléguer, une formule invariable : « C'est de la fabrication d'avant-guerre », et généralement nous nous laissons tenter par cette recommandation. Il n'en va pas autrement — doive le rapprochement paraître irrévérencieux — de la fabrication de nos lois. Si elles étaient usinées comme jadis, l'exécutif pourrait, sans crainte, confier à de nouveaux artisans le soin de réviser et de rajeunir l'œuvre de leurs devanciers. Ils auraient su s'inspirer de la phrase célèbre de l'auteur de l'Esprit des lois : « les lois sont les rapports qui dérivent de la nature des choses ».

Mais Montesquieu n'est plus, et l'esprit du législateur s'est modifié — pour ne rien dire de plus.

### APPENDICE

### Liste des lois qui ont modifié le Code civil

Lois des 14 juillet 1819; 13 mai 1835; 11 mai 1845; 10 juillet 1850; 21 et 31 mai 1854; 22 juillet 1867; 2 août 1868; 5 janvier 1875; 20 août 1881; 7 juillet 1884; 18 avril 1886; 26 juin 1889; 27 décembre 1890; 9 mars 1891; 20 novembre 1892; 6 février, 18 mars, 8 et 17 juin 1893; 5 mars 1895; 24 et 25 mars, 20 juin 1896; 8 et 9 avril 1898; 25 avril 1899; 7 avril et 17 mai 1900; 15 décembre 1904; 21 février et 30 novembre 1906; 21 juin, 2 et 13 juillet 1907; 6 janvier 1908; 6 avril et 30 décembre 1910; 8 avril 1911; 10 mars et 28 mai 1913; 9 mars et 1er juillet 1914; 28 juillet 1915; 28 octobre 1916; 20 mars, 30 avril et 31 décembre 1917; 1er mars et 31 mai 1918; 19 mars, 17 et 26 juin, 14 juillet, 9 août, 24 octobre et 20 novembre 1919; 15 décembre 1921; 28 février, 9 et 22 décembre 1922; 7 février, 26 mars, 25 et 29 avril, 26 juin et 11 décembre 1924; 29 avril 1925; 21 février 1926;

---

que s'il trouve un organe toujours prêt à réaliser cette adaptation de l'abstrait au concret... Cet organe ne peut être que la Jurisprudence. » (R. Saleilles).

(35) Qu'il nous soit permis de faire appel, sur ce point, à un souvenir personnel. Lorsque nous faisions partie de la Commission qui a doté le Siam d'une législation à l'européenne, nous pouvions constater que le moindre amendement adopté au cours de la discussion comportait des répercussions et entraînait des modifications nécessitant parfois un long travail de révision de l'ensemble. Et cette constatation nous permettait de nous rendre compte de ce que pouvaient devenir les textes truffés d'amendements adoptés au cours de débats tumultueux et contradictoires.

---

8 avril, 17 juillet et 10 août 1927; 28 décembre 1928; 19 juillet 1929; 4 janvier, 30 juillet, 3 et 21 décembre 1930; 9 juillet 1931; 2 février et 11 mars 1932; 2 et 19 février, 15 mars et 15 juin 1933; 4 février 1934; 30 octobre 1935; 24 mars 1936; 7 et 18 février, 10 mars, D. 14 et 17 juin, L. 28 juin 1938; L.L. 20 mai et 19 juin, D. 19 juillet, L. 15 décembre 1939; L.L. 20 juillet et 29 novembre 1940; 2 avril, 9 et 30 mai, 1er et 8 août, 14 septembre, 5 octobre 1941; 23 juillet, 22 septembre, 10 décembre 1941; 15 janvier, 10 février, 29 juillet, 4 septembre 1943; Ord. 28 mars, 12 avril, 3 mai, 28 juin, 1er septembre, 2 et 17 octobre 1945.

— Ont été, en outre, codifiées notamment les matières suivantes : Travail (L. 30 décembre 1910 et lois subséquentes). — Impôts directs (L. 31 juillet 1917 et lois subséquentes). — Enregistrement et Timbre (L.L. 28 décembre 1926 et lois subséquentes). — Circulation routière (D. 10 janvier 1939). — Famille et natalité (D. 29 juillet 1939). — Accidents du travail. Assurances sociales. Nationalité (Trois Ord. 19 octobre 1945).

**549** FORMULES COMMENTEES. — Conversion d'un bail à colonat partiaire ou métayage en bail à ferme. (Application du titre IV de l'ordonnance du 17 octobre 1945, modifiée par la loi du 13 avril 1946, par Raoul MICHENET, Principal Clerc de Notaire. [Ed. N].

**550**

### RESTITUTION DES BIENS SPOLIES
### (ETUDE DE L'ORDONNANCE DU 21 AVRIL 1945
### ET DE LA JURISPRUDENCE)

par M. Paul CHAUVEAU,
*Doyen honoraire de la Faculté de Droit d'Alger,*
*Avocat à la Cour.*

#### I. — Précédents et place de l'ordonnance du 21 avril 1945 dans la législation.

1. — L'Allemagne a pratiqué, au cours de la guerre, une politique systématique de spoliations. Elle n'y a pas seulement puisé des ressources nécessaires à la conduite des hostilités, elle l'a érigée en procédé de gouvernement des pays occupés par ses armées, et elle préparait, par ce moyen, sa domination économique de l'Europe.

Cette guerre n'a pas été caractérisée par une proportion inaccoutumée d'actes de pillage individuels. Les spoliations ont été la conséquence d'ordres émanant des autorités d'occupation ou autres autorités de fait soumises aux premières. Et elles se sont souvent déguisées sous la forme d'actes d'apparence légale, grâce à un usage habile et abusif de la technique juridique.

2. — Par une déclaration solennelle en date du 5 janvier 1943, dix-huit nations alliées, parmi lesquelles le Comité National Français, ont fait connaître au monde qu'ils entendaient faire échec à ces procédés d'expropriation dans leurs biens, et qu'à cet effet, ils se réservaient de déclarer non valables ces transferts ou transactions, même d'apparence légale ou effectués avec le consentement des victimes.

3. — Ce manifeste est avant tout un acte de valeur internationale. Il visait à avertir les pays étrangers, surtout neu-

très, et à éviter leur opposition ou réaction en présence de certaines mesures qui pourraient exiger le rétablissement de la situation de ceux qui se voyaient injustement dépouillés. Mais en même temps, il était aussi un avertissement salutaire pour certains nationaux des expropriés.

4. — La mise en œuvre de la proclamation du 5 janvier 1943 a rencontré des difficultés pratiques considérables. Le champ à couvrir était énorme, tellement nombreuses et diverses ont été les spoliations dans leurs formes et dans leurs mobiles. On doit noter tout d'abord le pillage économique des pays envahis au profit de l'économie allemande. Des biens enlevés de force ou réquisitionnés par les occupants, ou même apparemment achetés avec des ressources prélevées au titre de frais d'occupation, ont été emportés en Allemagne, ou parfois dissimulés dans des pays neutres. Leur restitution pose un problème interallié et même international. Il a fallu de longs mois d'études avant que le Conseil de Contrôle en Allemagne ne lui donne une solution partielle, sur le plan interallié, en janvier 1946.

Dans d'autres cas, les spoliations avaient un but de pure politique interne : persécution des israélites, dissolution de certains syndicats ou groupements, etc... Les effets des spoliations, dans ces dernières hypothèses, ont rarement dépassé le cadre national.

5. — Envisagée dans son ensemble, la question de la restitution des biens spoliés à leurs légitimes propriétaires exige des accords internationaux et des dispositions législatives internes.

Celles-ci sont nécessaires et suffisantes pour rétablir les droits des expropriés dans le cadre purement national, mais elles sont également utiles, voire indispensables, pour assurer, sur le plan interne, l'application des proclamations et conventions internationales.

6. — Sur le plan interne, le premier texte a été publié à Alger dès 1943. C'est l'ordonnance du 12 novembre 1943 qui vise à donner un effet pratique à la déclaration de Londres du 5 janvier précédent. Elle est très loin de résoudre même les seules difficultés internes. Dès l'abord, la situation a paru assez complexe pour nécessiter un examen plus réfléchi. L'ordonnance se contente de poser le principe de la restitution et de prévoir la mise sous séquestre des biens visés dans la déclaration du 5 janvier 1943. Ces mesures conservatoires devaient laisser le temps voulu pour mûrir les diverses mesures d'exécution nécessaires pour permettre la pleine efficacité de la déclaration. Des ordonnances et décrets ultérieurs étaient prévus pour préciser ces mesures.

7. — L'ordonnance du 12 novembre 1943 ayant été rendue applicable dans la métropole par celle du 9 août 1944 sur le rétablissement de la légalité républicaine, plusieurs textes ont été publiés pour en assurer l'exécution. Le législateur n'a pas voulu attendre que toutes les difficultés aient été étudiées et résolues. Envisageant successivement les diverses situations et allant du plus simple au plus compliqué, il a réglé de nombreux cas particuliers par des textes spéciaux.

Une ordonnance du 14 novembre 1944, suivie d'un décret du 2 février 1945, porte première application de l'ordonnance du 12 novembre 1943 sur la nullité des actes de spoliation. (Voir l'étude de G. Lagarde; J.C.P. 1945.I.452.) Mais elle est loin d'être le seul, ni même le premier texte intéressant la matière (en voir une énumération dans l'article précité de M. Lagarde et dans celui de MM. Sarraute et Tager; Gaz. Pal. 8 août 1946, n° 10).

Ces diverses ordonnances ont permis en outre :

14 nov. 1944. Voir Commentaire Esmein, Gaz. Pal. 2 et 6 mars 1944 et l'article signé P. D., J.C.P. 1945.I.453);

2° La restitution à ceux qui en avaient été expropriés dans des conditions précisées, de biens qui, faisant l'objet de mesures de séquestre, administration provisoire, gestion ou liquidation exorbitante du droit commun, n'avaient pas encore fait l'objet de liquidation ou disposition à la date de mise en vigueur des textes. (Ord. du 16 oct. 1944 et Ord. du 14 nov. 1944 avec l'étude de M. Lagarde précitée.)

8. — La possibilité de réclamer la restitution de biens aliénés par les administrateurs ou liquidateurs et se trouvant entre les mains de tiers acquéreurs paraît un problème beaucoup plus difficile à résoudre. Le gouvernement n'a voulu promulguer une ordonnance à ce sujet qu'après avoir pris l'avis de l'Assemblée Consultative provisoire, qui en a délibéré dans sa séance du 15 mars 1945. (Voir J. O. Déb. du 16 mars 1945.)

Le projet gouvernemental amendé ensuite des observations de l'Assemblée est devenu l'ordonnance du 21 avril 1945 (J.C.P. 45.III.9455), portant deuxième application de l'ordonnance du 12 novembre 1943.

9. — Les dispositions de cette ordonnance sont assez larges pour lui permettre de s'appliquer aux diverses formes de spoliations dont les Français ont été victimes pendant la guerre. Il n'en demeure pas moins qu'au cours de la discussion de ce texte, l'Assemblée a eu surtout en vue les expropriations commises dans un but politique ou de représailles à l'encontre de certaines catégories de Français, israélites, résistants, syndicalistes, etc... Les biens provenant de ces spoliations ont été généralement liquidés en France même par des séquestres ou administrateurs.

Les spoliations commises par nos ennemis à leur profit présentent une importance et une gravité encore plus considérable, car au grief moral de l'injustice qu'elles encourent avec les premières, viennent s'ajouter des considérations d'ordre économique et d'intérêt national : diminution de notre potentiel économique, contrôle étranger de nos entreprises, etc...

Il est normal que ces spoliations soient traitées de façon différente et plus rigoureuse. C'est l'objet d'une ordonnance du 9 juin 1945 portant troisième application de l'ordonnance du 12 novembre (J. O. 12 juin et rectif. 14 juin 1945; J.C.P. 1945.III.9595) complétée par un décret du 23 juillet 1945 (J. O. 24 juillet et J.C.P. 1945.III.9743). Dans le même domaine, il faut encore signaler une ordonnance du 11 avril 1945 et divers arrêtés — dont celui du 15 avril 1945.

10. — La présente étude sera limitée à l'ordonnance du 21 avril 1945.

## II. — Idées directrices de l'ordonnance.

11. — Le législateur a vu dans les personnes qui avaient été expropriées de leurs biens sur l'ordre direct ou indirect des Allemands, non seulement des victimes d'une mesure injuste, mais des infortunés qui avaient souffert un dommage de guerre, à l'égal de ceux dont les biens avaient été détruits par une opération militaire.

Ont été considérés comme ayant droit à réparation à ce titre, non seulement ceux dont les biens ont été aliénés sans leur consentement (art. 1er), mais ceux qui ont donné leur consentement sous la contrainte des suites de l'occupation (art. 11).

12. — Toutefois, la charge de la réparation des dommages de guerre est écrasante. En réparant les dommages subis par ceux qui ont été dépouillés, le législateur a eu

les considérants tiennent à la distinction classique entre les acquéreurs de bonne et de mauvaise foi. L'article 4 précise que les acquéreurs et sous-acquéreurs successifs sont considérés comme de mauvaise foi au regard du propriétaire dépossédé. Cette présomption qui n'admet pas la preuve contraire les oblige à restituer les fruits dans les conditions d'un acquéreur de mauvaise foi. Ils ne peuvent pas invoquer les dispositions de l'article 2280 du Code civil pour se faire rembourser le prix d'achat quand ils ont acheté le bien dans un marché ou chez un marchand vendant des choses semblables. Sans doute, le spolié doit rembourser à l'acquéreur le prix de vente, mais seulement dans la mesure où il en a profité, c'est-à-dire sous déduction des divers prélèvements ou frais qui ont pu grever ce prix. Par ailleurs, l'acquéreur ne peut invoquer le droit de rétention. Ainsi la réparation du dommage est imposée au maximum à l'acquéreur lui-même, qui supportera les pertes éventuelles résultant de l'opération de restitution.

13. — Toutefois, ces idées n'ont pas été suivies dans toutes leurs conséquences. En premier lieu, l'ordonnance est inapplicable aux valeurs mobilières vendues en bourse ou par un intermédiaire professionnel sans l'indication de la contre-partie, à moins que l'acquéreur n'ait eu connaissance de l'origine de la propriété. En second lieu, certaines personnes peuvent être relevées de la qualification de mauvaise foi dans les cas prévus aux paragraphes 6 et 7 de l'article 4. De plus, l'acquéreur de bonne foi profite encore de certains avantages ; notamment, il n'est pas soumis au prélèvement de 10 % prévu par l'article 6 sur le montant des sommes à lui restituer, et il bénéficie d'un droit de recours contre les agents d'affaires et les intermédiaires (art. 5). C'est dire que la présomption de mauvaise foi joue seulement au regard du propriétaire et non dans les rapports de l'acquéreur avec des tiers, fisc, intermédiaires, etc...

14. — Il faut enfin signaler que doctrine et jurisprudence paraissent vouloir s'accorder pour admettre que la présomption de mauvaise foi édictée par la loi est une mesure d'exception à interpréter restrictivement. Elle ne s'appliquerait qu'à la qualité d'acquéreur et non à celle d'occupant, et ne serait à envisager qu'au point de vue du droit de rétention et de la restitution des fruits. (Trib. Gap 1er juin 1945 ; Gaz. Pal. 30 juin ; Esmein, Doctrine, Gaz. Pal. 5 juin 1945.)

15. — Par suite de circonstances diverses, perte de biens due à la faute de l'acquéreur, insolvabilité de celui-ci ou détournement de l'administrateur provisoire, il peut se faire que la réparation du dommage par voie de restitution ne soit pas possible. La charge ne peut alors en incomber qu'à l'Etat. L'Assemblée n'a pas voulu que les spoliés se présentent parmi les diverses victimes de la guerre comme créanciers privilégiés. C'est pourquoi l'ordonnance prévoit que le quantum et les modalités de l'indemnité à verser par l'Etat, seront fixés en application des dispositions à prendre pour la réparation des dommages de guerre (art. 7).

16. — A l'idée de réparation d'un préjudice subi, qui est l'idée maîtresse de l'ordonnance, paraît se mêler parfois une certaine notion de pénalité à l'encontre de l'acquéreur. Nous ne parlons même pas du prélèvement de 10 % prévu par l'article 6. Il est destiné à financer les réparations par voie d'indemnité. Mais on arrêtera son attention sur l'article 23 qui prévoit la dévolution des biens dont les propriétaires dépossédés n'auraient pas demandé la restitution.

17. — Il faut distinguer parmi les actes de dépossession ceux qui sont le résultat d'une mesure d'autorité imposée au propriétaire contre son gré, et ceux auxquels il a consenti.

L'article 1er considère ceux-là comme nuls de droit, ceux-ci comme annulables. La différence est justifiée. Dans le premier cas, le consentement du propriétaire fait totalement défaut, et la dépossession a son origine et fondement dans un ordre injuste de l'occupant ou dans une disposition du gouvernement de Vichy aujourd'hui annulée comme illégale. On comprend qu'il ne puisse y avoir de discussion sur la nullité de l'acte de dépossession ; le juge n'a pas besoin de le prononcer ; il lui suffit de la constater et il ne peut s'y refuser.

Dans la seconde hypothèse, il y a un acte ayant toutes les apparences de la régularité. Il est seulement vicié par la contrainte qui s'est exercée sur la volonté du disposant. Le juge doit vérifier l'existence et apprécier l'action de cette contrainte, et ensuite prononcer la nullité comme il le fait chaque fois où la nullité d'un acte est demandée pour vice de consentement. Le juge conserve une certaine liberté d'appréciation.

On comprend que les conditions exigées pour la restitution ne soient pas les mêmes dans les deux hypothèses.

## A. — Dépossession forcée (Art. 1er).

18. — Au cas de dépossession forcée, l'acte de disposition doit tout d'abord avoir été accompli en vertu de mesures du Gouvernement de Vichy, ou par l'ennemi, sur son ordre ou sous son inspiration.

Ainsi la vente d'une jument par le domestique d'un israélite qui a pris la fuite, faite en dehors de toute immixtion administrative ou de toute action de l'ennemi, est un acte purement individuel qui n'entre pas dans les prévisions de l'ordonnance. (Trib. Civ. Belfort, 13 juillet 1945, Schrameck c. Neuhauser, J.C.P. 46.II.3167.)

De cette condition, il résulte que l'ordonnance du 21 avril 1945 atteint les seuls actes accomplis entre le 16 juin 1940 et le 9 août 1944, dans l'hypothèse de la légalité républicaine, ou la date de la libération du territoire, là où elle est postérieure au 9 août.

C'est pourquoi la nullité de la vente effectuée par les Domaines des biens du parti communiste, dissous par la loi du 26 septembre 1939, ne peut pas être ordonnée par application de l'ordonnance du 21 avril 1945 (Trib. Civ. Marseille, 31 juillet 1945, Gaz. Pal. 1er novembre 1945. — Sur la restitution des biens du parti communiste. Voir ord. 6 mai 1944; Gaz. Pal. 1944, 2, 291).

19. — Il ne suffit toutefois pas que la mesure de disposition ait été accomplie par l'ennemi ou en vertu d'actes du gouvernement de Vichy; elle doit avoir été la conséquence de mesures exorbitantes du droit commun en vigueur le 16 juin 1940. Cette condition est primordiale. Notre législation a toujours contenu des textes permettant la dépossession forcée dans des cas limitativement énumérés; des mesures semblables sont consacrées par les législations étrangères, voire même par le droit international, et notamment par le droit international de la guerre.

Si le propriétaire a été dépossédé par application d'une de ces mesures, même si elles ont été appliquées par les agents de Vichy ou par l'ennemi, nul ne saurait s'en plaindre ni obtenir la restitution. C'est ainsi que la vente ordonnée

ensuite d'une saisie immobilière pratiquée par un créancier hypothécaire demeure valable, même si le débiteur était israélite (Seine, 14 décembre 1944, *Gaz. Pal.* 1945, 1, 17). Il en va de même pour la vente d'un fonds de commerce par voie d'adjudication réalisée après déclaration de faillite du propriétaire. (*Paris, 20 février 1945, Gaz. Pal. 5 mai 1945. — Adde Seine 13 février 1945, Gaz. Pal. 13 mars 1945. — Dijon, 15 décembre 1944, Gaz. Pal. 1945, 1, 49. — Rappr. Paris 27 août 1945, Gaz. Pal. 19 octobre 1945.*)

Toutefois, il faut noter que la déclaration de faillite a pu être la conséquence des mesures ordonnées par Vichy ou par l'ennemi en application de dispositions exorbitantes au droit commun, ou bien, ces mesures ont pu avoir une influence fâcheuse sur la liquidation de la faillite. Il y a là un problème tellement délicat que l'ordonnance du 21 avril 1945 n'a pas voulu le régler et que son article 25 a prévu qu'une ordonnance ultérieure fixerait les conditions dans lesquelles les opérations de certaines faillites pourraient être rouvertes. En attendant la parution de cette ordonnance, la solution des arrêts précités doit être maintenue.

20. — Les *réquisitions* faites par l'armée allemande ne sont pas par elles-mêmes des mesures exorbitantes du droit commun. Le droit international de la guerre a en effet toujours permis à une armée en occupation de se procurer par voie de réquisition ce qui peut être nécessaire à ses besoins; par ailleurs, l'article 43 de la convention de La Haye autorise l'occupant à prendre toutes mesures qui dépendent de lui en vue de rétablir et d'assurer autant que possible l'ordre public. Donc, les réquisitions ennemies ne sont exorbitantes, au sens de l'ordonnance du 21 avril 1945, que dans la mesure où elles auraient été utilisées dans des conditions et pour des fins non autorisées par les lois de la guerre, par exemple pour dissimuler un acte de pillage ou de désorganisation économique. En fait, il est très délicat de distinguer la réquisition régulière de celle qui constitue une spoliation. (*Voir Trib. Douai, 31 juillet 1945, Gaz. Pal. 30 oct. 1945 et note; Trib. Civ. Strasbourg, 1er août 1945, Gaz. Pal. 21 sept. 1945 et note; — Trib. Civ. Péronne 27 avril 1945, Gaz. Pal. 17 juillet 1945.*)

21. — De même ne constituent pas des actes exorbitants du droit commun, les *expropriations pour cause d'utilité publique*; ni les réquisitions en propriété du gouvernement de Vichy, non plus que les acquisitions par l'État en vertu de son *droit de préemption* ou de priorité (art. 15).

Toutefois, ces acquisitions peuvent donner lieu à *rétrocession* si leur maintien dans la main de l'État ne correspond plus à une notion d'utilité publique (*même texte*).

22. — Les mesures contraires au droit des gens, celles édictées, pour l'application de principes politiques ou raciaux condamnés, par des textes postérieurs au 16 juin 1940 et aujourd'hui annulés par application de l'ordonnance sur le rétablissement de la légalité républicaine, sont à l'inverse des mesures exorbitantes du droit commun dans le sens de l'ordonnance du 21 avril 1945.

Le texte en énumère quelques-unes : mesures de séquestre, administration provisoire, gestion, liquidation, confiscation. Mais l'énumération n'est pas limitative. (Voir un tableau des divers types de spoliation dans l'article de MM. *Sarraute et Tager, Gaz. Pal. 7 août 1945.*)

23. — L'article 1er déclare nul de droit les *actes de disposition* accomplis dans les conditions précitées. Le texte vise indistinctement tous les actes de disposition, mais il les oppose très nettement aux actes d'administration, qui, aux termes de l'article 3, demeurent valables sauf exception.

Les expressions acte de disposition et acte d'...

droit commun, civil ou commercial, suivant les hypothèses. Il n'y a aucune raison pour leur assigner une portée différente.

Dans la première catégorie figurent principalement les aliénations, les démembrements de propriété, les constitutions de droits réels et les baux consentis pour plus de neuf ans. Il y a toutefois des aliénations qui constituent des actes d'administration : ce sont celles qui rentrent dans la gestion courante d'une entreprise commerciale, industrielle ou agricole et les ventes de denrées périssables.

C'est ainsi que la vente faite par un administrateur gérant d'une entreprise industrielle, d'un camion rendu inutilisable par suite d'un bombardement est un acte normal de l'exploitation de l'industrie en cause et constitue un acte d'administration et non un acte de disposition imposé comme conséquence d'une mesure exorbitante de droit commun. (*Aix, 21 nov. 1945, Les Grandes Bières de France c. Michaud et Brondello; J.C.P. 46.II.3168.*)

Il convient de préciser que l'acte de disposition peut avoir pour objet un bien, droit ou intérêt quelconque, sous réserve de l'exception prévue par l'article 13 relative aux *titres et valeurs mobilières*. Leur aliénation ne peut pas être annulée s'ils ont été vendus soit en Bourse par un agent de change, soit par l'intermédiaire d'un banquier en valeur ou d'un établissement de banque, sans indication de la contre-partie, à moins que l'acquéreur n'ait eu connaissance de l'origine de la propriété.

24. — Sous cette réserve, le domaine des actes de disposition est donc très large. Seront considérées comme des aliénations toutes les renonciations à un droit, telles que les remises de dettes, l'abandon d'un commerce et la radiation du registre du commerce, la renonciation à une licence, ou au droit de renouvellement d'un bail (*Paris, 18 octobre 1945, Gaz. Pal. 26 nov. 1945*), voire un prêt dépassant les besoins courants de l'entreprise. A fortiori, constitue un acte de disposition, la cession de parts sociales (*Paris, 10 octobre 1945, Aff. Arnulf c. Chamanski, J.C.P. 46.II.3169*), la résiliation d'un bail avant son terme normal (*Seine, 25 juin 1945, Gaz. Pal. 2 août 1945; — Aix, 13 déc. 1945, Crémieux c. Sté Immobilière St-Ferréol, J.C.P. 46.II.3170*) et les expulsions ordonnées après la nomination d'un commissaire gérant (*Seine, 26 octobre 1945, Gaz. Pal. 26 nov. 1945*). Cette expulsion est proprement un acte de spoliation.

25. — A la différence des actes de disposition, *les actes d'administration* demeurent en principe valables, à condition d'être conformes aux dispositions de l'article 1374 du Code civil, c'est-à-dire de correspondre à une gestion de bon père de famille (*Seine, 18 janvier 1946, Sté Parisienne d'Edition c. Dirler et Roberty; J.C.P. 1946.II.2990 et note Toujas; Meaux, 25 juillet 1945; J.C.P. 46.II.3126*).

Toutefois, ces actes sont annulables lorsqu'ils portent préjudice au propriétaire au jour de la demande. Si l'on se rapporte aux travaux préparatoires, ces actes seront ceux qui empêchent le spolié de rentrer véritablement dans son patrimoine. A l'Assemblée Consultative, M. E. Nouveau a cité l'exemple d'une mise en gérance libre d'un fonds de commerce ou d'un bail de moins de neuf ans. Ces actes qui sont des actes d'administration, et qui peuvent avoir été des actes de gestion de bon père de famille au moment où ils ont été passés, empêchent le spolié de rentrer effectivement en possession de son bien et lui causent ainsi préjudice au jour de sa demande.

26. — L'annulation des actes d'administration par application de l'article 3 pose la question de savoir par qui ces actes doivent avoir été accomplis. Le texte s'applique sans

...ges de France c. Michaud et Brondello précité). Étant donné les explications fournies par M. Nouveau à la tribune de l'Assemblée Consultative, il faut admettre qu'il règle aussi le sort des actes d'administration faits par les acquéreurs ou sous-acquéreurs des biens spoliés (Seine, 9 janvier 1946, Sté Parisienne d'Edition c. Dirler et Ro-chy, J.C.P. 1946.II.2990 et note Toujas à propos d'un acte d'embauchage d'ouvrier). Il semble bien, par contre, qu'il soit inapplicable aux actes d'administration accomplis par des tiers dans leur propre intérêt; les règles de la gestion d'affaires auxquelles l'article 3 renvoie sont étrangères à ce cas.

A dire le vrai, on se demande même comment la difficulté peut naître en pratique. Elle s'est présentée à propos de la résiliation des baux dans l'hypothèse suivante. Il est arrivé assez souvent que, à la suite de la renonciation à un bail par le gérant ou à la résiliation du bail poursuivi contre ce dernier, le propriétaire a reloué pour moins de neuf ans les locaux devenus libres à des occupants de bonne foi. Le spolié obtient l'annulation de la renonciation ou de la résiliation; mais peut-il obtenir l'expulsion des occupants? Désireux de ne pas priver l'annulation d'effet pratique, la jurisprudence lui en reconnaît le droit (Seine, 25 juin 1945; Et. Lévitan c. Sté Garouste, J.C.P. 46.II.3171; — Trib. Civ. Toulouse 22 mai 1945, Gaz. Pal. 13 juin 1945.) Mais cette solution ne paraît pas pouvoir être justifiée par les dispositions de l'article 3. Il s'agit bien d'un acte d'administration, mais il a été accompli par un tiers, dans son propre intérêt, et en application des dispositions du droit commun. Il semble plus exact de constater que cette relocation n'a été rendue possible que par une renonciation aujourd'hui annulée; qu'ainsi le spolié n'ayant jamais cessé d'être locataire, la relocation consentie lui est inopposable. (Voir les décisions précitées.)

Le juge des référés peut prononcer cette expulsion même dans ce cas, car l'article 17 lui donne pleine compétence pour décider au fond sur toutes les questions soulevées par l'application de l'ordonnance.

## B. — ACTES ACCOMPLIS AVEC LE CONSENTEMENT DU SPOLIÉ (ART. 11).

27. — Dans le titre II de l'ordonnance du 21 avril 1945, le législateur a envisagé le cas des personnes dont les biens n'avaient pas encore été soumis à des mesures exorbitantes du droit commun, mais qui, craignant de s'en voir déposséder en conséquence d'une de ces mesures, ont préféré les vendre ou conclure à leur sujet des actes susceptibles de les protéger.

L'intéressé a donné son consentement. L'acte se présente avec toute l'apparence d'un acte normal et régulier. Mais le législateur a considéré que le consentement n'avait pas été libre et il admet que l'acte peut être annulé à raison de l'espèce de violence sous l'empire duquel il a été contracté. (Cf. Bordeaux 31 juillet 1945, J.C.P. 46, II, 2950.)

28. — Le domaine d'application de l'article 11 n'est pas exactement la même mesure que celui de l'article 1er relatif aux dépossessions forcées.

Dans un sens, il est plus large, car il s'applique à tous contrats et actes juridiques, alors que l'article 1er n'embrasse que les actes de dispositior. C'est ainsi qu'il a été jugé applicable à un acte d'achat de fonds de commerce accompagné d'un acte d'association concernant ledit fonds. Toulouse, 12 déc. 1945; Dame Billard c. Berkovic; J.C.P. 946, III, 2943.) Il demeure malgré tout assez douteux que l'ordonnance puisse être justement appliquée à un acte

...l'...um...age... dont juste le contraire d'un acte de spoliation.

A d'autres égards, le domaine de l'article 11 est singulièrement plus limité.

29. — Pour être annulable aux termes de l'article 11, un acte doit :

a) Etre postérieur au 16 juin 1940;

b) Avoir été passé par des personnes physiques ou morales dont la situation a été réglée, avant ou après la date de ces actes, par les textes visés à l'article 1er de la présente ordonnance ou par des dispositions prises à leur encontre par l'ennemi. Elles seules peuvent avoir agi sous l'empire de cette contrainte spéciale dont le législateur veut corriger les effets (Pontoise, 21 août 1945, Gaz. Pal. 3 nov. 1945);

c) Porter sur une des catégories de biens énumérés à l'article 11. A la différence de l'article 1er, en effet, ce texte contient une énumération de contrats et actes juridiques caractérisés par la nature des biens ou droits qui en font l'objet. La jurisprudence considère cette énumération comme limitative. Elle en a conclu, par exemple, qu'au cas où un fonds de commerce a été démembré, si l'acte querellé n'a porté que sur le droit au bail, la cession ne pouvait pas être annulée par application de ce texte (Bordeaux, 31 juillet 1945, J.C.P. 46, II, 2949). Pareillement, l'article 11 ne peut pas être invoqué, en cas de vente de meubles corporels (Seine, 10 juillet 1945, Gaz. Pal. 23 août 1945; Aix, 21 nov. 1945, Les Grandes Bières de France c. Michaud et Brondello précité).

Toutefois, par extension d'une conception déjà admise en droit commun, si la vente a porté sur un seul élément du fonds de commerce, cette vente peut être assimilée à la vente du fonds lui-même dans le cas où l'élément vendu constitue l'élément principal. (Seine, 8 oct. 1945, Dame Gesseleff c. Cie Trieste et Venise. J.C.P. 46, II, 2984.)

30. — d) Il faut enfin que l'acte ait été passé sous l'empire de la violence. En principe, la violence est présumée lorsque les conditions précédentes sont réunies.

Toutefois, si le détenteur rapporte la preuve que son acquisition a été faite au juste prix, la présomption ne joue plus, et la preuve de la violence incombe au propriétaire dépossédé.

L'acquisition au juste prix est une exception soulevée à l'encontre de la présomption; elle doit être, dit l'article 11, invoquée in limine litis, et au plus tard dans le mois de l'assignation, sous peine de forclusion.

31. — L'application de ces dispositions soulève d'assez nombreuses difficultés pratiques. On peut tout d'abord se demander si la présomption édictée est irréfragable ou non. Il semble bien, à lire l'ensemble du texte, que le législateur considère la faiblesse du prix par rapport aux cours normaux ou à la juste valeur de l'objet comme une preuve suffisante de violence. Il pense que si le vendeur a cédé à prix bas, c'est qu'il a été obligé de vendre dans de mauvaises conditions. On est ainsi conduit à penser que la présomption est irréfragable, d'autant que, même en droit commun, le juge pourrait invoquer l'insuffisance du prix comme preuve d'une contrainte. (Cf. Esmein, Gaz. Pal. 18 juin 1945, n° 23.)

Par contre, il doit être permis à l'acquéreur de prouver que le prix porté à l'acte ne correspond pas au prix réel: Pour savoir si le prix est juste, il faut ainsi tenir compte des éléments occultes aussi bien qu'apparents. (Seine, Vve Tatarski c. Ets Vasseur. J.C.P. 46, II, 3172.) Il est arrivé assez souvent en pratique que des israélites ont demandé

Case: 1:04-cv-05953 Document #: 1 Filed: 09/10/04 Page 106 of 118 PageID #:106

qu'une partie du prix leur soit versée de la main à la main pour pouvoir la soustraire à toute investigation. (*V. in fine note sous Bordeaux, 31 juil. 1945, Gaz. Pal. 3 oct. 1945.*)

**32.** — En second lieu, il faut préciser la *notion de violence*, afin de savoir quelle preuve le demandeur doit rapporter lorsqu'il ne bénéficie pas de la présomption légale. La jurisprudence a marqué une certaine hésitation. Quelques décisions ont été rédigées de façon à donner l'impression que l'existence ou la menace de promulgation de lois raciales ou d'une législation d'exception suffisait pour constituer la contrainte. (*Paris, 10 oct. 1945; Arnulf c. Chamanski, J.C.P. 46, II, 3169; — Seine, 18 juin 1945, Gaz. Pal., 28 juillet 1945.*) L'annotateur du jugement a fait justement observer qu'un tel motif vaudrait dans tous les cas, et l'on aboutirait ainsi à n'établir aucune distinction pratique entre les hypothèses où la présomption joue et celles où elle devrait être écartée.

C'est sans doute pourquoi d'autres décisions plus nombreuses prennent soin, pour justifier leur solution, de relever des faits constituant une pression particulière, s'ajoutant à la considération générale de la législation. Dans son arrêt du 20 août 1945, la Cour de Paris constate que le demandeur avait vendu son fonds, « sur les instances pressantes de son commissaire-gérant, agissant lui-même en exécution des instructions du commissaire général aux questions juives ». (*Gaz. Pal. 15 sept. 1945; Rappr. Seine, Vve Tatarski c. cts Vasseur précité.*) Une mise en demeure de la Préfecture ou une intervention du commissaire de police de la ville fournirait un autre exemple de violence particulière. (*Bordeaux, 25 juil. 1945, J.C.P. 46, II, 2950; Trib. civ. Compiègne, 10 juil. 1945; J.C.P. 46, II, 2950.*) Le tribunal de Pontoise a rejeté la demande en résiliation d'un israélite qui n'avait pas rapporté la preuve de la violence qui lui incombait. (*Pontoise, 21 août 1945; Gaz. Pal. 3 nov. 1945.*)

Si l'on constate que l'arrêt de la Cour de Paris a été rendu sur appel du jugement précité du Tribunal de la Seine, on peut conclure que la différence n'est souvent que dans la rédaction et que la jurisprudence paraît disposée à admettre qu'il ne suffit pas au demandeur d'invoquer les risques qu'il courait en tant que sujet passible de mesures d'exception, mais qu'il doit prouver qu'il a été personnellement l'objet d'une violence particulière.

**33.** — Plus délicate est la question de savoir si l'acquéreur doit avoir connu la pression dont le vendeur était l'objet. Le droit commun exige que le défendeur ait participé à la violence au moins en en tirant sciemment avantage. (*Planiol et Ripert, et Esmein, T. VII, n° 195.*) Le tribunal de Pontoise, de son côté, a débouté un israélite de sa demande en résiliation, considérant qu'il n'avait pas révélé sa qualité d'israélite et que l'acquéreur n'avait pas pu connaître la contrainte dont il se prétendait l'objet. (*Pontoise, 21 août 1945, Gaz. Pal. 3 nov. 1945.*) Il est permis de se demander si l'ordonnance ne modifie pas le droit commun sur ce point.

**34.** — Enfin, une dernière difficulté d'application consiste à définir l'expression *juste prix*. On s'accordera sans peine pour reconnaître que le prix ne sera *juste* que s'il correspond à la valeur réelle de la chose vendue, s'il constitue une contre-prestation équilibrée.

Mais un jugement de la Seine a estimé que le terme *prix* ne vise qu'une prestation pécuniaire à l'exclusion de toute prestation en nature. (*Seine, 23 juil. 1945, Gaz. Pal. 3 nov. 1945.*) Cette interprétation restrictive est difficile à approuver. C'est le déséquilibre des prestations qui révèle

équilibrée, la justification de la présomption disparaît nature de la contre-prestation importe peu, du moins principe, et sauf exceptions particulières.

**35.** — On pourrait résumer l'article 11 en disant q permet l'annulation des actes passés avec le consentem du demandeur :

*a)* Pour lésion, lorsqu'ils n'ont pas été contractés à juste prix;

*b)* Pour violence, si le prix est juste, à charge par demandeur de prouver la violence.

**C. — DU CONSENTEMENT DU PROPRIÉTAIRE.**

**36.** — On a vu que le champ d'application respectif articles 1er et 11 de l'ordonnance du 21 avril 1945 dép de savoir si l'acte critiqué a été fait avec le consentem du propriétaire. La jurisprudence éprouve quelque ma donner un critère qui permette de distinguer les actes s mis à l'un ou à l'autre de ces textes. (*Sur cette quest voir l'article signé G. E. L., J.C.P. 1946, I, 492.*)

**37.** — L'article 1er déclare nul de droit les actes fa contre *la volonté du propriétaire, ou même avec son c cours matériel.* Pour apprécier s'il en est ainsi, la jurisp dence s'en tient le plus souvent à un critère formel. Si propriétaire a agi seul, hors la présence de l'administ teur-gérant, de sorte qu'il figure seul dans l'acte de ven les décisions admettent qu'il a joué un rôle juridique ess tiel bien différent du concours matériel, et qu'il a bi voulu vendre. (*Seine, Vve Tatarski c. cts Vasseur précité; Paris, 20 août 1945, J.C.P. 46, II, 2947; Bordeaux, 25 ju 1945, J.C.P. 46, II, 2950, Gaz. Pal. 4 sept. 1945.*) Au co traire, si l'acte a été passé par le commissaire-gérant, tombe sous le coup de l'article 1er; même si le propriétaire est intervenu et l'a signé, cette intervention étant un simp concours matériel. (*Seine, 11 mai 1945, Gaz. Pal. 23 m 1945; Paris, 5 nov. 1945, Gaz. Pal. 10 déc. 1945.*)

**38.** — Toutefois, ce critère purement formel n'est p toujours satisfaisant. Ainsi le tribunal civil de la Se a été amené à décider que bien que la vente d'un immeul appartenant à un israélite ait été passée par l'administ teur provisoire seul, sans le concours du propriétair l'acquéreur est fondé à soutenir que la vente a été fa avec le consentement du propriétaire si celui-ci avait ant rieurement signé un compromis de vente stipulant le mê prix. (*Seine, 9 juin 1945, J.C.P. 46, II, 2952; dans le mê sens, Aix, 13 déc. 1945, Aulanier c. Bidjanaro, J.C.P. 46, 3173; Seine, 10 oct. 1945, dame Dreyfus c. ép. Guido J.C.P. 1946, II, 3014 et note Toujas; Seine, 26 oct. 194 Borgel c. Lauvernier, J.C.P. 46, II, 3174).* De mêm lorsque le propriétaire a mené lui-même des négociatio pour la vente d'un bien et a passé l'acte en présence de commissaire-gérant, on doit considérer qu'il a joué u rôle essentiel n'ayant aucun rapport avec le simple conco matériel envisagé par l'article 1er. (*Seine, 27 juin 194 J.C.P. 46, II, 2948.*)

**39.** — Il est parfaitement justifié de ne pas s'en ten à un critère formel et de pousser plus avant l'analyse l'opération pour connaître le rôle véritable joué par propriétaire dans l'acte de disposition. Si le rôle princip a été joué par l'administrateur, le propriétaire ne pu qu'un concours matériel. Dans le cas contraire, son co sentement existe, atteint seulement, suivant les cas, d'v vice. La Cour de Bordeaux, dans une formule heureu distingue l'hypothèse où le spolié n'intervient à l'acte q pour y jouer un rôle purement passif et pour signer,

tractante, et les cas où le propriétaire a bien voulu
dre, mais où son consentement a été vicié par la con-
inte en ce sens qu'il n'eût pas désiré vendre si les évé-
ments ne l'avaient pas poussé à consentir un sacrifice
gé par lui nécessaire et à rechercher dans une vente
tive le moyen de sauver au moins une partie de son patri-
oine. (*Bordeaux,* 31 juil. 1945, *J.C.P.* 46, II, 2949; comp.
ijon, 3 janv. 1946, *J.C.P.* 46, II, 3127.)

40 — Mais on hésite à approuver certains arrêts qui
araissent admettre que, dès l'instant où le propriétaire
urait agi sous la contrainte d'une pression exercée par les
utorités ou par le commissaire-gérant, il y aurait de sa
art simple concours matériel et non pas consentement
icié. (Nancy, 31 oct. 1945, *Gaz. Pal.* 30 nov. 1945.) Tout
u long de ses considérants, la Cour de Nancy assimile le
imple concours matériel et la décision prise sous con-
rainte. Cette asssimilation est difficilement acceptable, car
'ordonnance entend clairement en faire deux cas distincts,
et elle aboutirait pratiquement à priver l'article 11 de toute
portée pratique. (*Cf. supra* n° 32.)

Puisque la distinction est imposée par le texte même de
l'ordonnance, le meilleur critère paraît bien être celui qui
se dégage de la jurisprudence du tribunal de la Seine et
que reproduit la formule de l'arrêt de la Cour de Bordeaux.
Il faut rechercher la position juridique prise par le ven-
deur; si elle est celle d'un spectateur passif, il y a simple
concours matériel; s'il a assumé un rôle juridique essen-
tiel, il n'y a plus simple concours matériel. (Seine, *Vve
Tatarski c. cts Vasseur*; Seine, 8 oct. 1945, *dame Gesseleff
c. Cie Trieste et Venise*, précité.)

### D. — NATURE DE LA NULLITÉ.

#### RENONCIATION ET ACTES DE RATIFICATION. VALIDITÉ.

41. — Une question délicate et débattue est celle de
savoir si la nullité des actes de spoliation est une nullité
absolue ou relative. La question se pose pratiquement
lorsque, aux demandes d'annulation, sont opposés des actes
par lesquels le prétendu spolié confirme l'acte querellé et
renonce explicitement ou implicitement à l'attaquer. Elle
présente aussi un intérêt pour répondre à la question de
savoir si la nullité peut être demandée par toute per-
sonne *intéressée* ou seulement par le spolié ou ses repré-
sentants.

42. — Un jugement du tribunal de la Seine du 19 oc-
tobre 1945 (*Bornstein c. Roberteau; Gaz. Pal.* 8 déc. 1945) a
décidé que les demandeurs n'avaient pas pu, par une con-
vention antérieure à la loi, renoncer à faire constater la
nullité des actes attaqués ni à voir ordonner les consé-
quences qui en découlent. Il n'ajoute aucune raison justi-
ficative.

MM. Sarraute et Tager sont d'avis que la nullité est
d'ordre public, à raison du caractère d'ordre public de la
loi (*Gaz. Pal.*, 11 août 1945, n° 13 et *Gaz. Pal.*, 8 sept.
1945, n° 38, § 2). Ils tirent argument de l'article 22 qui
donne au Ministère Public le droit de requérir d'office la
nullité des actes visés par l'ordonnance.

Il faut préciser que si cette opinion est admise, ce ne
sont pas seulement les actes de ratifications ou de renon-
ciations antérieurs à la promulgation de la loi du 21 avril
qui seraient nuls, mais même ceux postérieurs, car la rati-
fication d'une opération atteinte d'une nullité absolue n'est
jamais valable.

43. — M. Paul Esmein est au contraire de l'avis que
la nullité de l'ordonnance du 21 avril 1945 est une nullité
purement relative (*Gaz. Pal.*, 9 juin 1945, n° 10 bis). Et

dans l'affaire *Vve Tatarski c. Vasseur* (préc.), ... ...
Civil de la Seine a jugé « qu'il n'est pas douteux que ne
soient susceptibles d'être effacées par une ratification les
nullités édictées par l'ordonnance du 21 avril 1945 qui,
soit qu'il s'agisse de l'article 11 ou de l'article 1er, ne sont
jamais créées que dans le seul intérêt de la victime d'une
spoliation et invocables par elle seule, de sorte qu'elles
sont par conséquent purement relatives; qu'il est certain,
d'autre part, que dès la libération, et sans attendre l'ordon-
nance du 21 avril 1945, une renonciation valable à la nul-
lité des actes de spoliation pouvait se produire, puisque
aussi bien le principe de cette nullité était déjà acquis et
connu depuis l'ordonnance du 12 novembre 1943, dont les
ordonnances du 14 novembre 1944 et du 21 avril 1945 ne
sont que la simple mise en œuvre ».

44. — Cette dernière thèse paraît bien préférable. Il sem-
ble très difficile d'admettre que la nullité puisse être invo-
quée par l'acquéreur qui aurait intérêt à se dégager de son
contrat. Ce résultat devrait être sanctionné si le caractère
absolu de la nullité était reconnu.

Par ailleurs, les arguments de texte avancés en sens
inverse sont fragiles. La question ne peut se poser que pour
la nullité de l'article 1er, car il ne peut pas être sérieuse-
ment contesté que celle de l'article 11 est une nullité rela-
tive. Les articles 11 et 12 disent clairement qu'elle est
prononcée pour vice de consentement.

Ce point établi, l'argument tiré du droit accordé par
l'article 22 au Ministère public perd beaucoup de sa valeur,
car il est attribué sans distinction entre la nullité de l'ar-
ticle 11 et celle de l'article 1er. Pour achever de le ruiner,
il suffit d'observer qu'il ne peut être exercé qu'au cas de
décès ou de disparition du spolié et si celui-ci ne laisse
aucun héritier au rang successible, c'est-à-dire si la suc-
cession est en déshérence, ce qui confère à l'Etat un intérêt
personnel à l'annulation de l'acte (art. 768 C. civ.).

Enfin, en faveur de la validité des actes de ratification,
ou renonciation à nullité, on observera que l'article 27 inter-
dit la cession des droits de toute nature reconnus par la
présente ordonnance. Or, malgré la tentative contraire de
MM. Sarraute et Tager, on ne peut pas assimiler une ces-
sion à une renonciation, puisque celle-ci entraîne extinction
de droit, que celle-là maintient au contraire en le transfé-
rant (*même sens, Esmein, loc. cit.*). La cession ayant seule
été interdite, il en résulte par *a contrario* que la renoncia-
tion est permise (Esmein, *loc. cit.*).

45. — Il est toutefois certain que la renonciation ne se
présume pas et ne peut résulter que d'une volonté claire-
ment exprimée (*Seine précité... Vve Tatarski c. Vasseur*.)

### E. — BÉNÉFICIAIRES DE LA NULLITÉ.

46. — La question de savoir si les *étrangers* pouvaient
bénéficier des dispositions de l'ordonnance du 21 avril
1945 offrait matière à hésitation dans le silence des textes.
Pour les exclure, il aurait fallu admettre que le droit de
demander l'annulation était un de ces droits civils exclusi-
vement réservé aux Français.

Le caractère réparateur de l'ordonnance du 21 avril 1945
ne permettait pas de lui reconnaître cette nature.

47. — On pouvait éprouver de plus sérieuses hésitations,
toutefois, à en étendre le bénéfice à des sujets *ennemis*.
Ceux-ci étaient-ils vraiment fondés à demander le redres-
sement d'opérations effectuées en vertu des ordres de leur
propre gouvernement. N'y avait-il pas une responsabilité
générale de l'ensemble de la population allemande ?

Si quelques décisions leur ont tout d'abord dénié le droit d'invoquer l'ordonnance du 21 avril 1945, elles ont été réformées pour la plupart, et les sujets ennemis eux-mêmes sont aujourd'hui rangés d'une façon générale parmi les bénéficiaires de l'ordonnance. (Paris, 24 juil. 1945, Steines c. Lejail; 10 déc. 1945, Heinemann c. Allain, J.C.P. 46, II, 2983; Seine, 18 juin 1945, Gaz. Pal. 7 juil. 1945.) Casse

## IV. — Des effets de la nullité.

48. — L'annulation d'un acte de spoliation ne produit pas toujours les mêmes effets. Tantôt l'ordonnance y attache les conséquences qui, d'après le droit commun, sont la suite de la nullité pour vice du consentement (art. 12); tantôt la nullité produit un ensemble assez particulier d'effets, plus rigoureux pour l'acquéreur, spécialement édictés par le titre Iᵉʳ de l'ordonnance.

Naturellement, les effets attachés à la nullité pour vice du consentement sont la conséquence de l'annulation d'un des actes accomplis avec le consentement de l'intéressé, puis-qu'ils sont présumés ou jugés avoir été passés sous l'empire de la violence (Titre II de l'ordonnance). Au contraire, la nullité d'un acte de spoliation ou de disposition forcée, auquel le propriétaire n'a pas consenti, produit les effets plus rigoureux prévus au titre Iᵉʳ.

Il y a lieu d'ajouter que même l'annulation des actes accomplis avec le consentement de l'intéressé est suscep-tible de produire les effets particuliers de ce titre Iᵉʳ lorsque deux conditions sont réunies :

1º Que l'acquéreur ait connu au temps de l'acte les cir-constances qui ont entraîné l'annulation;

2º Et que par ailleurs l'acquisition n'ait pas été faite au juste prix.

49. — Cette disposition de l'article 12 § 2 ajoute un nou-vel intérêt à la question du juste prix. Le fait que le prix payé pour l'acquisition soit juste oblige tout d'abord le demandeur en nullité à rapporter la preuve de la violence qui aurait infesté son consentement. Il ne peut plus se pré-valoir de la présomption édictée par l'article 11 (Trib. com. Pontoise, 21 août 1945; Gaz. Pal. 3 nov. 1945). En outre, alors même que cette preuve serait rapportée, la question de savoir si le prix payé est juste conserve un intérêt, car, dans l'affirmative, les effets seront nécessairement ceux de la nullité pour vice du consentement.

50. — Pour que l'annulation produise les conséquences spéciales, il ne suffit pas que le prix payé soit insuffisant, il faut encore que l'acquéreur ait connu les circonstances qui ont entraîné l'annulation. Ces circonstances sont les éléments constitutifs de la présomption de violence, à savoir essentiellement que le vendeur était une de ces per-sonnes dont la situation a été réglée par les textes visés à l'article 1ᵉʳ.

La loi n'établit aucune présomption de semblable con-naissance. Elle a donc besoin d'être prouvée, et elle doit être établie comme existant au temps de l'acte.

Lorsque ces conditions sont réunies, on comprend que la loi se montre plus sévère, car l'acquéreur peut alors être considéré comme étant de mauvaise foi. Mais on observera qu'elles seront rarement satisfaites, et encore plus rare-ment susceptibles d'être prouvées, si l'acte a été passé avant que les textes visés à l'article 1ᵉʳ aient été promulgués. Au lieu de prouver chez l'acquéreur la connaissance de textes non encore parus, le vendeur pourrait alors prouver que l'acquéreur savait que le propriétaire vendait sous l'empire

### A. — Effets de la nullité pour vice du consentement

51. — Il n'y a pas lieu d'insister longuement sur ces effets, qui sont ceux du droit commun, et dont certains sont précisés à nouveau dans le paragraphe 3 de l'article 12.

L'acte annulé est supposé n'avoir pas existé. Par consé-quent, chaque partie doit restituer à l'autre ce qu'elle a reçu en exécution du contrat. Cette annulation va réfléchir contre les tiers en vertu de la règle « résoluto jure .... ». Ainsi les droits réels consentis par l'acquéreur vont se trou-ver annulés. Ces effets sont communs à toute annulation.

52. — Ce qui caractérise les conséquences de l'annula-tion pour vice du consentement est la façon dont les comptes entre parties sont réglés :

Chaque partie conserve les fruits qu'elle a perçus jusqu'au jour de la demande, sauf s'ils ont été perçus de mauvaise foi. (Voir Planiol, Ripert et Esmein, t. VI, nº 327; Aubry et Rau, 6ᵉ éd., t. IV, § 336.).

Le propriétaire dépossédé doit restituer :

1º Le prix principal payé par l'acquéreur;

2º Les frais et loyaux coûts de l'acte;

3º Les impenses nécessaires et la plus-value procurée par les impenses utiles.

Après avoir rappelé ces règles, l'article 12 précise que le juge pourra accorder des délais, ce qui permet de se demander si l'acquéreur peut exercer le droit de rétention que lui reconnaîtrait le droit commun. Il semble qu'il ne puisse l'exercer que si le juge n'a pas accordé de délais.

53. — Enfin, les actes d'administration faits par l'acqué-reur subsistent hors le cas de fraude. (Cass. civ. 9 nov. 1938, Gaz. Pal. 1929, I, 312, auteurs précités.) Il en sera notamment ainsi des baux de moins de neuf ans.

Il est à noter que les actes d'administration faits par le plaignant lui-même pourraient être annulés par applica-tion de l'article 11, ce texte visant tous contrats ou actes juridiques sans distinction.

### B. — Spoliations. Effets édictés par le titre Iᵉʳ.

54. — La nullité particulière organisée par le titre Iᵉʳ est naturellement rétroactive, et comme toute nullité, remonte dès ses effets au jour même de l'acte dont la nul-lité est constatée. L'article 2 en tire la conséquence dans les termes suivants : « Le propriétaire dépossédé reprend ses biens, droits ou intérêts exempts de toutes charges et hypo-thèques dont l'acquéreur ou les acquéreurs successifs les auraient grevés. Il les reprend avec leurs augments et acces-soires. »

Ces dispositions de l'article 2 sont renforcées par celles de l'article 19 qui édicte que « le président du tribunal ordonnera toute radiation de transcription, inscription ou transfert ».

55. — Comme toute autre nullité, celle-ci affecte les tiers, en ce sens que les droits que l'acquéreur a pu leur consentir sont annulés en même temps que les droits de leur auteur. Nous en avons signalé une application en ce qui concerne les baux. (Voir supra nº 26.) Il faut encore mentionner les créanciers hypothécaires et privilégiés.

Pour atténuer, au profit de ces derniers les effets de la nullité, l'article 9 dispose expressément que : 1º leurs droits sont reportés sur les sommes pouvant revenir à leur débi-teur par application des articles précédents (prix restitué, etc...); 2º que leur créance devient exigible sur leur

En dehors de ceux qui tiendront leur droit de l'acquéreur, la constatation de la nullité de l'acte de spoliation, la constatation de la nullité de l'acte de spoliation, la constatation de la nullité de l'acte de spolia- ... tera également une série de personnes à l'en- ...squelles l'ordonnance du 21 avril 1945 donne un ... recours à l'acquéreur ou au sous-acquéreur (voir 67 et s.). C'est là une première particularité de ... slation.

. La nullité nécessitera un règlement de *comptes* ... *rties.* Ici encore, l'ordonnance édicte une série de ... peciales qui n'ont pas toujours toute la précision ... ble. Nous en avons indiqué l'esprit général (*supra* ... s.).

. *Droits du propriétaire dépossédé.* — Outre la chose ... dont il a été dépossédé, le propriétaire a droit : ... 1x augments et acccessoires de cette chose (*art. 2* ...

1x fruits de toute nature, civils, industriels et natu- ...

des dommages et intérêts pour tout dommage causé ... ose spoliée par la faute ou par le fait du détenteur.

— Les auteurs de l'ordonnance n'ont pas défini très ... ent ce qu'ils entendaient par augments et acces- ... L'esprit général du texte recommande de les inter- ... dans un sens favorable aux intérêts du spolié.

*augments* sent constitués par tout ce dont la chose ... s'est accrue depuis le jour de la spoliation, qu'il ... e d'un accroissement naturel (alluvion, croît d'un ... l, etc...) ou du résultat de l'action du détenteur. Il ... sans doute de renvoyer aux règles de l'accession con- ... . dans les articles 547 et suivants du Code civil. ... dant, l'application de la règle est particulièrement ... te en fait quand on envisage les stocks d'une indus- ... Le Tribunal de Strasbourg a jugé que le demandeur ... ouvait prétendre au stock créé par le détenteur pour ... t qu'il dépassait celui laissé par le vendeur. (*Stras-* ... *j*, 19 juill. 1945, *Gaz. Pal. 24 nov. 1945.*)

ant aux accessoires, ce sont les objets rattachés à la ... : principale, soit matériellement, soit par leur destina- ... ou leur utilité.

— L'article 14 fait une application particulière de la ... osition générale de l'article 2. Il décide qu'au cas ... gmentation de capital postérieure à la dépossession du ... riétaire, celui-ci aura droit, moyennant le rembourse- ... t du montant de la souscription, aux actions souscrites ... le détenteur de ses actions. Les actions nouvelles sont ... ffet un augment des actions anciennes auxquelles était ... ché le droit de souscription.

outefois, si l'augmentation du capital a eu comme con- ... tence de rendre le propriétaire dépossédé minoritaire, ... i-ci aura le droit de demander, à la place de ses actions, ... valeur au jour de la demande. Ainsi il ne sera pas ... traint de débourser une somme trop forte.

1. — Quant aux fruits, ils doivent être restitués, non pas ... jour de la demande en justice, mais à partir du jour ... quel remonte la nullité, c'est-à-dire du jour même de la ... liation. C'est là une différence essentielle avec la nullité ... ir violence des aliénations faites avec le consentement de ... téressés.

La règle ne comporte aucune exception et s'applique ... ime si le détenteur était de bonne foi. Non seulement ... rticle 4 établit une présomption de mauvaise foi des divers ... quéreurs ou sous-acquéreurs, mais son dernier paragraphe ... pose l'obligation de restituer les fruits même à ceux que ... texte soustrait à la présomption de mauvaise foi.

cessives, chaque détenteur doit seulement les fruits ... répondant à la période pendant laquelle il a détenu la chose. Le texte n'énonce pas cette règle de façon for- melle, mais elle doit être admise par analogie avec le droit commun et comme seule raisonnable.

62. — Le détenteur ne doit restituer que les fruits nets; il y a lieu d'appliquer ici les dispositions de l'article 548 du Code civil. Parmi les frais qu'il convient de déduire des fruits bruts pour déterminer les fruits à restituer, figure la rémunération du travail de l'acquéreur.

Ainsi, au cas où l'objet restitué consiste en une entre- prise agricole ou commerciale, il y aura lieu de déduire des bénéfices réalisés, non seulement les frais de labours et d'exploitation, le salaire du personnel employé, mais encore un salaire pour l'acquéreur qui, pendant le temps où il a détenu l'entreprise, a agi comme gérant ou direc- teur, et grâce à l'activité duquel les bénéfices ont été réa- lisés. (*En ce sens, Trib. civ. Strasbourg, 19 juill. 1945, Gaz. Pal. 24 nov. 1945.*)

63. — Il a fallu prévoir l'hypothèse où les bénéfices réa- lisés par l'acquéreur seraient des bénéfices illicites, sujets à confiscation. Il a paru trop sévère de décider que le pro- priétaire n'aurait pas droit aux fruits dans ce cas; on a estimé que ce serait le punir pour une faute commise par autrui et qu'il n'était pas démontré qu'il eût lui-même com- mise s'il avait continué l'exploitation. Toutefois, on ne pouvait pas non plus lui reconnaître droit à tous les béné- fices réalisés par le détenteur, car il ne les aurait pas réa- lisés s'il avait lui-même exploité correctement et légale- ment. A l'Assemblée Consultative, le ministre des Finances avait même fait observer qu'en raison des circonstances de guerre il n'était pas démontré qu'il ait pu réaliser un béné- fice normal.

Finalement, le texte adopté réserve les droits du fisc en décidant que « l'acquéreur ou ses ayants droit seront en tout état de cause tenus au payement du montant de la confiscation »; mais il préserve aussi le propriétaire spolié en ajoutant : « sans que les poursuites du Trésor puissent en aucun cas affecter les droits, biens et intérêts du pro- priétaire dépossédé, augmentés des fruits normaux effecti- vement provenus d'opérations régulières » (*art. 4 § 4*). Il résulte de ce texte que le capital aliéné et sujet à restitu- tion est à l'abri des poursuites du fisc; outre ce capital, le propriétaire peut réclamer les bénéfices provenant d'opé- rations régulières ou licites *effectivement réalisés,* jusqu'à concurrence des bénéfices *normaux* pouvant provenir de semblables opérations. Ainsi, une double ventilation s'im- pose entre les opérations illicites et les opérations licites, auxquelles le détenteur s'est livré, et, pour les dernières, entre le bénéfice anormal qui aurait pu être réalisé et celui qui normalement aurait dû l'être.

64. — Enfin, le propriétaire peut réclamer une indemnité pour tout dommage causé par le fait ou par la faute du détenteur. Le degré exact de la responsabilité de l'acquéreur n'est pas clairement précisé par ce texte. Il ne paraît pas douteux que toute action ou toute négligence intention- nelle ou non du détenteur ayant entraîné un dommage engage sa responsabilité. Mais une délicate question de preuve reste incertaine: la relation de cause à effet entre le dommage et le fait du détenteur doit-elle être établie, ou bien celle-ci est-elle présumée dès l'instant où la chose est endommagée et où le détenteur n'établit pas un cas fortuit ou de force majeure ? M. Esmein estime que « la préoccupation que manifeste l'ordonnance de sauvegarder les intérêts du spolié, au besoin au détriment du déten-

teur, conduit à faire admettre cette dernière interprétation ». (*Gaz. Pal.*, 13 juin 1945, n° 14.)

La raison n'est pas déterminante. La préoccupation générale et vague du législateur n'est pas motif suffisant pour ajouter aux termes finalement approuvés et promulgués. Or, il n'existe pas de présomption sans texte. L'article 7 de l'ordonnance qui établit la responsabilité du détenteur peut difficilement être considéré comme créant une présomption. Il est dans le style de l'article 1382 du Code civil qui n'établit aucune présomption, et, si le législateur avait voulu créer semblable présomption, il lui eût été facile de donner à son texte une autre rédaction. Ajoutons que suivre M. Esmein dans son argumentation sur la distinction entre le fait et la faute nous semble dépasser de loin la pensée du législateur. Par cette redondance, celui-ci a voulu selon toute vraisemblance englober aussi bien la maladresse ou faute non intentionnelle que la faute intentionnelle.

Il n'est pas très sûr qu'en pratique la question soulève de nombreuses difficultés. Si la jurisprudence était appelée à les trancher, les considérations d'espèce pourraient influer sur sa décision. Il est certain que l'acquéreur, qui était détenteur, est mieux placé pour établir les causes du dommage que le spolié.

65. — Le droit à indemnité du propriétaire au cas de dommages est garanti par une série de dispositions complémentaires de l'article 7, subrogation aux droits des détenteurs contre les assureurs, droit à indemnisation par l'Etat au titre des réparations pour dommages de guerre en cas d'absence ou d'insolvabilité des détenteurs. Il suffit ici de renvoyer au texte.

66. — *Droits des détenteurs.* — La loi s'efforce de faire restituer aux acquéreurs toutes les sommes qu'ils ont débour- sées, aussi bien comme prix d'acquisition, principal et frais, que celles qu'ils ont régulièrement payées en sus du prix comme tiers détenteurs, remboursement d'hypothèques, intérêts ou charges diverses.

Toutefois, elle n'impose pas au propriétaire dépossédé l'obligation de rembourser indistinctement toutes ces sommes. Celui-ci n'est débiteur que dans la mesure où il aura tiré profit des sommes payées. Et toutes les fois où le remboursement exige un recours contre un tiers, le risque du recours est laissé à l'acquéreur, qui souffrira de l'éventuelle défaillance du débiteur.

Le propriétaire devra donc rembourser le prix principal et les intérêts y afférents, moins les sommes qui auront pu être prélevées à quelque titre que ce soit. Si l'immeuble spolié était grevé d'une hypothèque dont le détenteur a payé les arrérages, le propriétaire a profité de ces paiements et devra encore en rembourser le montant.

Les honoraires, courtages, frais d'expertise et autres frais ne sont pas à sa charge.

67. — Les détenteurs possèdent divers *recours* pour assurer le remboursement de ces sommes dont le propriétaire est dispensé.

L'acquéreur est tout d'abord subrogé dans les droits éventuels du propriétaire dépossédé à l'égard des sommes qui auraient été prélevées sur le prix d'acquisition (*art.* 6). Une ordonnance fixera les conditions d'exercice de ce droit qui demeure éventuel (*art.* 16).

En dehors des sommes prélevées sur le prix d'acquisition en vertu de lois spéciales, d'autres frais ont pu encore grever le prix d'acquisition, notamment les honoraires des administrateurs provisoires, des frais de régie, etc... Les modalités de leur remboursement doivent encore être pré- cisées par l'ordonnance prévue à l'article 16.

Quant aux frais d'enregistrement, leur rembour[sement] peut être demandé par application de l'article 282 du [...] de l'Enregistrement. Il résulte même de l'article 26 de [...] donnance que les annulations amiables produiront le [...] effet et ouvriront le même droit à remboursement des [...] d'enregistrement que les annulations judiciaires, « so [...] condition d'être homologuées en justice par le présiden[t] tribunal saisi sur simple requête ».

68. — Les divers intermédiaires qui sont intervenus [...] la vente et ont à cette occasion touché des courtages, [...] missions ou honoraires en doivent le remboursement à [...] quéreur, sous déduction de leurs frais bruts. L'arti[cle ...] vise les agents de publicité ou agents d'affaires quelcon[...] auxquels le Commissariat aux Questions juives ou les a[d]- ministrateurs provisoires ont pu avoir recours pour facili[ter] recherche d'un acquéreur ou la vente. Il vise aus[si ...] experts, architectes ou autres qui auront facilité la mi[se] vente des biens spoliés.

A l'encontre de ces diverses catégories de perso[nnes] un droit de recours est ouvert à tout acquéreur, mêm[e ...] est de mauvaise foi.

69. — Un droit plus large est ouvert, mais au [profit ...] des seuls sous-acquéreurs de bonne foi, à l'encontre de [...] agent d'affaires, rédacteur d'acte ou intermédiaire [...] conque qui s'est sciemment abstenu de révéler l'origin[e ...] bien cédé.

Il apparaît que ce recours permet de demander non [seu]- lement les sommes encaissées par ledit intermédiaire, [mais] une indemnité pour tout le préjudice que le déten[teur] évincé établira être la conséquence de l'annulation [de] l'acte.

La solution est assez logique puisqu'il y a faut[e] l'intermédiaire qui s'est abstenu d'aviser l'acquéreu[r ...] l'origine suspecte du bien alors qu'il la connaissait.

La bonne foi du sous-acquéreur paraît devoir s'app[récier] et s'établir ici selon les règles de droit commun. La [pré]- somption de mauvaise foi édictée par l'article 4 ne sa[urait] jouer à son encontre; elle est établie seulement au rega[rd] propriétaire spolié.

70. — Les détenteurs peuvent encore demander le [rem]- boursement de leurs *impenses*. Les impenses nécessaires [sont] remboursées intégralement, les impenses utiles à con[cur]- rence de la plus-value procurée, précise l'article 8. Le [paie]- ment est à la charge du propriétaire qui a profité d[es ...] dépenses; cependant, le législateur, décidément sou[cieux] de le ménager, lui permet d'obtenir du juge des [...] suffisants pour lui permettre de s'acquitter au moye[n ...] bénéfices d'exploitation.

Il ne semble pas que le détenteur obligé d'attendre le [...] boursement ait droit à des intérêts. Le texte est mue[t ...] ce point. On peut se demander si le juge, qui statu[e ...] en équité, serait en droit de lui en accorder.

71. — *Des meubles corporels.* — Les règles ici vien[nent] d'être exposées sont écartées en ce qui concerne les [meu]- bles corporels. L'article 10 de l'ordonnance dispose, en [...] qu'il doit être fait application du second paragraph[e ...] l'article 2279 à l'exclusion des dispositions de l'article [...] Il en résulte que le propriétaire dépossédé peut rev[endi]- quer le meuble contre celui dans les mains duquel [il le] trouve, ce dernier étant réduit à un recours contre [...] duquel il le tient.

Toutefois, dans le cas où le propriétaire a perçu le [prix] de la chose comme dans celui où d'une autre façon [quel]- conque il aurait profité du prix payé, il semble dif[ficile] d'admettre qu'il puisse reprendre le meuble sans être o[bligé] de rembourser le montant de ce dont il a profité. Ce [...]

cours prévu par l'article 2279. Il ne faut pas perdre de vue, en effet, que l'article 2279 § 2 a été écrit en prévision d'une hypothèse de perte ou de vol, qui implique que le propriétaire dépossédé n'a reçu aucun paiement.

L'article 10 apporte une autre modification expresse à l'article 2279. Au délai de trois ans accordé par ce texte pour exercer la revendication est substitué un délai d'un an à compter de la date légale de la cessation des hostilités.

72. — *Prélèvement au profit du Trésor.* — Les acquéreurs ou détenteurs successifs ne recevront pas toujours l'intégralité des sommes ci-dessus spécifiées. Le dernier paragraphe de l'article 6 prévoit, en effet, qu'un prélèvement de 10 % sera effectué au profit du Trésor lorsque l'acquisition aura été faite de mauvaise foi.

Ce pourcentage se calcule sur le prix d'acquisition; dans une formule qui n'est pas parfaite, le texte parle de « 10 % de son acquisition ». Cette expression paraît viser le prix principal à l'exclusion des frais accessoires.

Ici encore, la bonne foi doit s'apprécier selon les règles de droit commun, et la présomption de mauvaise foi établie par l'article 4 ne saurait être invoquée par le fisc (*Cf. supra* n° 69).

Il ressort des discussions qui ont eu lieu à l'Assemblée Consultative que ce prélèvement a été institué pour assurer le financement de la restitution et éviter qu'elle ne constitue une charge pour le Trésor.

---

V. — Procédure. Délais. Mesures conservatoires.

---

73. — La procédure a été organisée par l'ordonnance du 21 avril 1945 avec le souci évident d'aboutir à des solutions rapides et de liquider au plus tôt l'ensemble de l'opération de restitution au profit des propriétaires dépossédés. On n'a pas voulu que les détenteurs, demeurent trop longtemps dans l'incertitude de leurs droits avec une menace d'annulation suspendue sur leur tête; il en serait résulté un trouble public fâcheux. A cet effet, un délai limite a été imposé pour introduire la demande de restitution.

Par ailleurs, une fois la demande formulée, l'ordonnance s'efforce de faire obtenir satisfaction au spolié sans retard. Elle prend des mesures énergiques pour éviter les mesures dilatoires de la part des détenteurs.

74. — L'article 21 dispose que la demande en nullité ne sera plus recevable après l'expiration d'un *délai* de six mois à compter de la date de la cessation des hostilités. Exceptionnellement, ce délai est d'un an pour les meubles corporels (art. 10). Il est clair qu'il s'agit ici d'un délai de forclusion qui, à la différence du délai de prescription, n'admet aucune cause de suspension ni d'interruption.

Le caractère rigoureux de la disposition est atténué par la faculté laissée au juge de relever le demandeur de la forclusion lorsque celui-ci prouve qu'il s'est trouvé, même sans force majeure, dans l'impossibilité matérielle d'agir dans le délai. L'ordonnance a sagement écarté la force majeure qui, dans la notion rigoureuse qu'en a la jurisprudence, aurait manqué d'équité. Le juge appréciera humainement l'empêchement dont le demandeur voudra se prévaloir.

75. — La demande doit être présentée en principe par le propriétaire dépossédé lui-même. S'il est décédé, ses héritiers seront habilités à agir. Enfin, au cas où il n'aurait laissé aucun héritier au rang successible, le Ministère public doit d'office requérir la nullité des actes prévus par l'ordonnance. (art. 22 § 2).

dispose que le ministre des Finances doit adresser au ministre de la Justice la liste des biens, droits et intérêts visés à l'article 1er qui n'auraient pas été revendiqués par leurs propriétaires dans un délai de six mois. Ces biens, droits ou intérêts seront placés sous séquestre sur la demande du Ministère public. Le travail du Ministère des Finances est lui-même facilité par les déclarations que l'article 28 impose à toute personne qui a détenu à un titre quelconque un bien visé à l'article 1er de l'ordonnance.

76. — La mise sous séquestre paraît impliquer que sur l'action du Ministère public, la nullité aura été préalablement reconnue par le juge compétent, qui au lieu d'ordonner la restitution comme conséquence de cette nullité, ordonnera la mise sous séquestre. En effet, celle-ci ne peut pas être ordonnée si les conditions exigées par la loi ne sont pas préalablement satisfaites et vérifiées.

La mise sous séquestre ne peut toutefois être demandée, semble-t-il, que si les conditions suivantes sont réunies :

1° Que l'acte attaqué soit nul de droit, c'est-à-dire fait sans le consentement du propriétaire dépossédé, et non pas simplement annulable. En effet, l'article 23 ne parle que des biens, droits ou intérêts visés par l'article 1er et n'autorise la mise sous séquestre que de ces seuls biens.

2° Que l'on soit sans nouvelles du propriétaire ou qu'il soit décédé et n'ait aucun héritier au degré successible. En effet, pour ceux que l'on sait être prisonniers ou déportés non encore rapatriés, l'article 22 prévoit une autre mesure, qui est une simple *mesure conservatoire* : la nomination, à la demande toujours du Ministère public, d'un administrateur provisoire, pouvant être pris parmi les parents ou alliés. Cette nomination est de droit si elle est demandée par le conjoint ou par un ascendant ou descendant.

77. — La mise sous séquestre pourra constituer aussi une mesure conservatoire si le propriétaire est ultérieurement retrouvé. Dans ce cas, les biens lui seront restitués s'il en fait la demande dans les délais légaux. Mais il est à prévoir qu'une partie de ces biens ne feront pas l'objet d'une demande de restitution, les propriétaires dépossédés étant décédés sans héritiers. La mise sous séquestre devient alors la première mesure d'une liquidation de la situation dont la procédure finale sera réglée par une ordonnance qui fixera les conditions de dévolution des biens ainsi placés sous séquestre (art. 23, § 2).

78. — *Le juge compétent* est en principe le président du tribunal civil. Toutefois, en matière commerciale, le demandeur a la faculté de saisir le président du tribunal de commerce.

La procédure se déroule avec la plus grande simplicité et rapidité. L'article 17 dispose que le magistrat statue en la forme des référés. La jurisprudence en a déduit que toute la procédure des référés était applicable, et que notamment il n'y a pas de délai minimum de comparution et que le magistrat doit apprécier si le défendeur a en fait bénéficié d'un délai suffisant, que les parties ne pouvaient pas soulever l'exception de communication de pièces et que le magistrat ne pouvait même pas l'ordonner. (*Trib. Com. Seine 11 mai 1945; Gaz. Pal. 23 mai 1945.*)

Sur la deuxième question, le bien-fondé de la décision soulève des doutes. De droit commun, le juge des référés ne statue pas sur le fond. Il en va tout autrement ici. Le juge des référés est en réalité un juge unique, qui statue sur l'ensemble du litige. Or, la communication de pièces est une mesure d'instruction du procès essentielle à la bonne administration de la justice, surtout lorsque la demande

tend à une décision définitive sur le fond du droit. Et il semble bien que le législateur ait voulu donner au magistrat des pouvoirs suffisants pour l'ordonner. Il semble même qu'il ait ce pouvoir en droit commun (v. *Rép. Fuzier-Herman*, V° Référé, n° 744) a fortiori ici.

79. — Le souci de simplifier et de faciliter la procédure est encore manifesté par cette précision de l'article 17 qui dispense du ministère d'un avoué. Étant donné que le juge doit statuer au fond, cette précision n'était pas inutile pour lever une hésitation possible.

Dans le cas où les parties y auraient recours, les honoraires de cet officier ministériel seraient diminués de moitié (art. 24). Il en va de même des honoraires de tout autre officier ministériel ou public, de ceux des experts et des salaires des conservateurs des hypothèques. Enfin, les différents actes de procédure et les délivrances de pièces sont dispensés de toute perception de taxe au profit du Trésor (*même texte*).

80. — La rapidité de décision est encore assurée par la compétence donnée à ce juge unique qui statue même au fond sur toutes les questions soulevées par l'application de l'ordonnance du 21 avril 1945. Il peut également prescrire toute mesure d'instruction qu'il estime nécessaire et même entendre tous témoins, sous réserve d'observer les formes prévues par les articles 407 et suivants du Code de Procédure civile.

En somme, il ne's'est obligé de se déclarer incompétent que si la demande qui lui est présentée constitue une action ayant sa base dans un texte autre que l'ordonnance analysée; il doit alors renvoyer les parties devant le juge de droit commun. (*Cf.* Toulouse 12 décembre 1945; *Dame Billard c. Berkovic*).

81. — La décision rendue est susceptible de voies de recours; mais pour éviter qu'elles ne soient utilisées comme moyen de retarder la remise en possession du spolié, la décision est exécutoire nonobstant appel, sur minute et avant enregistrement (art. 18).

L'appel doit être interjeté dans un délai de quinzaine à compter de la signification de la décision de première instance. Il doit être jugé sommairement et sans procédure, conformément à l'article 809 du Code de Procédure civile.

Les autres voies de recours sont l'opposition et la tierce opposition. Celle-ci est ouverte à tout intéressé. L'opposition n'est pas recevable lorsque la citation a été faite à personne.

Quant au pourvoi en cassation, il s'exerce dans les formes du droit commun.

## VI. — Dispositions diverses pour assurer l'application de la loi ou portant sanction.

82. — Le dépistage et le recensement des opérations annulées par la loi est chose difficile, à raison de leur grand nombre et de leur variété. On peut évidemment penser que le propriétaire spolié ne manquera pas de se plaindre et de réclamer la restitution des biens dont il a dû se départir. Mais cette supposition ne conserve plus sa valeur si le propriétaire est absent ou décédé.

C'est pourquoi l'article 28 oblige les acquéreurs ou détenteurs eux-mêmes, sous des sanctions sévères précisées par l'article suivant, à faire une déclaration au Ministère des Finances (Service des Restitutions des Biens des Victimes des lois et Mesures de spoliation). Son objet est de révéler tous les biens, droits ou intérêts visés à l'article 1er, c'est-à-dire les spoliations proprement dites ou aliénations faites sous le consentement du propriétaire. Les actes auxquels le pro-

priétaire a consenti, même sous l'empire de la viol... n'ont pas à être déclarés. Elle est imposée non seule... aux titulaires ou détenteurs actuels, mais à ceux qui été détenteurs ou titulaires. Elle n'est toutefois pas ap... cable aux divers administrateurs, séquestres ou liqu... teurs qui sont déjà astreints à une déclaration en vert... l'article 8 de l'ordonnance du 14 novembre 1944.

La loi la veut détaillée et l'article 28 énumère tout... qu'elle doit préciser.

Ces déclarations devaient d'ailleurs être faites par le... recommandée avec accusé de réception dans le délai d... mois à compter de la mise en vigueur de l'ordonnance.

83. — Beaucoup de personnes désireuses de mettre l... biens à l'abri de confiscation les ont, pendant l'occupa... déposés chez des tiers. Ici encore, le déposant peut av... disparu ou être décédé. L'article 28 impose à tout dép... taire qui a reçu un dépôt après le 16 juin 1940 et ne l'a encore restitué, de faire une déclaration suivant la mê... procédure. En sont seuls dispensés les dépositaires professi... nels qui sont astreints à la tenue d'une comptabilité.

84. — Il fallait prévoir que les acquéreurs ou dét... teurs s'efforceraient, par des moyens divers, d'échap... aux effets de l'ordonnance. On a songé à l'éventualité d... dépôt des biens restituables chez des tiers, qui s'en pré... draient propriétaires. Il est présumable qu'en de sem... bles cas, on ne trouverait aucune preuve écrite du dép... Pour combattre cette fraude, l'article 31 déclare que... dépôts seront considérés comme des dépôts nécessaires... pourront être prouvés par tous les moyens.

85. — L'hypothèse d'un contrat apparent de transf... des biens, droits ou intérêts avec réserve occulte au pro... du cédant a été prévue par l'article 30, qui dispose que... caractère réel de la convention pourra être prouvé par to... les moyens.

86. — Un autre danger contre lequel le législateur a vou... protéger les spoliés est l'industrie des agents d'affaires dé... reux de spéculer sur les droits de toute nature que la ... leur reconnaît. Depuis l'ordonnance du 9 août 1944 sur... rétablissement de la légalité républicaine, il était possibl... de prévoir que des mesures de restitution seraient ordo... nées. Mais l'étendue exacte des droits qui seraient accord... demeurait incertaine et la solution tardait à venir. Certai... spoliés ont pu accepter des offres de cession de ces droi... encore incertains, faits par des spéculateurs peut-être mie... renseignés. À la lumière de l'ordonnance, la cession app... raît fâcheuse pour le cédant. L'article 27 le rétablit dans ... droits en déclarant nulle toute cession de droits reconn... aux personnes visées à l'article premier, si elle est surven... après la mise en vigueur de l'ordonnance du 9 août 1944.

87. — Une opération non moins dangereuse pour ... spolié, est la convention par laquelle un intermédiaire ... charge, moyennant une somme convenue d'avance, d'ass... rer aux personnes visées à l'article premier, le bénéfice d'... cords amiables ou de décisions judiciaires. L'article 27 l... déclare pareillement nulles et de nul effet.

88. — Les intermédiaires convaincus d'avoir offert l... services spécifiés ci-dessus sont punis des peines prévues ... la loi du 3 avril 1942, prohibant la conclusion de pactes s... les peines dues aux victimes d'accidents.

Cette disposition pénale prise à la lettre ne vise pas l... acquéreurs ou détenteurs des droits énoncés à l'article premier. Puisqu... s'agit d'un texte pénal, il y aurait quelque difficulté à ... leur appliquer.

89. — Ceux qui, par des manœuvres frauduleuses o... tenté de dilapider les biens visés à l'article premier ou ...

à l'article 408, alinéa 2. Cette disposition paraît atteindre ceux qui ont conclu des conventions de complaisance ayant pour but le transfert des biens, mais avec réserve occulte des droits du cédant. Le but est de mettre obstacle à la restitution et la convention de complaisance constitue un moyen frauduleux.

Il est moins certain que ceux qui ont simplement déposé le bien restituable chez un tiers tombent également sous le coup de cette sanction. On pense que la réponse dépend des circonstances particulières de chaque espèce.

90. — Enfin, l'ordonnance punit de façons diverses un certain nombre d'agissements qui sont ou peuvent être antérieurs à tout texte prévoyant une restitution quelconque. Ce sont des mesures complémentaires à la restitution frappant des fraudes ou indélicatesses plus caractérisées.

Ainsi des paragraphes 2 et 3 de l'article 29 qui punissent les administrateurs ou gérants qui se sont rendus acquéreurs même indirectement ou par personne interposée des biens dont la gestion leur était confiée, et ceux qui ont aliéné des biens ou droits visés à l'article 1er en violation d'une clause du contrat imposant un délai d'incessibilité.

91. — On mentionnera pour terminer l'amende prévue par l'article 20 à l'encontre de celui qui aurait acquis un bien restituable à un prix inférieur de plus du quart au juste prix.

C'est pour permettre au Ministère public de requérir cette condamnation que le même texte fait obligation au greffier de transmettre au Procureur de la République toute assignation et tous rapports d'experts.

### VII. — Domaine d'application.

92. — Aux termes des articles 32 et 33, l'ordonnance est applicable à la France Métropolitaine et à l'Algérie. Toutefois, un décret doit fixer les modalités d'application dans les départements du Haut-Rhin, du Bas-Rhin et de la Moselle.

D'autres décrets régleront les modalités d'application dans les territoires relevant du Ministère des Colonies.

Il n'est rien dit de la Tunisie, ni du Maroc qui relèvent du Ministère des Affaires étrangères.

551

### LA RÉFORME DU MÉTAYAGE
### (Loi du 13 avril 1946)
### par R. SAINT-ALARY
*Chargé de cours à la Faculté de droit de Dijon*

1. — La loi du 13 avril 1946 n'a pas modifié le titre de l'ordonnance du 17 octobre 1945 relative au statut du fermage. Elle y a pourtant introduit des dispositions nouvelles qui emportent réforme complète du métayage. Une adjonction de cette importance justifiait, semble-t-il, un changement dans l'intitulé du texte légal. Les rédacteurs de la loi ont oublié de l'opérer. Le législateur moderne est pressé ; avant tout il veut « aboutir ». Il ne faut pas lui tenir rigueur de ne pas se plier toujours à une discipline formelle.

Aussi bien n'a-t-il pas été sans se rendre compte par lui-même des imperfections que son œuvre offrait dans la

est difficile désormais de parler de contrat — puise l'essentiel de sa réglementation dans la loi récente. Mais les textes du Code civil qui ne sont pas en contradiction avec les dispositions nouvelles demeurent applicables ; il en est de même de quelques articles de la loi du 18 juillet 1889 sur le Code rural (art. 43 nouv. Ord. 17 octobre 1945). Ainsi, les sources sont diverses et d'inspiration différente ; il faut les rapprocher et les harmoniser. Ce sera l'œuvre d'une codification ultérieure qui sera obtenue par règlement d'administration publique (art. 22 de la loi du 13 avril 1946).

2. — En attendant, l'interprète est sollicité d'analyser les textes dans leur état actuel. Il éprouvera d'abord quelque appréhension à s'engager dans ce labyrinthe de dispositions légales pour en détacher celles qui ont trait au seul métayage. Il concevra ensuite quelque doute sur l'utilité de son entreprise. Il y a de bonnes raisons, en effet, d'hésiter à donner son opinion sur une loi dont l'avenir est incertain, surtout quand cette incertitude tient à la fois à l'existence de nouveaux projets de réforme et à l'omnipotence des organismes chargés de l'application de la loi. Or, d'un côté vient l'écho de nouvelles tentatives faites en vue de modifier, une fois encore, le statut des baux ruraux et, de l'autre, l'accord est fait pour considérer que le rôle des commissions consultatives des baux ruraux et des tribunaux paritaires sera essentiel : de leur attitude doit dépendre pour une grande part que la loi soit tenue en échec ou qu'elle reçoive sa pleine efficacité (1).

3. — Pourtant, en dépit de ces conditions défavorables, une étude du métayage dans l'état actuel des textes ne manque pas d'intérêt. Malgré son caractère éphémère, elle peut avoir le mérite, — outre celui qui existe toujours à « faire le point » —, de montrer l'orientation de l'évolution et de dégager les facteurs qui la commandent. Et cet intérêt ne peut se doubler que d'une certaine curiosité si l'on constate que l'action de ces facteurs tend peut-être à entraîner la disparition de l'institution elle-même.

4. — A première vue, on pourrait cependant en douter. Le législateur de 1946 est revenu sur les exagérations qu'avaient commises celui de l'année précédente. On se rappelle en effet les critiques à peu près générales qui s'étaient élevées au lendemain de l'ordonnance. On avait regretté amèrement que, d'un trait de plume, par la conversion systématique du métayage en fermage (art. 51 anc.), le législateur supprimât un mode d'amodiation des terres dont les avantages économiques et sociaux, peut-être un peu accentués pour la circonstance, paraissaient indéniables. On avait rappelé, en effet, combien le colonat partiaire (2) présentait d'intérêt dans des régions de petite et de moyenne culture où il pouvait s'adapter à l'infinie variété de l'économie rurale. Il permettait ainsi aux cultivateurs dénués de ressources, aux domestiques agricoles notamment, de s'élever sur l'échelle sociale. Les salariés devenaient, grâce à lui, indépendants ; grâce à lui était créée une nouvelle étape sur le chemin de la propriété. Certes, l'ordonnance précipitait-elle l'accession au fermage de ceux qui étaient déjà nantis, mais elle reje-

(1) Cet accord s'était déjà réalisé sur l'Ordonnance du 17 octobre 1945 ; v. : P. Chauveau : Le statut du fermage d'après l'ordonnance du 17 octobre (J.C.P. 46.I.489, n. 14 et s.) ; Savatier : Statut juridique du fermage (Lois nouvelles, 1946.I.29, n. 51).

(2) Cette expression est, on le sait, impropre. Seule celle de colonage partiaire devrait être employée. (V. Ripert et Boulanger, Traité élémentaire de Marcel Planiol, III, n. 2761). Mais elle n'est plus dans la loi.

**EXHIBIT N°21**

*Exhibit Nº 21*



WAR OF 1939
Acts of despoliation, despoiled properties, reporting, restitution

Decree No. 47-2105 of October 29, 1947,

relative to the restitution of properties despoiled by the enemy (*J.O. [Journal Officiel]* of October 31, p. 10831)

The President of the Council of Ministers,

Upon the report by the Minister of Justice, the Minister of Foreign Affairs, and the Minister of Finance,

in consideration of the Decree of December 30, 1919, establishing the office of private properties and interests;

in consideration of the decree of December 13, 1944, determining the powers of the office of private properties and interests,

in consideration of the order of April 11, 1945, relative to the return of certain chattels recovered by the State following acts of pillage perpetrated by the occupying power,

in consideration of the decision of April 16, 1945, relative to the reporting of certain categories of properties and valuables removed by or for account of the enemy from French territory,

in consideration of the orders of April 31 and June 9, 1945, governing application of the order of November 12, 1943, on the nullity of acts of despoliation perpetrated by the enemy,

in consideration of the decisions of May 17 and July 10, 1945, concerning application of the provisions of the order of April 11, 1945,

in consideration of the decree of June 22, 1946, relative to restitution of properties despoiled in France and transferred outside the national territory by the enemy,

in consideration of the law of August 24, 1946, establishing a National Company in charge of liquidating "surplus" equipment acquired by the State,

decrees:

Art. 1. The deadline established by Art. 1 of the Decision of April 16, 1945, for the reporting to the office of private properties and interests of certain categories of properties removed by the enemy from French territory, which was extended by the decision of August 18, 1945, is extended again, and will expire two months after the date of publication of the within decree.

Reports filed after that date will not be accepted.



**ERIKSEN** TRANSLATIONS / 32 COURT STREET, BROOKLYN, NEW YORK 11201 / TEL 718-802-9010 / FAX 718-802-0041

EXHIBIT N°21

DOMMAGES DE GUERRE, IM-
MEUBLES D'HABITATION, CONSTRUC-
TION, ÉTAT, ASSOCIATIONS SYNDICALES,
DÉFENSA, RÉGIES D'AVANCES.

**Arrêté du 21 octobre 1947,**

*Portant institution de régies d'avances auprès de chaque délégation départementale de la reconstruction et de l'urbanisme pour le payement de certaines dépenses résultant de l'application de l'ordonnance n° 45-2064 du 8 sept. 1945 autorisant la construction directe par l'État ou par des associations syndicales de reconstruction d'immeubles d'habitation de caractère définitif. (J. O. 26 oct., p. 10688).*

---

## SUBSTANCES VÉNÉNEUSES, Im-
PORTATION, COMMERCE, DÉTENTION ET
USAGE, TABLEAU C.

**Décret n° 47-2073
du 22 octobre 1947,**

*Modifiant le décret du 14 sept. 1916 portant règlement d'administration publique en ce qui concerne l'importation, le commerce, la détention et l'usage des substances vénéneuses (J. O. 24 oct., p. 10576).*

Le président du conseil des ministres, — Sur le rapport du garde des sceaux, ministre de la justice, du ministre de la santé publique et de la population, du ministre de l'économie nationale, du ministre des finances et du ministre de l'agriculture, — Vu la loi du 19 juillet, 1845 modifiée et complétée par les lois du 12 juill. 1916 et 13 juill. 1923, et notamment l'art. 1er de ladite loi, de laquelle il résulte que les conditions de vente, d'achat et d'emploi des substances vénéneuses sont déterminées par décret portant règlement d'administration publique; — Vu le décret du 14 sept. 1916 modifié; — Vu la loi du 1er août 1905 sur la répression des fraudes dans la vente des marchandises et des falsifications des denrées alimentaires et des produits agricoles notamment les art. 3, 4 et 6; — Vu la loi validée du 11 sept. 1941 modifiée par l'ordonnance du 23 nov.1916 et la loi du 22 mai 1916; — Vu les avis du conseil supérieur d'hygiène publique de France et de l'académie de médecine; — Vu l'avis du ministre de la production industrielle; — Le Conseil d'État entendu, — Décrète :

Art. 1er. Sont inscrites au tableau C, annexé au décret du 14 sept. 1916, les substances suivantes :
1. Essence de chénopodium.
2. Streptomycine.

Art. 2. Le garde des sceaux, ministre de la justice, le ministre de l'économie nationale, le ministre des finances, le ministre de l'agriculture, le ministre de la santé publique et de la population sont chargés, etc...

---

## MINISTÈRES, MINISTRES, NOMINATION.

**Décret du 27 octobre 1947,**

*Portant nomination d'un membre du Gouvernement (J. O. 29 oct., p. 10718).*

---

## TERRITOIRES D'OUTRE-MER,
GUADELOUPE, MARTINIQUE, RÉUNION,
GUYANE, ORGANISATION JUDICIAIRE.

**Rectificatif**
**au décret n° 47-1573
du 25 août 1947**
*(supra, p. 356),*

*Relatif à l'organisation judiciaire des départements de la Guadeloupe, de la Guyane française, de la Martinique et de la Réunion (J. O. 31 oct., p. 10831).*

---

## GUERRE DE 1939, ACTES DE SPOLIA-
TION, BIENS SPOLIÉS, DÉCLARATION,
RESTITUTION.

**Décret n° 47-2105
du 28 octobre 1947,**

*Relatif à la restitution des biens spoliés par l'ennemi (J. O. 31 oct., p. 10831).*

Le président du conseil des ministres, — Sur le rapport du garde des sceaux, ministre de la justice, des finances, etc. — Vu le décret du 60 déc. 1912 portant création de l'office des biens et intérêts privés; — Vu le décret du 15 déc. 1944 déterminant les attributions de l'office des biens et intérêts privés; — Vu l'ordonnance du 12 nov. 1945 relative à la dévolution de certains biens meubles récupérés après l'État à la suite d'actes de pillage commis par l'ennemi; — Vu l'arrêté du 12 avr. 1916 relatif à la déclaration de certaines catégories de biens et valeurs mobilières par l'ennemi au pays sur le territoire français; — Vu les ordonnances du 21 avr. et de 9 juin 1915 portant application de l'ordonnance du 12 nov. 1915 sur la nullité des actes de spoliation accomplis par l'ennemi; — Vu le décret du 21 mai et 26 juill. 1946 relatif à l'application des biens spoliés ou titres de crédit sur le territoire national par l'ennemi; — Vu la loi du 24 août 1946 ratant les sociétés nationales, la charge de la liquidation du matériel dit « ennemi » compte pour l'État; — Décrète :

Art. 1er. Le délai fixé par l'art. 1er de l'arrêté du 16 avr. 1946, pour la déclaration à l'office des biens et intérêts privés, de certaines catégories de biens enlevés par l'ennemi sur le territoire français, qui a été prorogé par l'arrêté du 13 août 1916, est de nouveau prorogé et expirera deux mois après la date de la publication du présent décret.

Ne seront pas recevables les déclarations déposées après cette date.

Art. 2. La restitution des biens spoliés, retrouvés hors du territoire national et rapatriés, est effectuée au profit des biens et intérêts privés aux ayants droit qui ont déposé une déclaration régulière dans le délai ci-dessus fixé.

Cette restitution sera faite sans préjudice de toute décision judiciaire rendue en application des textes relatifs aux spoliations.

Art. 3. Sont remis en possession les propriétaires dûment identifiés des biens rapatriés, dès lors qu'ils justifient avoir été dépossédés par contrainte.

Art. 4. Sont également remis en possession les propriétaires de biens acquis par l'ennemi en vertu de contrats d'apparence légale, s'il appert qu'ils ont subi une contrainte et qu'un préjudice direct leur a été causé.

Art. 5. Si l'acquisition des biens visés à l'article précédent a été faite moyennant le payement d'un juste prix, la remise en possession au propriétaire n'est effectuée qu'après avis favorable donné par une commission interministérielle comprenant des représentants des ministères des affaires étrangères (office des biens et intérêts privés), de la justice, de l'économie nationale, des finances, de la défense nationale, de la production industrielle et, éventuellement, de tout autre ministère intéressé.

Art. 6. En toute hypothèse, la restitution des biens spoliés ne sera considérée comme définitive qu'après versement intégral au Trésor, pour le propriétaire spolié, des sommes qu'il a reçues en payement de ces biens et sans qu'il puisse prétendre à une compensation à quelque titre que ce soit.

Art. 7. La commission ci-dessus visée décide s'il y a lieu de restituer à leur propriétaire les biens qui n'ont pas fait l'objet d'une déclaration de spoliation dans le délai imparti à cet effet.

---

Art. 8. Un propriétaire refuse reprendre possession de ses biens, avis est donné par l'office des biens et intérêts privés au ministère du commerce de la reconstruction et de l'urbanisme (commissariat général aux dommages de guerre).

Art. 9. Les biens dont les propriétaires ont pu être identifiés dans les trois mois qui suivent leur rapatriement, de même que ceux qui n'ont pas été restitués par quelque cause que ce soit, sont remis par l'office des biens et intérêts privés aux organismes compétents, afin d'en assurer la liquidation, sans délai, au profit du Trésor.

Art. 10. Dans le cas où la commission décide de ne pas remettre le propriétaire en possession, les frais que celui-ci justifie avoir exposés pour le rapatriement de ses biens lui sont remboursés dans la limite du produit net de la vente.

Art. 11. Les prescriptions du présent décret ne sont pas applicables aux biens spoliés dans les départements du Haut-Rhin, du Bas-Rhin et de la Moselle, pour lesquels des dispositions réglementaires spéciales sont prévues.

Art. 12. Le garde des sceaux, ministre de la justice, le ministre des affaires étrangères et le ministre des finances sont chargés, etc...

---

## PRESTATIONS FAMILIALES, AL-
LOCATIONS FAMILIALES, CAISSES, COMP-
TABILITÉ.

**Décret n° 47-2106
du 28 octobre 1947,**

*Fixant les règles relatives à la comptabilité des caisses d'allocations familiales (J. O. 31 oct., p. 10838).*

---

## DÉCORATIONS, MÉDAILLE DE LA
FAMILLE FRANÇAISE, RÉGIME.

**Décret n° 47-2103
du 22 octobre 1947,**

*Réformant le régime de la médaille de la famille française (J. O. 31 oct., p. 10840).*

---

## MINISTÈRES, SECRÉTAIRES D'ÉTAT,
NOMINATION.

**Décret du 31 octobre 1947,**

*Portant nomination de membres du Gouvernement (J. O. 1er nov., p. 10862).*

---

## MINISTÈRES, FORCES ARMÉES, MI-
NISTRE, ATTRIBUTIONS.

**Décret n° 47-2110
du 31 octobre 1947,**

*Relatif aux attributions du ministre des forces armées (J. O. 1er nov., p. 10865; N., J. O. 4 nov., p. 10002).*

---

## TERRITOIRES D'OUTRE - MER,
AFRIQUE OCCIDENTALE, TAXES, PLUS-
VALUES DES TERRAINS.

**Décret du 20 octobre 1947,**

*Rapportant le décret n° 47-446 du 12 mars 1947 approuvant l'arrêté du gouverneur général de l'Afrique occidentale française instituant dans le territoire une taxe sur la plus-value des terrains bâtis ou non bâtis (J. O. 1er nov., p. 10871).*



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

DOCKETED

SEP 1 3 2004

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

---

**Plaintiff(s):** MARILYNN D. ALSDORF

County of Residence: COOK

Plaintiff's Atty: David M. Rownd
FagelHaber LLC
55 E. Monroe; 40th Floor
(312) 346-7500

**Defendant(s):** THOMAS C. BENNIGSON

County of Residence: ALAMEDA

Defendant's Atty:

---

II. Basis of Jurisdiction: **4. Diversity (complete item III)**

**04C 5953**

III. Citizenship of Principal Parties
**(Diversity Cases Only)**

Plaintiff:-**1 Citizen of This State**
Defendant:-**2 Citizen of Another State**

**JUDGE COAR**

**MAGISTRATE JUDGE ASHMAN**

IV. Origin : **1. Original Proceeding**

V. Nature of Suit: **890** Quiet Title to Personal Property

VI.Cause of Action: **28 U.S.C. §§1655 and 2201 for Declaratory Judgment to Quiet Title in relation to the ownership of a painting by Pablo Picasso known as "Femme en Blanc"**

VII. Requested in Complaint
Class Action:
Dollar Demand:
Jury Demand:**No**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature:

Date: 9/10/04

FILED FOR DOCKETING
04 SEP 10 PM 3:38
CLERK
U.S. DISTRICT COURT

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.** Revised: 06/28/00

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

In the Matter of:

**MARILYNN D. ALSDORF**

v.

**THOMAS C. BENNIGSON**

**DOCKETED**

SEP 1 3 2004

**04C 5953**
Case Number:

**JUDGE COAR**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

**MARILYNN D. ALSDORF**

MAGISTRATE JUDGE ASHMAN

| (A) | | (B) | |
|---|---|---|---|
| SIGNATURE | | SIGNATURE | |
| NAME | Richard H. Chapman | NAME | David M. Rownd |
| FIRM | FagelHaber LLC | FIRM | FagelHaber LLC |
| STREET ADDRESS | 55 E. Monroe, 40th Floor | STREET ADDRESS | 55 E. Monroe, 40th Floor |
| CITY/STATE/ZIP | Chicago, Illinois 60603 | CITY/STATE/ZIP | Chicago, Illinois 60603 |
| TELEPHONE NUMBER 312/346-7500 | FAX NUMBER 312/580-2201 | TELEPHONE NUMBER 312/346-7500 | FAX NUMBER 312/580-2201 |
| E-MAIL ADDRESS | | E-MAIL ADDRESS | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06183021 | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6207931 | |
| MEMBER OF TRIAL BAR? YES X NO | | MEMBER OF TRIAL BAR? YES X NO | |
| TRIAL ATTORNEY? YES X NO | | TRIAL ATTORNEY? YES X NO | |
| DESIGNATED AS LOCAL COUNSEL? YES X NO | | DESIGNATED AS LOCAL COUNSEL? YES X NO | |
| (C) | | (D) | |
| SIGNATURE | | SIGNATURE | |
| NAME | Beth Hansher | NAME | James L. Oakley |
| FIRM | FagelHaber LLC | FIRM | FagelHaber LLC |
| STREET ADDRESS | 55 E. Monroe, 40th Floor | STREET ADDRESS | 55 E. Monroe, 40th Floor |
| CITY/STATE/ZIP | Chicago, Illinois 60603 | CITY/STATE/ZIP | Chicago, Illinois 60603 |
| TELEPHONE NUMBER 312/346-7500 | FAX NUMBER 312/580-2201 | TELEPHONE NUMBER (312) 346-7500 | FAX NUMBER (312) 580-2201 |
| E-MAIL ADDRESS | | E-MAIL ADDRESS | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06272352 | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6280737 | |
| MEMBER OF TRIAL BAR? YES NO X | | MEMBER OF TRIAL BAR? YES NO X | |
| TRIAL ATTORNEY? YES NO | | TRIAL ATTORNEY? YES NO | |
| DESIGNATED AS LOCAL COUNSEL? YES X NO | | DESIGNATED AS LOCAL COUNSEL? YES X NO | |

